UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| MATTHEW LAROSIERE, Plaintiff, | CASE NO.: 6:24-cv-01629 |
| v. | |
| CODY RUTLEDGE WILSON, DEFCAD, Inc., DEFENSE DISTRIBUTED, and DIOSKOUROI, LLC., Defendants. | |

VIDEO DEPOSITION OF CODY WILSON

TAKEN BY: PLAINTIFFS HEREIN

DATE: Tuesday, March 17, 2026

TIME: 9:00 a.m. to 12 p.m.
1:00 p.m. to 6:15 p.m.

PLACE: Wilson Elser
2063 Main Street
Suite 100
Sarasota, Florida 34237

REPORTED BY: KARIN J. STRAUSS, Court Reporter
Notary Public
State of Florida at Large

A-P-P-E-A-R-A-N-C-E-S

Appeared on Behalf of Plaintiff:

ZACHARY Z. ZERMAY, Esquire
Zermay Law, P.A.
1200 Fourth Street
#1102
Key West, Florida 33040

Appearing on Behalf of Defendants:

JURA CHRISTINE ZIBAS, Esquire
AMARIS GYEBI, Esquire
Wilson Elser
2063 Main Street
Suite 100
Sarasota, Florida 43237

ALSO PRESENT: Matthew Larosiere, Esquire
Brett Johnston, Videographer

VIDEO DEPOSITION OF: CODY WILSON

I N D E X


| Examination | Page |
|---|---|
| Direct, by Mr. Zermay | 5 |


E X H I B I T S


| Number | Description | Marked |
|---|---|---|
| Plaintiff's 1 | Defendant's Second Amended Amended Answer with Counterclaims | 45 |
| Plaintiff's 2 | Plaintiff's First Amended Complaint | 48 |
| Plaintiff's 3 | DEFCAD.com 25 pages of Images | 96 |
| Plaintiff's 4 | 17 pgs of Photographs | 111 |
| Plaintiff's 5 | 46 pgs Deposition Exhibit (Misc) | 133 |
| Plaintiff's 6 | Black Flag White Paper 10 pgs | 145 |
| Plaintiff's 7 | 7 pgs of Exhibit K | 205 |
| Plaintiff's 8 | 15 pgs Terms of Service | 217 |
| Plaintiff's 9 | Cody Wilson's Objections and Responses to John Elik's Request For Interrogatories to C. Wilson | 240 |

P R O C E E D I N G S

VIDEOGRAPHER FULLER: The date is March 10, 2026. This is the video deposition of David J. Abbey, Esquire,

P R O C E E D I N G S

THE VIDEOGRAPHER: We're now on the record. The today's date is Tuesday, March 17, 2026. The time is 9:06 a.m.

This is the video deposition of Cody Wilson taken in the matter of Matthew Larosiere versus Cody Rutledge Wilson.

This deposition is being conducted at 2063 Main Street, Suite 100, Sarasota, Florida.

The court reporter to Karin Strauss. A videographer is Brett Johnston.

Will counsel please announce their appearances for the record, after which the court reporter will swear in the witness.

MR. ZERMAY: Yes, good morning. Attorney Zachary Zermay here for Plaintiff, Matthew Larosiere.

MS. ZIBAS: Jura Zebas of Wilson Elser for Defendant DEFCAD, Defense Distributor, and Cody Wilson for Cody Wilson's deposition

individually today.

MS. GYEBI: Amaris Gyebi for Defendant Wilson, DEFACD, and Defense Distributed. Also here for the deposition of Cody Wilson, individually.

MS. ZIBAS: There's another individual in the room who needs to identify himself.

MR. LAROSIERE: Plaintiff Matthew Larosiere.

THE COURT REPORTER: All right. Sir, would you raise your right hand, please.

THE DEPONENT: (Indicating.)

THE COURT REPORTER: Do you solemnly swear or affirm that the testimony that you're about to give will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT: I do.

THE COURT REPORTER: Thank you.

MR. ZERMAY: Okay.

MS. ZIBAS: I want to make a statement for the record before we proceed.

As there is no Protective Order in place, since Plaintiff and his Counsel indicated. There will be no streaming or use of any ongoing video during the course of this

deposition.

We want to make a statement we do not agree. And we do not permit any streaming, any posting to the internet or anything during the course of this deposition. If there's any issues, we will raise them with the court accordingly.

(WHEREUPON, CODY WILSON, being previously duly sworn by the court reporter testified as follows:)

DIRECT EXAMINATION

BY MR. ZERMAY:

Q Okay. So we're on the record now. Good morning, Mr. Wilson.

A Good morning.

Q I'm Zachary Zermay, representing Matthew Larosiere in this action.

So a question: Have you ever been deposed before?

A I think this is my first time.

Q Okay. So I'm glad I asked. There's some rules to depositions that which, you know, I want to go over.

This is -- well, first off, you're sworn in by the court reporter here, which means that your testimony now is under penalty of

perjury, which is legal speaking for you have to tell the truth.

Do you understand that you have to tell the truth, just as if you were in a courtroom?

A I do.

Q Okay. Awesome.

So with that being said, because you're under oath, we want your answers to be truthful and complete. Do you understand that?

A I understand that.

Q Okay. So because we're on the record and the court reporter is taking a transcription of everything that's being said here, it's important that we get clear answers. With being said, what I mean by clear answers is I mean vocalized. And during the ordinary common parlance of conversations if I say, like, you know, do you something, and you might say uh-huh or huh-uh, being uh-huh meaning the intonation of the voice meaning yeah, I do understand or meaning huh-huh, meaning no -- the problem with that, at least on record transcriptions, is that it doesn't come out very well. It just comes out as grunts or, you know, nah.

So you're doing a good job right now

saying yes or no to understanding that questions. And I'd ask for you to keep vocalizing your responses, even if I understand the answer. It's just for taking the deposition transcript down, so we want the responses to be clear.

Do you understand that?

A I understand.

Q Okay. And so if you answer a question I'll assume that you understood the question.

So if you don't understand a question I'm asking, please say I don't understand it, because we don't want any misstatements on the record, particularly if the answer isn't clear.

And if you need a break at any time please let us know, we'll try to accommodate that. The only thing I ask of you is that you finish answering the question, if there's a question pending.

So if I say, like, you know, what color is the sky today, and you say I'd like a break, I'd ask for you to give an answer to the question before we go ahead and take the break. No problem with the break, we just want to make sure that we go ahead and do that.

And your attorneys are here today; Ms.

Zebas and Ms. Gyebi. So she may make objections to some questions I make today. And typically speaking, you know, listen to her advice. She's, you know, your clients or your counsel. I'm not your counsel.

But typically speaking if there's an objection made for the record the objection is preserved. And the only time you shouldn't respond to the question is in the event of attorney/client privilege or if your attorney expressly tells you not to answer the question.

So unless your attorney expressly tells you to not answer the question I ask that you answer the question to the best of your abilities, despite the maintenance of the objection.

Do you understand that?

A I understand.

Q Okay. So do you know the difference between a guess and an estimate?

A I would have to guess.

Q Okay. So let me try to explain the difference conceptually.

So purposes of the deposition today I'm entitled to your best estimate. I'm not trying to get a guess, because a guess could be, you know,

you're just speculating, you know, based upon what you would think the answer would be, but you would have no basis to actually make that.

So, for example, if I ask you how many shoes do you have in your closet? You'd be able to roughly estimate how many shoes you have in your closet. You're aware of how many -- at least conceptually how many pairs you may or may not have.

So that would be an estimate to the best of your abilities, if I say how many shoes do you have in your closet.

Now, if I ask you how many shoes are in my closet? You'd be guessing, because perhaps I only have one pair of shoes. Maybe I only have sandals. You would have no actual basis to be making an estimation about how many or a recitation of how many shoes I have in my closet, because again, you have no firsthand knowledge about that.

Sir, does that clarify the difference between a guess and an estimate?

A Sure.

Q Okay. I didn't hear much confidence in that.

So do you have a desk at your residence or

where you work?
A Yes.
Q Okay. So you have some conception of how large the desk is; right?
A Yes.
Q Okay. So if I ask you how large your desk is, while you might not be able to give me the exact length of the desk, whether it be four feet, five feet, four and a half feet, you'd be able to make a rough estimation, like, I don't know. It's four and a half feet, maybe five feet.
Does that clarify what an estimate would be?
A Yes, it does.
Q Okay. And if I say how big is my desk? Maybe I don't have a desk. That would be a guess about how big the desk would be, because you've never seen it before or even knows that it exists.
So do you understand?
A I understand.
Q Okay. Wonderful. So here's the question that which my insurance carrier will kill me if I don't ask these questions. They sound like they're stupid questions, but, you know, welcome to the

practice of law, right. Sometimes we have to ask these things.

Are you -- have you taken alcohol or any types of medication in the last 24 hours which would impact your testimony today?

A No.

Q Have you ever been found guilty of committing a felony before?

A No.

Q Or ever a crime of dishonesty?

A Would you restate the question?

Q Sure. Have you ever been found guilty of committing a crime of dishonesty?

A No.

Q Okay. So those are, I guess, the end of the -- I have to ask these questions for insurance purposes.

So I know this maybe sounds repetitive, but could you please state your full legal name and spell it for the record?

A I can. Would you like me to state my full name for the record?

MS. ZIBAS: Uh-huh.

THE DEPONENT: It's Cody Rutledge Wilson.

Is there more to my name that you want me to

state?

BY MR. ZERMAY:

Q Yeah. Could you spell it?

A My name is spelled C-O-D-Y, R-U-T-L-E-D-G-E, W-I-L-S-O-N.

Q Okay. Have you ever used any other names?

A Could you restate your question?

Q By any other names, like, did you go by any other name in your life?

MS. ZIBAS: Objection to form.

THE DEPONENT: Okay. I don't really -- I don't understand how to answer the question?

BY MR. ZERMAY:

Q Have you been known by any other name other than Cody Rutledge Wilson?

A I don't believe so.

Q Okay. Have you ever legally changed your name?

A No.

Q Have you signed any documents under names other than Cody Rutledge Wilson?

A I don't believe so.

Q So what is your address which you live?

A 8403 Cross Park Drive, Suite 3E, Austin, Texas, 78754.

Q Okay. Is that -- do you have a driver's license?
A I do.
Q Is that the address on the driver's license?
A It is.
Q Okay. So I guess I'll just jump right into it.
So you testified earlier that you haven't used any other names other than Cody Wilson. Could you please list any student names or screen names, handles or account names which you've previously used?
MS. ZIBAS: Objection as to form. Clarification of legal versus web internet use.
THE DEPONENT: To answer your question, yes, I could list any.
BY MR. ZERMAY:
Q Okay. Could you?
A Yes. In this situation I'm not understanding how to proceed, like, the question is could I list them? I believe I could list them.
Q Can you list them?
A Yes.
Q What are they?

A You say any screen names, is that what I heard?

Q Yes.

A Radomysisky is a Twitter name.

THE COURT REPORTER: Oh, boy.

THE DEPONENT: I could help you with that. Would you like me to help you with it now?

THE COURT REPORTER: Yes.

THE DEPONENT: R-A-D-O-M-Y-S-I-S-K-y.

Many variations of Russian figures from the Russian Revolution, namely Zinoviev, Grigory Zinoviev. It starts with a Z-I-N-O-V-I-E-V, and alternate spellings of that name often those starting with Z-E instead of Z-I. I guess that counts as any, doesn't it?

BY MR. ZERMAY:

Q Any other names?

A I'm sure that there have been other names online, yes.

Q What are they?

A Let me think. I can recall -- no, my title name, James Fannin; James Fannin, F-A-N-N-I-N.

Q What is the context of that user name? Is it a Twitter handle; what is it for?

MS. ZIBAS: Objection to form.

THE DEPONENT: Could you restate your question?

BY MR. ZERMAY:

Q Sure.

What is that screen name used for?

A It's a screen name I've used to communicate with. That's my answer.

Q What have you used it to communicate with?

A James Fannin has been my signal screen name, I believe. I think that's it.

Q What is Signal?

A Signal is a messaging application.

Q Do you use Signal to communicate in your personal life?

A No.

Q Do you use Signal to communicate in your business life?

A I do.

Q How often do you use Signal?

A Often. Probably every day.

Q Who do you communicate with using Signal?

A Any potential or former business connections, associates.

Q Can you list them?

A I could not list them all, no.
Q Well, could you list the ones that which you can remember?
A I could. It would be very difficult.
Q Please list them.
A I can't represent that I could list them all. I'd like to be clear about that.
Q Okay. What's the ones you can remember, to the best of your ability?
A On Signal I list and I message people connected to business projects, you know, the firearms industry, certain journalists, certain media people. Let's see, some employees of my company, contractors of my company.
Q So when I ask "who," I'm asking who specifically, like, the personal names of the people which you're communicating with. Does that clarify the question?
A Yes.
Q Could you list the specific names of those people that which you're communicating with using Signal?
A I communicate with Pablo Diaz on Signal. I communicate in a number of group chats that post many, many people, including the employees of my

company. Those employees include Steven Schefeld. They include Garret Walliman. They include -- you just need to give me a moment.

There's many group chats where I don't necessarily recall everyone's names, but I could characterize them or I could tell you where I've met them, for example. It's difficult to summon names, but in general people who had a connection to me or need a secure connection to me. Sometimes people overseas or people who work in defense, the defense industrial or security projects.

Q So you mentioned journalists. Specifically which journalists have you communicated with using the Signal application?

A Andy Greenberg from the Wire, the most frequent, most recent contact. Jacob Siegel from the Tablet Magazine. You can count Courtesy Arvin. He's not necessarily an a journalist. Andrew Beck. And there's going to be a lot of a journalist's names that I want at the top of my mind that I can't summon.

Q So you can't remember those names at the present moment; is that your testimony?

A No.

Q Would you be able to get the names of

those journalists that which you're communicating with on Signal and produce that to us at a later date?

A I'm sure that I could.

Q Okay. You mentioned that you were speaking with other business people that which you couldn't remember whether they'd be employees or --

A I don't recall that being my testimony.

Q Okay. Well, you testified that you communicate with business people on Signal, on the Signal application; right?

A Yes.

Q What are the specific names of those people?

A Business people on Signal? It's difficult to arrive at their names. I'd like to give a name. I don't know. Maybe this is like performance anxiety. It's difficult to surface a name at the moment.

Q So you cannot remember the name of the business people that which you communicate with using the Signal application at this time?

A That's not my testimony.

Q Okay. So what are the names of those

people that which you communicate on Signal?
A I'm trying to give you a name.
Q Why are you unable to give me a name of the business person that which you communicate with over Signal?
A That may be a biological question. I can remember who these people are. It's difficult for me to tell you their names.
Q So you cannot convey orally to me at the present moment the names of those business people that which you communicate with using the Signal application?
A I have shared some of their names already, but every time I arrive at a name I wonder if, in fact, we're communicating on Signal just by iMessage. So I don't want to give false testimony, right, so under the penalty of perjury. And I don't want to guess.
Q That makes sense.
So you mentioned Imessage. So which business people have you communicated with using iMessage?
A Phew, can I have a time frame?
Q Sure. Within the past four years?
A I think I'd be here for seven hours if I

had to list every business person that I've communicated with on iMessage. Maybe you can restate your question? Perhaps I heard it wrong.

Q Well, could you please answer to the best of your ability?

A Yes, but want to hear he question again.

MR. ZERMAY: Madam court reporter, could you please read back the question?

(THEREUPON, the court reporter read back the preceding question.)

MS. ZIBAS: Objection to form. If you can understand the time frame.

THE DEPONENT: Sorry, I just didn't recall that as the question that I was asked. I'll answer that question as best as I'm being asked to.

I believe my answer to that question is no, I can recall. It's difficult for me to summon the name on demand. I think it's more about the demand. It's difficult to surface the name. I'm still trying, though.

BY MR. ZERMAY:

Q So do you have records in your possession, custody or control that which would name those people that you're communicating with on the Signal

application?
A I would expect to have some records in my possession.
Q So could you explain to me the nature of the Signal application particularly related to automatically deleting messages?
MS. ZIBAS: Objection to form.
THE DEPONENT: I don't know anything about the Signal application in that regard.
BY MR. ZERMAY:
Q Well, you use the Signal application; right?
A I do use it.
Q All right. Are you familiar with its interface?
A I'd like to understand the question.
Q Yeah. Are you I'm familiar --
A I'm trying to understand the question.
Q Are you familiar with the Signal application's interface?
A Does this mean the user interface?
Q Yes.
A Like, the presentation of the application?
Q Yeah. How the application works?
A I don't know how it works, but I know how

to use it.
Q Okay. Do you use it with the automatically deleting messages feature?
A No, I don't have that setting.
Q So every single Signal message that you sent is on your Signal application; right?
A I don't know.
Q Do you have the Signal application on your cell phone?
A Yes.
Q Is it your personal cell phone?
A Yes.
Q Could you please describe to me your personal cell phone?
MS. ZIBAS: Objection to form.
THE DEPONENT: I guess the answer is yes, I could describe it.
BY MR. ZERMAY:
Q Will you describe it?
A Yes, I will describe it.
Q Please describe your personal cell phone.
A Is that a question?
Q Yep.
A It doesn't sound like one.
Q What is your personal cell phone's make

and model, design, et cetera?
A I have an iPhone 15. Gosh, that sounds like a guess. I'm truly trying not to guess, though.
Q It's an iPhone?
A I'm really trying not to guess.
Q Is it an iPhone?
A It is an iPhone.
Q Tell me more about it, please.
A Man, is that a question?
Q What are the other features of your cell phone?
A Oh, man, I know that it's an Apple device. I know that it has app store applications. I know that it is wifi enabled.
Q What color is it?
A I'd have to guess. And I want to be clear about that. Since it has a case I don't actually recall the base color of the Iphone.
Q Well, do you have your cell phone with you here today?
A I don't have it on me.
Q Would you be able to find out the color and nature of your cell phone here today?
A I expect that I could do that. I expect

that I could do that.

Q Okay. We'll revisit that after the break.

A Is there a break?

Q There will be at some point.

A A scheduled break?

Q The lunch hour.

Okay. So you testified earlier that you lived at an address. Could you please repeat that address?

A 8403 Cross Park Drive, Suite 3E, Austin, Texas, 78754.

Q Is that also the address of the Defense Distributed's headquarters?

A No, it is not.

Q So without including DEFCAD and Defense Distributed, but including all of your a cryptocurrency assets, roughly how much is your net worth?

MS. ZIBAS: Objection to form.

THE DEPONENT: How much is my net worth? I don't know.

BY MR. ZERMAY:

Q Do you have a rough estimate?

A No.

Q Would you be able to ascertain that

information by looking at records in your possession, custody or control?

A To answer that question I would prefer to ask my CPA.

Q Who is your CPA?

A His name is Jason Tyra (phonetic).

Q What is the address of your CPA?

A I don't know.

Q Do you remember roughly what part of the country your CPA is located in?

A I do.

Q What is that location?

A Texas.

Q What part of Texas?

A I don't recall exactly.

Q Do you have a rough estimate of where in Texas your CPA is located?

A I could make an estimate, yes.

Q What is your estimate?

A I believe he's in the Dallas Metro area.

Q What is your CPA's telephone number?

A I do not recall.

Q Would you be able to get that telephone number from looking at records in your possession, custody, and control?

A Yes, I believe so.

Q So you've verified -- well, you've received copies of Interrogatories directed to DEFCAD; right?

A I believe I did.

Q You verified the Answers to those Interrogatories; correct?

MS. ZIBAS: Objection to form. He's here in his individual capacity. You can answer.

THE DEPONENT: I see. As I understand it I can answer that in my individual capacity?

MR. ZERMAY: Yep.

THE DEPONENT: Although it seems to me, like, I'm not sure if I'm answering a legal question or not. So I don't know if I've verified the DEFCAD Answers in the way that you mean.

BY MR. ZERMAY:

Q Did you sign them?

A Have I signed the DEFCAD Interrogatory Answers?

Q Yes.

A I believe that I signed those Answers.

Q Okay. Did you sign the Interrogatory

Answers for Defense Distributed?

A I believe that I did.

Q Do you understand the -- strike that question. Let me go back a little bit.

What's your highest level of education?

A Does that mean -- well, I can't ask a question. I'm not sure if I understand your question?

Q Okay. Were you a student at any college, law school, high school?

A Yes.

Q Okay. Could you describe to me which high school you went to?

A Yes.

Q What high school did you go to?

A I went to Cabot High School, Cabot, Arkansas.

Q Did you proceed on to college?

A Yes.

Q Where did you go to college?

A I went to the University of Central Arkansas.

Q What was your major, if any?

A My major was in English literature.

Q Any subspecialties?

A Economics.
Q Was that a minor?
A It was.
Q Okay. Did you proceed on to a graduate level program?
A I don't think so.
Q So did you go to law school?
A I did.
Q What is the name of that law school?
A I went to the University of Texas School of Law.
Q That's a good law school. Did you finish your education at that law school?
A Not in the way that you mean.
Q Well, did you receive a Juris Doctor diploma?
A No.
Q Why did you not proceed to get the Juris Doctor degree?
A It's a complicated question. I found a better deal.
Q What do you mean by "a better deal"?
A Let's say something that promised more reward.
Q What was that better deal?

A This is difficult to answer. I was given an opportunity, and it seemed to be both a commercial and legal opportunity better than continuing to receive my education at the University of Texas.
Q Well, what was the opportunity, itself?
A I think it was more than one. I mean, only that it was a different avenue. You know, a kind of secondary career option.
Q Could you describe to me that avenue that which you elected to proceed, instead of continuing with your law school degree?
A Yes, I could describe it.
Q Please, what was that description of that avenue that which you proceeded down from law school?
A In a way I think I have already answered this question, although I'd like to answer, you know, different versions of this question, I just feel like I've already answered the question.
Q Was it an employment opportunity?
A No, it wasn't.
Q What type of opportunity was it?
A I believe I've already answered this question. I found it to be a legal and commercial

opportunity.

Q Was it related to cryptocurrency?

A No, it wasn't.

Q What was it related to?

A It was related to firearms.

Q Okay. What was the nature of that opportunity related to firearms?

MS. ZIBAS: Objection to form.

THE DEPONENT: I'd like to answer the question. Maybe you could restate it for me?

BY MR. ZERMAY:

Q So you just testified that you left law school to pursue an opportunity in firearms. Am I misstating that testimony?

A No.

Q Describe to me what that opportunity involving firearms was, please.

A Does please magically convert a statement to a question? I'm only asking, because we're going to be here for hours. It sounds like it doesn't.

Q I don't think your attorney said anything.

A Remember, there's nonverbal and verbal communications. I don't interpret this as me being instructed not to answer, I'm just waiting for a

question.

Q Well -- so I don't know how else to phrase this in common English? What was --

MS. ZIBAS: Who, what, where, and why. If you use who, what, where, and why, it makes it easier.

BY MR. ZERMAY:

Q What was that opportunity regarding firearms?

A Okay. Okay. Let me help you here. I found the opportunity to challenge the US State Department in court, and I thought it was a rare opportunity. So I took it.

Q How did you challenge the United States State Department in court?

A I sued them in court.

Q What did you sue the United States State Department in court for?

A Well, it was a range of things, but it was styled as and characterized as our First Amendment challenge, a 1983 action.

Q What was the range of challenges that which you sued the United States State Department for a 1983 challenge?

A I'm unable to exactly reproduce it for

you, but I can describe it in general terms.
Q Okay. What are those general terms?
A Yeah. The ITAR as written and as enforced by the US State Department is a content based restriction of speech. That's the main challenge; therefore, a violation of the First Amendment.
Q What was the result of that litigation involving the United States State Department?
A There have been more than one result.
Q What are those results?
A Oh, man. They exist often as settlements in the law, regulations in the Code of Federal Regulations, legal settlements, and some entitlements.
Q Okay. What do you mean by, "settlements in the law"?
A I didn't say that.
MR. ZERMAY: Madam court reporter, could you, please, scroll back and see his testimony?
(THEREUPON, the court reporter, read back the preceding answer.)
THE DEPONENT: The first settlements in the law. I see. When the law has to resolve itself on a question often of first impression,

that's sometimes called a settlement, but it's not the second type of settlement that I mentioned.

BY MR. ZERMAY:

Q Well, what was the nature of the settlement in the law?

A I compare it to other moments of constitutional decision. So this first settlement in the law was that the United States Government consider 3D printed guns to be controlled by the US Department of State. This was not -- this has not been settled a question in the law until this time.

Q What was the result of the settlement in the law?

A The settlement of the law is the result, so I don't know. I'm not sure I understand your question?

Q So you mentioned certain entitlements of the lawsuit with the United States State Department. What is the sort of entitlements in which you claim stem from that lawsuit with the United States State Department?

A One such entitlement was a license to publish.

Q Could you describe to me the license to the publish?
A Yes.
Q What is it the license to publish?
A A license offered from the Department of State to publish without restrictions the files at issue in the lawsuit.
Q So how was that license granted to you?
A It was written. It was issued by the regulatory authority, the Political-Military Bureau of Affairs of the United States State Department.
Q What is the license number that which is attributed to that license?
A I can't recall.
Q Would you have documents in your possession, custody, or control that which would have the license number that you were provided. As a result of the United States State Department?
A I would have to guess. I believe this is a public document, though.
Q So you would have to guess as to whether or not you have it?
A Yeah. I mean it was given to me ten years

ago.

Q Do you still have that license?

A I believe my attorneys have the license.

Q When did you give your attorneys the license?

A They received it.

Q Have you ever seen the license?

A Yeah, I've seen it.

Q What does it look like?

A A legal document. It's got the State Department letterhead and all that stuff.

Q What does the license say?

A I'd have to characterize it, and I would botch it probably. But it has a few provisions. It was negotiated to settle all the claims of our lawsuit.

Q So what right does the license give you?

A That's a tough question. I'm not a lawyer. I don't know if I can answer it correctly.

Q To the best of your knowledge and understanding what does the license grant you to do?

A It's a license to publish.

Q A license to publish what?

A It's not characterized as a license to publish what. It's a license to publish under the framework of the export controls of the United States Government. This is often given to you in exceptional terms.

So they outline a number of things, categories and files that you can publish without a license. So it's a license that means you don't have to have a license.

Q What do you mean by, "A license that means you don't need to have a license"?

A That's me describing the license to you to the best of my ability.

Q Does this license have an expiration date?

A No, that's part of the negotiation; that specifically does not have a term.

Q Does the license mention Matthew Larosiere?

A Not by name.

Q How does it mention Matthew Larosiere?

MS. ZIBAS: Objection to form.

THE DEPONENT: Of course I don't agree that it mentions Matthew Larosiere.

BY MR. ZERMAY:

Q So could you clarify what you meant by, "Not by name"?
A By activity. It mentions forms of activity and categories of files.
Q Does the license mention copyright?
A I don't recall.
Q Would you be able to look at the records in your possession, custody, and control and ascertain whether or not the license mentions copyright?
A If the license is in my possession, custody, and control I could do that.
Q You testified earlier that your lawyers have a copy of the license; right?
A I believe they do.
Q Okay. Which lawyers have a copy of the license?
A My export attorneys certainly, my appellate attorneys. Let's see, I don't think the lawyers in this action have it. Oh, that's not true. Chad Flores.
Q Who is your export attorney that has a copy of that license?
A I have more than one export attorney.
Q What are the names of your export

attorneys?

A Darren Reilly is the first best answer to that question. I'm not going to be able to summon the other expert attorney's name.

Q Would you be able to get -- or be able to get me that name by looking at records in your possession, custody, or control?

A I can give you Matthew Goldstein.

Q What was the name of the first attorney that you mentioned, export attorney?

A Darren Reilly.

Q Do you have his address?

A Yes.

Q What is his address?

A I don't have it at hand verbally, if you will, but I believe I have it in my possession.

Q Okay. Do you have his telephone number?

A Again, I don't recall it. But he's on the internet.

Q Okay. And the second attorney, do you have his address?

A No, he's moved on. Again, I think I could get it, though.

Q Okay. Do you have his telephone number?

A I believe I have a good number for him,

yes.

Q Okay. You mentioned an appellate attorney; right?

A I did.

Q What is the name of the appellate attorney that has the license from the United States State Department that you've previously mentioned?

A Chad Flores is the best first appellate attorney to speak to. I think Josh Blackman's got it, as well.

Q What is Josh Blackman's address?

A I don't know.

Q Would you be able to get a copy of that address by looking at records in your possession, custody or control?

A No.

Q You would not?

A I don't think so.

Q Do you have Jeffrey Blackman's or Jeff Blackman's telephone number?

A His name is Josh Blackman.

Q I have Josh, right.

A I have his telephone number.

Q Okay. What state is he licensed in?

A Texas.

Q Texas. Okay.

So do you think that the license that the United States State Department granted you -- grants you a license to publish copyrighted materials?

A The license is to my company, Defense Distributed.

Q So you don't have a license with the United States State Department?

A I don't recall if it mentions me by name.

Q So is it your understanding that the license grants anybody the right to violate copyright or to publish copyrighted materials?

MS. ZIBAS: Objection. Form.

BY MR. ZERMAY:

Q Let me rephrase.

Do you -- is it your understanding that the license grants any entity the right to publish copyrighted materials?

A No.

Q Is it your understanding that the license grants the entity to which it was addressed the right to publish copyrighted materials?

MS. ZIBAS: Objection to form.

THE DEPONENT: That's not my testimony;

no.

MR. ZERMAY: I'm asking a question?

THE DEPONENT: Is that my understanding? No, that is not my understanding.

BY MR. ZERMAY:

Q So you do not believe that the license from the State Department grants the entity to which it was addressed the right to publish copyrighted materials?

A I believe with this broad construction that, of course, the license permits some copyrighted material to be published which might have otherwise been regulated. It does do that.

Q Do you think that despite the license -- strike that.

Do you think as a result of the license that the entity to which licenses was addressed -- strike that.

Do you think that the license obliviates the need to get a license from the copyright holder before publishing copyrighted materials?

MS. ZIBAS: Objection to form.

THE DEPONENT: I think I understand the question. I don't believe that that license

does what you're asking.

BY MR. ZERMAY:

Q So are you familiar with the Affirmative Defenses that were raised in your Defense in this action?

A I think so.

MR. ZERMAY: Okay. Here's a copy for reference a copy, for the Court reporter, as well.

MS. ZIBAS: I assume you didn't bring any extras?

MR. ZERMAY: We have them.

MS. ZIBAS: So would you like to share one with me or look at Mr. Wilson's first?

The appropriate procedure is to provide a copy for counsel, but that's up to you.

MR. ZERMAY: (Indicating.)

BY MR. ZERMAY:

Q So have you reviewed this document before?

MS. ZIBAS: I'm still looking at it, so he can't look at it yet.

MR. ZERMAY: Okay. Yes, we're going to have you mark it.

THE DEPONENT: This document looks

familiar to me.

BY MR. ZERMAY:

Q Have you seen that document before?

A I've not seen this document before.

MS. ZIBAS: Is anyone marking this for the record?

MR. ZERMAY: Yeah, we are.

MS. ZIBAS: Okay. You just haven't gotten there yet.

MR. ZERMAY: Yeah, we are.

MS. ZIBAS: Are you going to have the court reporter mark it before you ask questions. The court reporter has to mark it.

MR. ZERMAY: We'll mark it as Exhibit 1.

MS. ZIBAS: He has to mark the original, the witness' copy.

THE COURT REPORTER: Yes.

MS. ZIBAS: And whatever nomenclature you want to use, it's up to you. I don't care.

MR. ZERMAY: Yeah, and if you guys have exhibits you guys can put A or something alphabetical.

THE COURT REPORTER: I can do that. I was just trying to save time.

MR. ZERMAY: Okay.

(THEREUPON, the Court Reporter marked Plaintiff's Exhibit 1 for identification.)

BY MR. ZERMAY:

Q Have you reviewed the exhibit?

A Roughly.

Q Okay. Are you familiar with the document?

A I believe so.

Q So I'd like to direct you to paragraph 315.

A All right.

Q Could you read paragraph out loud?

A "Each of Plaintiff Larosiere's claims are defeated by the defense of license, because the United Stated Federal Government, in an exercise of its exclusive authority to administer the Arms Export Control Act of 1976, 22 U.S.C. Chapter 22 and International Trafficking in Arms Regulations, 22 C.F.R. Parts 120-130, in 2018 entered into a Settlement Agreement with Defense and granted Defense Distributed a Federal license to publish the files in question without restriction."

Q Can you rectify your position that the license that you've described previously does not grant the -- does not obliviate a

requirement to obtain a copyright holder's permission before publishing copyrighted materials, and your Affirmative Defense in paragraph 315 of the Answers in Affirmative Defenses?

MS. ZIBAS: Objection to form. Compound.

THE DEPONENT: I see problems with the question, yeah. So --

BY MR. ZERMAY:

Q How do you rectify your position that the entity to which the United States State Department's license was addressed to, and the Affirmative Defense in paragraph 315?

MS. ZIBAS: Objection to form.

THE DEPONENT: Sorry. Try it one more time. I'm trying here.

BY MR. ZERMAY:

Q Okay. So you read paragraph 315; right?

A Yes, yes.

Q How do you understand the Affirmative Defense in paragraph 315?

A It reads like my attorney is saying. We have an affirmative defense license, for among other reasons, an actual license to publish this material. Where the Plaintiff, himself, doesn't even have

one.

Q So --

A I also read the paragraph to not be exclusive to this defense. Of course, the license that I rely on the most in this Affirmative Defense is the Plaintiff's own license implicit and explicit.

Q The Plaintiff's own license?

A Yes. The Plaintiff has notoriously licensed the files at issue in this case.

Q Okay. Could you detail the license that Plaintiff provided?

A Yes.

Q Please detail -- or what is the license that which Plaintiff issued in this case?

A There are more than one license that the Plaintiff has issued in this case, and there are more than one filed.

Q Okay. Well, let's start from -- are you familiar with the works in the issue in this case?

A I am now.

Q What is your understanding of the works at issue in this case?

MS. ZIBAS: Objection to form.

THE DEPONENT: I'd like to answer.

MR. ZERMAY: Okay. You can.

THE DEPONENT: Would you please restate your question?

MR. ZERMAY: She didn't instruct you not to answer.

THE DEPONENT: I understand that. Would you please restate?

BY MR. ZERMAY:

Q Sure.

What is your understanding of the works at issue in this case?

MS. ZIBAS: Objection to form.

THE DEPONENT: Okay. I do not understand the question.

BY MR. ZERMAY:

Q Okay. So you received a copy of the Complaint; correct?

A Yes.

Q Okay. And in the Complaint, particularly paragraphs 106 to 108, and 142 to 144 we listed the Amigo Grande. Are you familiar with that?

A Can I review a document?

MR. ZERMAY: Sure. Maybe we should attach the Complaint as Plaintiff's Exhibit 2.

(THEREUPON, the Court Reporter marked

Plaintiff's Exhibit 2 for identification.)
BY MR. ZERMAY:
Q If I could direct you to paragraph 106 to 108?
A Page 14?
Q Yes.
A Thank you. All right.
Q Could you please read paragraphs 106 to 108?
A Yes.
Q Okay. So let me know when you're done.
A Okay.
Q So when I refer to the Amigo Grande, these are the paragraphs which I'm referring to. When I say Amigo Grande would you understand that to mean the United States Copyright Office, Register No. VA0002381513?
A I understand these infringements to have a number of VA and TX registrations.
Q Okay. So you previously testified that the Plaintiff granted licenses for -- granted licenses that gave rise to your Affirmative Defense in paragraph --
A 315.
Q Yeah, of the Complaint or -- sorry, of

your Second Amended Answer to Counterclaims.

Could you describe to me the license that Plaintiff provided to you for the Amigo Grande?

MS. ZIBAS: Objection to form.

THE DEPONENT: Oh, man. I might be able to describe the license. Could you restate your question?

BY MR. ZERMAY:

Q Yeah.

Please describe the license or -- sorry. What license did Plaintiff provide you for the Amigo Grande?

A Well, Plaintiff provided a public unlimited implicit license and explicit license to download his work.

But I have to say for the record this is not the Plaintiff's work. And I disagree with the characterization of it as Plaintiff's work in these paragraphs.

Q So what language use did Plaintiff use to grant the license of Amigo Grande?

A When the Plaintiff publically says anyone can download and copy the work, and anyone can download and 3D copy my work.

This is under the Doctrine of Copyright, a

license for anyone to copy his work.

Q Do you remember or can you recall the wording of the grant of that license?

A I can.

Q What is the wording of the granting of that license?

A He has made this license more than once, and more than once publically.

I can recall a tweet to a member of the United States Congress where he invites the entire public to download his work and copy it.

And I can recall a statement he made to the press, this was 3Dprintindustry.com. I actually told that journalist. I said call Matthew Larosiere who will license the work to you, as well.

And he did. And he said anyone can download the work for free, anyone can 3D print the work for free. I would never restrict that, he said.

Q And that's the license that Plaintiff granted, as to the Amigo Grande; is that --

A I don't believe that Plaintiff owns the Amigo Grande. But whatever Plaintiff does own, he clearly has licensed.

Q Okay. So do you have a copy of a written

license to you as to the Amigo Grande?

A I have copies of the Plaintiff's public statements, which are broad public licenses. Yes, I have copies of these licenses in writing.

Q When did he give you those licenses to publish the Amigo Grande?

A Gosh, the Plaintiff has been licensing his work this way since 2021. I guess the first time he did it was four or five times in 2021. I have licenses from '23, '24, and maybe the year of '25.

Q Okay. Does the license expressly name you in it?

A Does Plaintiff's license expressly name me? No.

Q Does the Plaintiff's license of Amigo Grande expressly name DEFCAD?

A Plaintiff's license uses the word "anyone." I believe that I and DEFCAD would be included in that word.

MR. ZERMAY: I'm sorry, madam court reporter, could you read back the question?

(THEREUPON, the court reporter read back the preceding question.)

THE DEPONENT: The Plaintiff doesn't have

an express license of Amigo Grande, as this question is styled.
BY MR. ZERMAY:
Q I don't want to misstate your testimony, but I'm concerned that the response is not responsive.
MS. ZIBAS: Ask another question and he'll be able to clear it up.
BY MR. ZERMAY:
Q So you do not have in your possession, custody or control a document that licenses the Amigo Grande expressly to you; right?
A I have written documents, the Plaintiff's license of his work that we have provided to you in discovery. And this is the closest thing to what you're asking that I have.
Q So you do not have a license as to the Amigo Grande expressly giving you the right to publish it; is that correct?
MS. ZIBAS: Objection to form.
THE DEPONENT: As to the Amigo Grande I have licenses from the creator of the Amigo Grande and the actual owner maybe, but not the Plaintiff, who doesn't own the work.
BY MR. ZERMAY:

Q Okay. So as to Amigo Grande you do not have an express license for DEFCAD to publish that work?

A I'm not saying that. I believe we do. I believe John Elik licensed Amigo Grande to DEFCAD to publish. I believe he has done that. I believe the Plaintiff has that document in his possession, custody and control. And so I don't need to give it to you, because you have it.

Q Who is Johnny?

A John Elik.

Q I think you said Johnny. But if you hadn't --

A I said John Elik. If it's time to correct, correct.

Q Who is John Elik?

A John Elik is the creator of most authoritative issues in this case.

Q Okay. Do you have his -- could you describe to me John Elik?

A I could. It's been a while since I've seen him. I don't know if my description would be accurate.

Q Okay. Could you describe him, to the best of your knowledge?

A Yes.
Q Okay. What is the description of John Elik that you currently have in your mind's eye?
MS. ZIBAS: Objection to form.
THE DEPONENT: Okay. John Elik is a white guy, maybe 25. Another description of John Elik? I think he's tall. I recall him being tall.
MR. ZERMAY: Okay.
THE DEPONENT: I see his hands a lot. His hands are on the video. I can describe his hands.
BY MR. ZERMAY:
Q Okay. Is that the best of your ability to describe John Elik?
A I'm sure I could do better.
Q What is your opinion of John Elik?
A Well, I think -- I don't think he's very honest, but maybe I'm being too charitable.
Q What do you mean by he's not honest?
A For example, he believes very strongly that he owns the works at issue in this case, but didn't want to bring a lawsuit about it, and decided to launder that desire through his friend and attorney.

Q Why would he do it?
A I know, it seems very risky. You know, there's a lot of fraud involved upon the copyright office and the court.
I think he did it because he didn't think he would get to this degree of investigation and discovery. I think he was probably promised by his attorney that it wouldn't turn out bad if he did it.
Q Could you describe the nature of the fraud that you believe occurred in this case?
A Yes.
Q Okay. What is the nature of the fraud that occurred in this case?
MS. ZIBAS: Objection to form.
THE DEPONENT: Maybe we can go piece by piece.
BY MR. ZERMAY:
Q Okay. So what do you mean by "fraud"?
A The representations in this Complaint, for example, are based upon fraudulent representations of ownership, for example.
Q What do you think is untrue about the representation of ownership of the Amigo Grande in this case?

A About the Amigo Grande?
Q Yes.
A That the Plaintiff owns it, and that it was produced under a work for hire agreement and/or that it was assigned to the Plaintiff. I don't believe any of it.
Q What is your -- why do you think that?
A Because John Elik represented the works as his own in the year 2022, at the end of the year 2023, and even before the filing of this lawsuit.
Q How did Mr. Elik make those representations?
A Mr. Elik made those representations to representatives of DEFCAD.
Q Okay. How did he make those representations to DEFCAD?
A He licensed the work.
Q What documents do you have that you contend constitutes the license of the work?
MS. ZIBAS: Objection to form.
THE DEPONENT: Okay. Could you restate the question?
BY MR. ZERMAY:
Q Sure.

Which license -- or which documents do you have that you contend John Elik gave DEFCAD that granted the license for the Amigo Grande?

MS. ZIBAS: Objection to form. You can answer.

THE DEPONENT: Okay. John Elik repeatedly licensed the works for publication of DEFCAD Garret Walliman, an employee.

For example, Garret Walliman acted for a time as Mr. Elik's liaison through DEFCAD and publication at DEFCAD.

BY MR. ZERMAY:

Q Did DEFCAD ever obtain a signed document licensing the Amigo Grande from John Elik?

A I don't recall.

Q Would you be able to inspect your records that are in your possession, custody or control to ascertain whether or not John Elik gave a signed document licensing the Amigo Grande to DEFCAD?

A Yes.

Q Have you looked for such a document in this case?

A I've looked for documents signed by John Elik in this case, yes.

Q What was the result of your search for documents signed by John Elik in this case?
A I found our NDA. We signed an NDA when John Elik was pursuing employment with DEFCAD. With that mentioned, there's certain mentions of intellectual property there. That document has some references to intellectual property.
Then there was an agreement that we passed back and forth about his splitting the time of his publications of the works between his platform and our own. But this is not a signed document. It was sent for his signature, he didn't sign it.
Q Okay. So I generally understand what an NDA is, but could you please describe that initialism just for the record?
A I understand an NDA to mean a nondisclosure agreement.
MR. ZERMAY: Let's take a five or ten minute break.
MS. ZIBAS: That's fine.
THE VIDEOGRAPHER: We're going off the record. The time is 10:18.
(THEREUPON, there was a brief recess, after which the following proceedings were had.)
THE VIDEOGRAPHER: We're back on the

record. The time is 10:33. This is beginning of the Media Unit Number Two.

BY MR. ZERMAY:

Q Welcome back everyone.

Mr. Wilson, you understand you're still under oath?

A Yes.

Q Wonderful. So before we went off the record we were talking about the Amigo Grande. I just want to ask some follow-up questions about the Amigo Grande before we move onto the next ones.

So do you have any signed written document that licensed the Amigo Grande for Defense Distributed?

A I don't believe so.

Q And do you have a signed written document licensing the Amigo Grande for Dioskouroi?

A I don't have that.

Q Okay. Before we go onto the other copyright infringements there are some other entities that are listed in the Complaint as Defendants. The three of them being: DEFCAD, Defense Distributed, and Dioskouroi. Are you familiar with those entities?

A Yes.

Q Okay. Could you describe to me the structure of DEFCAD?

MS. ZIBAS: Objection to form.

THE DEPONENT: Could you clarify your question?

BY MR. ZERMAY:

Q Sure.

So typically speaking with corporations there's, like, a president, CEO, CFO, corporate officers. There may be affiliates, affiliate companies, parent companies.

Are you familiar with those concepts?

A In general I believe I'm familiar.

Q Okay. So are you aware of DEFCAD's corporate structure?

A Yes.

Q What is that corporate structure?

A I believe it has been dissolved legally. I don't know that that has a corporate structure currently.

Q What was its corporate structure between the years 2021 and 2025?

A I think the answer changes in that time frame.

Q What was its corporate structure in 2021?

A It was a corporation. Damn, I'm getting close to guessing and I don't want to guess. But I know it was registered as a corporation.
Q What state was it incorporated in?
A In the year 2021 DEFCAD was incorporated in the State of Arkansas.
Q Did DEFCAD have any affiliates in 2021?
A I don't understand the question?
Q So an affiliate -- what I mean by affiliated, I mean by related corporations.
A I do not recall the PIR's kind of reporting of affiliates. I just don't recall from 2021.
Q When you use the acronym PIR what do you mean?
A I mean Public Information Report.
Q Did DEFCAD have any parent company in 2021?
A At this time I don't recall that legal designation.
Q So by -- do you understand what I mean by parent company?
A I might be assuming.
Q So by parent company I mean the shares of the corporation being owned by another corporation.

A Okay.
Q So with that understanding do you now know what I mean by "parent company"?
A I know what you mean by it.
Q Okay. In 2021 did DEFCAD have a parent company?
A I don't remember.
Q Would you be able to find out by inspecting records in your possession, custody or control?
A I believe so.
Q Okay. In 2021 did DEFCAD make any money?
A I don't recall.
Q Would you be able to find out if DEFCAD made any money by inspecting records in your possession, custody or control?
A I don't think I understand the question, in all honesty. Perhaps you could define, "Make any money."
Q Sure. Do you know what money is?
A I think so.
Q Okay. So by money I would mean things of value that which the United States Government designates as legal currency. Do you understand what United States legal currency is?

A I think so.
Q In common parlance it's the dollar, the United States dollar.
Did DEFCAD make any United States dollars in the year 2021?
MS. ZIBAS: Objection to form. He's here as an individual. He's only answering in his individual capacity.
THE DEPONENT: In my individual capacity I don't have firsthand knowledge of that.
BY MR. ZERMAY:
Q Do you have knowledge in your mind's eye regarding that?
MS. ZIBAS: Objection to form.
THE DEPONENT: I understand the metaphor, but no, I'm not visualizing anything.
BY MR. ZERMAY:
Q Did you ever see with your eyeballs any documents that would show whether or not DEFCAD made any money?
MS. ZIBAS: Objection to form.
THE DEPONENT: Is the question -- is this -- should I be thinking in the year 2021?
MR. ZERMAY: Yep.
THE DEPONENT: I'm sorry, I just don't --

I don't recall.
BY MR. ZERMAY:
Q So you don't recall if you've seen any documents with your own eyes as to whether DEFCAD made any money for the year 2021?
A Yeah.
Q Would you be able to inspect records in your possession, custody or control to ascertain whether or not DEFCAD made money in the year 2021?
A I'm not sure if such records exist.
Q Who would know whether or not such records existed?
A 2021? I would have to guess. If I guess, perhaps my CPA.
Q Okay. And the CPA you previously mentioned earlier in the deposition?
A Yes.
Q Okay. So for the year 2022 are you -- do you know whether DEFCAD made any money in the year 2022?
MS. ZIBAS: Objection to form.
THE DEPONENT: Money? I don't believe DEFCAD made any money in 2022.
BY MR. ZERMAY:
Q What is the factual basis for your

contention that DEFCAD did not make any money in the year 2022?

MS. ZIBAS: Objection to form.

THE DEPONENT: A factual basis? I'm uncomfortable here having to I think assume what you mean by your question. Perhaps we could break it into its elements?

BY MR. ZERMAY:

Q Sure.

Did you see any documents which show what, if any, money DEFCAD made in the year 2022?

A I just don't think so. I don't think so.

Q Does DEFCAD have a bank account?

A No, it doesn't.

Q Did DEFCAD have a bank account in the year 2022?

A I believe it did.

Q Do you recall which bank DEFCAD had an account with in 2022?

A Yes.

Q What bank did DEFCAD have an account with in 2022?

A Wells Fargo Bank.

Q Did DEFCAD have a Wells Fargo bank account in 2021?

A I don't recall.
Q Would you be able to find whether or not DEFCAD had a bank account in 2021 by looking at records in your possession, custody or control?
A I don't think -- I don't know that I could.
Q Did DEFCAD have any other bank accounts in the year 2022?
A Not that I recall.
Q Would you be able to inspect your records that are in your possession, custody or control to ascertain whether or not DEFCAD had another bank account in the year 2022?
MS. ZIBAS: Objection to form.
THE DEPONENT: Okay. As I understand the question I could inspect my records.
BY MR. ZERMAY:
Q Did DEFCAD have any accounts with a cryptocurrency brokerage in the year 2021?
A No.
Q And do you understand what I mean by the term "cryptocurrency brokerage"?
A Right. I was assuming. Could you

explain?

Q Sure.

It would be a website or organization that which you could either purchase cryptocurrency on or transfer cryptocurrency on, including but not limited to Hot Wallet or Cold Wallets?

A That's a good definition. I don't believe DEFCAD had such an account.

Q Okay. What about in 2022?

MS. ZIBAS: Objection to form.

THE DEPONENT: Could you restate the question?

BY MR. ZERMAY:

Q Sure.

Did DEFCAD have an account with a cryptocurrency brokerage, including Coin-base, Binance, MetaMask or other organizations of that nature for the year 2022?

A I don't believe so.

Q Okay. So let's see if we can move this along faster.

What about between the years 2023 and 2025 did DEFCAD have a bank account between the years 2023 and 2025?

A Yes.

Q Okay. What bank did DEFCAD -- sorry, strike that.

What bank or banks did DEFCAD have accounts with between the years 2022 and 2025?

A Wells Fargo Bank.

Q Okay. Did DEFCAD have any accounts with a cryptocurrency brokerage between the years 2023 and 2025?

A No.

Q Did DEFCAD have any parent companies between the years 2023 and 2025?

MS. ZIBAS: Objection to form. Individual capacity answers only.

THE DEPONENT: Maybe you could restate your question?

BY MR. ZERMAY:

Q So are you aware of whether DEFCAD was owned by another entity between the years 2023 and 2025?

A Am I aware? Are we using the same definition of a parent company from before?

Q Yeah.

A Then yes, I'm aware.

Q Was it owned by another entity between the years 2023 and 2025?

A No.

Q Who owned DEFCAD between the years 2023 and 2025?

A I don't believe anyone owned any shares of DEFCAD in that time.

Q So no natural person owned DEFCAD between 2023 and 2025?

A To the best of my knowledge I don't believe any shares were owned or signed.

Q Okay. Between the years 2023 and 2025 have you received anything of value from DEFCAD?

MS. ZIBAS: Objection to form.

THE DEPONENT: I guess again, if we could break this down into parts, I could answer.

BY MR. ZERMAY:

Q Okay. So for the year of 2021 have you received anything of value from DEFCAD?

MS. ZIBAS: Objection to form.

MR. ZERMAY: What's the problem with the form of the question?

MS. ZIBAS: "Anything of value," what does that mean?

BY MR. ZERMAY:

MR. ZERMAY: It could mean --

MS. ZIBAS: Exactly the point. That's why

it's a form objection. He can answer it. I'm just saying that it's a bad question. That's why I'm saying "form."

THE DEPONENT: I would have to assume, I guess, that you mean a few things. Most directly, of course, I think you mean money, but maybe you can tell me.

BY MR. ZERMAY:

Q Yeah. Did you receive any money from DEFCAD in the year 2021?

A I did not, no.

Q Did you receive any cryptocurrency from DEFCAD in 2021?

A No.

Q Are you listed as a corporate officer of DEFCAD?

A Am I currently listed as an officer?

Q In 2021?

A Oh, shit, I don't know. I don't recall. I think not.

Q Would you be able to inspect records in your possession, custody or control to ascertain whether or not you were a corporate officer of DEFCAD for the year 2021?

A Yes, I think I have such records.

Q Okay. For the year 2022 did you receive any United States currency from DEFCAD?

A No, not to my knowledge.

Q For the year 2022 have you received any cryptocurrency from DEFCAD?

A No.

Q For the year 2022 were you listed as a corporate officer of DEFCAD?

A As in 2021, I don't believe so.

Q What about for 2022?

A Sorry. I mean, as in my response to 2021, I believe in 2022 I was not listed as a corporate owner or officer.

Q Okay. For 2023 did you receive any money from DEFCAD?

A I don't recall. I believe no.

Q Would you be able to inspect records in your possession, custody or control and ascertain whether or not you received any money or United States currency from DEFCAD?

A I don't believe I can, so this has been a problem.

Q What problem is there with attaining such records?

A Since I wasn't an owner of DEFCAD it's been difficult to recover all of the financial records of DEFCAD in this period.
Q Who owns or who owned DEFCAD for the year 2021?
A Again, I don't know that anyone had an ownership. I think I understand your question, but I don't want to assume.
Q Who filed Articles of Incorporation for DEFCAD?
A A period like that or are we time bounding this? DEFCAD has been a corporation many times.
Q Who filed the initial Articles of Incorporation for DEFCAD with the Arkansas Secretary of State?
A I think DEFCAD has been registered in Arkansas more than once.
Q Who filed the first Articles of Incorporation with DEFCAD?
A I would have to guess. It may have been a registered agent service who did the filing.
Q Who would have caused any person to file Articles of Incorporation with the Arkansas Secretary of State?
A Who would have caused? Benjamin Denio in

that time period.

Q Who is Benjamin Denio?

A Denio; D-E-N-I-O, yeah. Benjamin Denio is a person from Arkansas who has a connection to DEFCAD and to me.

Q What is Benjamin Denio's connection to DEFCAD?

A He was its initial organizer in Arkansas where he lived.

Q What is Benjamin Denio's connection with you?

A We've known each or for many years. He helped me found Defense Distributed.

Q Okay. Do you know Benjamin Denio's address?

A I do.

Q What is Benjamin Denio's address?

A 22 Bishop Place, Little Rock Arkansas. It may be North Little Rock, Arkansas.

Q So for the years 20 -- so just from 2023 to 2025 did DEFCAD have any affiliates?

MS. ZIBAS: Objection to form.

THE DEPONENT: If you could remind me of the meaning of "affiliate"?

BY MR. ZERMAY:

Q Sure. Companies that which have common ownership interest.
A I'm not sure, and I do not recall if this legal description was used.
Q How is DEFCAD, Defense Distributed, and Dioskouroi connected?
MS. ZIBAS: Objection to form. It assumes facts.
THE DEPONENT: It is a big one. Well, I note that they're connected in this lawsuit, for example. The Plaintiff seems to believe that they're connected, so I can see natural ways that they are connected.
BY MR. ZERMAY:
Q What are those natural ways that they are connected?
A Well, I mean, like, grammatically, right? Like, you're asking me about all three of them?
Q Yeah.
A They are therefore connected.
Q Okay. Could you detail for me in which ways that DEFCAD, Defense Distributed, and Dioskouroi are connected?
MS. ZIBAS: Objection to form.

THE DEPONENT: I could try.
BY MR. ZERMAY:
Q Okay. Please detail -- well, how are they connected?
A I'm not saying that they are.
Q Is it your contention that DEFCAD, Defense Distributed, and Dioskouroi are not connected?
A I'm not saying that, either.
Q Okay. What are you saying?
A I'm responding to the questions in my deposition.
Q Okay. Well, how are they not connected, if they're not connected?
MS. ZIBAS: Objection to form.
THE DEPONENT: If you'll give me a moment I might chew on that.
I don't believe Dioskouroi has any connection to the companies being sued in this case.
BY MR. ZERMAY:
Q Are there any contracts between Defense Distributed and DEFCAD?
A Hum? At this time I would have to examine my records.
Q Between the years 2021 and 2025 were there

any contracts between DEFCAD and Defense Distributed?

A I can't say for certain.

Q Would you be able to inspect records in your possession, custody, and control to ascertain whether or not there were contracts between Defense Distributed and DEFCAD between the years 2021 and 2025?

MS. ZIBAS: Just do you want to clarify? You're asking him, like, with the corporate records or individual's records or both?

MR. ZERMAY: Just records.

MS. ZIBAS: Well, that's what I'm saying. Do you mean individual or corporate? You have an individual and then you have corporate. So if it's both, that's fine. Just clarify.

BY MR. ZERMAY:

Q Either/or?

A Well, for my benefit could you restate the question?

MR. ZERMAY: Madam court reporter, could you please restate the question?

(THEREUPON, the court reporter read back the preceding question.)

THE DEPONENT: And that was the question,

you included all three?
MS. ZIBAS: Objection to compound. Form.
THE DEPONENT: I could make a diligent honest search of my personal records to see if there was such a document.
BY MR. ZERMAY:
Q When do you think you'll be able to do that by?
A That's a good question. A lot of deadlines, but I would endeavor to do it before the close of discovery for the benefit of the Plaintiff.
Q Okay. So do you recall signing responses to John Elik's Interrogatories?
A In this case?
Q Yes, in response to John Elik's written discovery?
A Oh, I suppose he was a party in this case, wasn't he?
Q Do you recall that now?
A Could I see the document?
MR. ZERMAY: (Indicating.)
MS. ZIBAS: The Court reporter needs to mark it.
BY MR. ZERMAY:

Q Let me show you a copy, a digital copy of the Interrogatories --
A The Plaintiff is known to fabricate digital records, and I would not feel comfortable reading a digital copy.
Q What is your factual basis that the Plaintiff is known for fabricating digital records?
A Well, my first factual basis is his fabricated digital records that he's provided in discovery.
Q What is the basis for your contention that records have been fabricated in discovery in this case?
A I should probably leave that to my expert to tell you, shouldn't I?
Q Have you retained an expert to ascertain whether or not records have been fabricated in this case?
MS. ZIBAS: Objection to form.
THE DEPONENT: If we have, I'm sure it will be disclosed.
BY MR. ZERMAY:
Q Do you have knowledge of whether or not an expert has been retained in this case to ascertain whether or not anything has been fabricated?

A I don't know.

Q So do you have a factual basis for contending that any documentation has been fabricated by the Plaintiff in discovery in this case?

A Could you restate the question?

Q Sure.

You previously stated that Plaintiff was known to fabricate documents in this case in response to a -- our attempt to show you a digital record. And you stated that -- I'm a paraphrasing here that Plaintiff is known for fabricating digital records in this case.

A Yes.

Q And I asked you what was your factual basis for what is the contention that Plaintiff fabricated records in this case?

MS. ZIBAS: Object to the form. Go ahead, if you can think of any.

THE DEPONENT: The records that he has so far provided in this case have been fabricated.

BY MR. ZERMAY:

Q Why do you think that?

A Any digital native can assess the records that Plaintiff has provided, and the claims that

he's made about them, and determine that they are false.

Q What is a digital native?

A People who are comfortable with the internet, the applications that are on the internet in editing suites like Photoshop and Adobe.

Q Okay.

A You don't want me to describe more about the documents?

Q You can describe more. Go on. Can you please describe more?

A Is that a question?

Q What else can you describe that which would constitute the basis for your contention that Plaintiff has fabricated records in discovery?

A Plaintiff -- this is a big question. I could describe a lot.

Q What are those descriptions?

A They would be asked to when the documents were made, for example.

Q What is the -- why do you say that the documents that Plaintiff provided were not made at the time that which he has represented them to have been created?

A For example, his supposed employee was

making representations, legal representation that he owned the works years after Plaintiff says that his documents were created. This is good circumstantial evidence how false Plaintiff's claims are.

Q What were those legal representations that Plaintiff's employee made?

A John Elik said he owned the works at issue in this case; that he owned them, and that he would send a list of them to be removed from DEFCAD.

Q What documents are you aware of that Mr. Elik --

A I'm aware of a document that we shared in discovery with you guys where the Plaintiff represented himself as John Elik's attorney, representing himself as John Elik's representative to remove the works from the website.

Q Can you describe those documents to me?

A Yes, I can describe those documents.

Q What is your description of those documents?

A Those documents are records of text messages, electronic messages, Rocket.Chat messages, which the Plaintiff is also known to have destroyed.

Q Okay. I guess what is your factual

basis for saying that Rocket.Chat messages were destroyed?

A Observing their destruction is the first factual basis.

Q When did you observe their destruction?

A In the discovery period in this case. I have observed many forms of their destruction many times.

Q What have you seen being destroyed with your own eyes?

A Hum? Maybe you can restate the question?

Q Sure.

You represented that you've seen Rocket.Chat messages being destroyed. Is that incorrect testimony or recollection of your testimony?

MS. ZIBAS: Objection to form.

THE DEPONENT: I think the difficulty is if you're using that present perfect tense, it can get confusing.

I have seen evidence of documents on Rocket.Chat destroyed in this case.

BY MR. ZERMAY:

Q What is the evidence that you've

seen?

A I've seen messaged conversations. I've seen histories, threads and channels which before existed and were complete, and afterwards were no longer able to be found or in some cases were marked deleted.

Q Do you have those records?

A Not today, not with me.

Q Do you have those records in your possession, custody or control?

A I'm not sure. I think we've provided a fair amount of them in discovery.

Q So you have those records in your possession, custody or control?

A I'm not sure. It's a lot of messages.

Q So you're not aware of --

A I'm saying I've seen them. I have seen them. I've seen them deleted. I've seen the word.

If you're asking, you know, are they on a device that I personally own or something? No, they're not.

Q Are they on a device that you have possession, custody or control of?

A Maybe some of them are. Could we break them down to the types of records that the Plaintiff

has destroyed?

Q Well, sure. What types of records do you contend that Plaintiff has destroyed?

A Well, his communications with Mr. Elik, number one. Let's see, number two, records relating to the creation and transfer -- attempted transfers of the ownership of the files, records related to licensing of the files.

Communications about all of the destruction that have been destroyed, which I think is interesting. Records like that.

Q So you have personal knowledge of these records that were destroyed -- or do you have personal knowledge of these records that were destroyed?

A I have seen some of these records through discovery in this case.

Q Have you preserved those records that you've mentioned?

A I don't think I've preserved them in my personal capacity, I'm afraid to say.

Q Which capacity have you preserved them?

A My legal team has them. I know some of our retained experts have them.

Q Who on your legal team has possession of

these records that you contend were destroyed?
A I would assume everyone, but I would have to assume. We made a significant motion for exfoliation a while back.
Oh, some of these records were made public. That's right. They were on the docket for a time. I think that in that sense they're public records. You can look them up.
Q So if they exist in the form of a public record is it still your contention that they're destroyed?
A Well, they become new records, right, where they show their destruction, and put them on the docket and get -- you know, get the numbers, and they get the four corners. So in a sense they're my documents, like, the picture there in your record. That's my document, that's not yours.
Q Okay. So I went to -- we've discussed the Amigo Grande. We'll keep marching along, at least as to the works at issue.
So what is your understanding of the MP99? That's the end of the question. What's your understanding of the MP99?
A I think I understand the question, but could you point me to a document?

Q Sure. Do you still have the Complaint with you?
A I think so. I have the First Amended Complaint.
Q Okay. Could you please go to paragraph 109 to 113, and let me know when you read those?
A Yes, I'll read them. To 113?
Q Yep.
A All right. I've read them.
Q Okay. So would you understand what I mean if I say the MP99 -- oh, MPP99, sorry.
A Yeah, it's got two P's. I believe I do. You define it as an infringement, meaning a number of types of works within the category.
Q Yes. So it would constitute 63 photographs, the Copyright Registration No. VA0002381513, a 3D model; and VA0002385899, written documentation, and TX000935088.
So if I refer to the MPP99 infringement that's what I'm referring to. Would you understand that?
A I believe you to mean the MPP99 infringement to refer to three sets of the works.
Q Let's see here. Would you also review

paragraphs 145 to 147 in the Complaint?
A Yes.
Q So reading those paragraphs do you understand what I mean by the MPP99 infringement?
A I believe I do.
Q Okay. So have you received any documentation from the Plaintiff granting you the right to publish the works that constitute the MPP99 infringement?
MS. ZIBAS: Objection to form.
THE DEPONENT: As I said earlier in this deposition the Plaintiff has licensed his work and the works of other people that he doesn't own.
He's licensed it very broadly, explicitly and implicitly many times in the public, including in the popular press.
I believe he included this work within his grant of licenses.
BY MR. ZERMAY:
Q So did you publish those works?
A Not in my personal capacity.
Q In what capacity did you publish those works?
MS. ZIBAS: Objection to the form.

THE DEPONENT: I don't agree with the form of the question. I did not publish the works in this case.

BY MR. ZERMAY:

Q Were they published on DEFCAD.com?

MS. ZIBAS: Objection to the form.

MR. ZERMAY: What's the problem with the form?

MS. ZIBAS: "Were they." You're not specific. If you imagine your question out there and the answer, it means nothing. That's all.

BY MR. ZERMAY:

Q Okay. So as to the MPP99 infringement, that being the works which constitute the MPP9 infringement, were those works published on DEFCAD.com?

A I believe at some time they were published on DEFCAD.com.

Q When were they published on DEFCAD.com?

A I don't have personal knowledge of the exact day that they were published on DEFCAD.com.

Q Do you have any knowledge of when they were published on DEFCAD.com?

A I now have knowledge after having been

through discovery.
Q What is that knowledge that you now are aware of?
A The MPP99 works were published some years ago, perhaps 2022. That's my memory, 2022 on DEFCAD, I think.
Q How were they published on DEFCAD in 2022?
A I don't have firsthand knowledge of that.
Q Do you have knowledge, period, on how they constituted or how they got published on DEFCAD.com?
A Do I have knowledge, period? Perhaps we can break it down into parts?
Q Sure.
Have you reviewed any documents with your eyeballs or heard anything with your ears that constituted information concerning publication of the MP99 -- or MPP99 infringement or MPP99 works on DEFCAD.com?
A When it comes to the MPP99 I recall dates. I recall this one being one of the earliest publications.
Q Based on your knowledge what is the rough estimate of when the MPP99 infringement -- or MPP99 works was published on DEFCAD.com?
A Damn, it would have been '21 or '22, in my

personal recollection.
Q Do you know who published the MPP99 infringement on DEFCAD.com?
A Well, the strict answer to your question is DEFCAD published the work.
Q Who caused DEFCAD to publish the work?
MS. ZIBAS: Objection to form. "Who caused."
THE DEPONENT: I think if the question will be "who caused," I don't know that I know the answer.
BY MR. ZERMAY:
Q Did a natural person upload the MPP99 infringement to DEFCAD.com?
A I believe a natural person did upload the work.
Q Do you know who that natural person was that caused the MP99 infringement to be uploaded to DEFCAD.com?
A I don't know.
Q Would you be able to find out who uploaded MPP99 infringement to DEFCAD.com by inspecting records in your possession, custody or control?
A I don't have such records in my possession.

Q Did you look for such records?
A Do you mean at any time in the past have I searched for such records?
Q Yes.
A Yes, I have.
Q How did you search for such records?
A I looked in my personal documents, and I looked in archives, devices that I recall where this search was being made.
Q So were the MPP99 works or MPP99 infringements, were they sold through Ghostguns.com?
A I don't recall.
Q What is Ghostguns.com?
A Ghostguns.com. Ghostguns.com is an E-Commerce website.
Q Who owns ghostguns.com?
A It's a d/b/a of Defense Distributed.
Q What do you mean by d/b/a?
A I mean a registered d/b/a. I mean, it's a trade name. It's a website, yeah.
Q Do you own ghostguns.com?
A No.
Q Who owns ghostguns.com?
A Defense Distributed.
Q What is your association with Defense

Distributed?

MS. ZIBAS: Objection to form.

THE DEPONENT: Maybe we can go more definite?

BY MR. ZERMAY:

Q Sure. Are you an officer of Defense Distributed?

A Yes.

Q What is your title and role at Defense Distributed?

A My title is Director of Defense Distributed, which is also my role.

Q What is the nature of your role?

A My role is executive and administrative.

Q Are you the sole executive officer of DEFCAD?

A Of DEFCAD? No.

Q Are there -- who, if anyone else, is an executive officer of DEFCAD?

A I don't think anyone else is.

Q You just testified that you were not the sole executive officer of DEFCAD?

A That's right. I'm not an officer of DEFCAD. I don't think anyone is.

Q But you just testified that you were the

director of DEFCAD, right?
A No, I testified I was the director of Defense Distributed.
Q Oh. Were you ever an officer of DEFCAD?
A Good question. My personal knowledge I remember listed as a director in a public information report. I'm not sure if that makes me an officer.
Q What was the nature of your role as director of DEFCAD?
A I helped domesticate DEFCAD in Texas.
Q Do you have any other role at DEFCAD besides domestication?
A Not as a corporate officer.
Q What was your role, exclusive of your role as the corporate officer?
A At DEFCAD I set the policies at DEFCAD, many of the legal policies and procedures at DEFCAD.
Q What do you mean by that?
A Gosh, it's big question. It means a lot of things.
Q What are those other things?
A What comes to mind are the export laws and policies. That's usually what's been had be developed at DEFCAD. The Plaintiff has the luxury of not understanding these.

Q Could you provide more detail as to that?
A Yes.
Q What are those details?
A For example, earlier in this deposition we mentioned the lawsuit with the United States Department of State. Part of that lawsuit was about publishing the works at DEFCAD, a website. That website is different from the website that exists now, but some of the policies remain the same.
Q Who asked you to develop those policies?
A Who asked me to develop the policies? I'm afraid I disagree with the framing of the question. I'm not sure that's true that anyone asked me.
Q How did you come about developing those policies?
A Organically.
Q What do you mean by organically?
A I mean the policies were usually in response to a legal situation or decision.
Q Could you describe those legal situations or decisions?
A I could.
Q What are those legal situations or decisions?
A There are very many, and it may be easier

to talk about federal versus state or certain time periods.

Q Sure. Let's start with federal between the years 2021 to 2025?

A Okay.

Q What are those legal situations or decisions between 2021 and 2025?

A The federal situation and situations that affect policy development of DEFCAD refer to the conclusion of export control or form, the modifications of the EAR, the modifications of the ITAR, and certain publications of federal rules, both as proposed rules and final rules.

Okay. So let's just circle back a little bit on -- so Exhibit 3. I think we're on Exhibit 3, so I'm going to pass -- well, here's the copy for you (indicating).

THE COURT REPORTER: I'll mark it.

(THEREUPON, the Court Reporter marked Plaintiff's Exhibit 3 for identification.)

BY MR. ZERMAY:

Q Let me know when you have had an opportunity to review that

A Would you like me to review every page?

Q Yeah. Why don't you be conversant.

A Oh, you've provided dates at the bottom.
MS. ZIBAS: Also an URL at the top.
THE DEPONENT: I know this is on the record, I'm being too quiet. Would you like me to continue to review it?
MR. ZERMAY: Yep, if you could be conversant with the documents.
THE DEPONENT: I think I get the pattern. You're welcome to ask me questions.
BY MR. ZERMAY:
Q Okay. So this is Plaintiff's Exhibit 3. Do you see the first page?
A Yes.
Q That is the -- what is your understanding of what's your understanding on the first page?
A It looks like a copyrighted work to me.
Q Could you describe it to me?
A Yeah. It looks to be a two dimensional image taken from a website. I hope you got permission to use this image?
Q Is the image of a screenshot from DEFCAD.com?
A It is, yes.
Q Is DEFCAD.com owned by DEFCAD?
A I guess not anymore. I'm not sure what

the true legal answer to that question is. I think it might be owned by the State of Texas. I think I may need to call a lawyer.

Q Okay. Was DEFCAD.com owned by DEFCAD?

A You know, I don't really know how to answer that question, I mean. I think -- I don't know that it was.

Q Could you ascertain who owned DEFCAD.com by inspecting records in your possession, custody or control?

A Do you mean the domain or the website?

Q The domain.

A Yes, I could -- well, shit. My own personal records? In my personal capacity I'm unsure if I could find such records.

Q Okay. So after inspecting this record is it your understanding that the Amigo Grande was published on DEFCAD.com?

A My understanding is not impacted by a review of this record.

Q Is it your understanding that Amigo Grande was published on DEFCAD.come?

A I believe the Amigo Grande was published on DEFCAD.com, if we mean that group of works that we have earlier discussed in this deposition.

Q Okay. And so the first page is Figure 1, and that is the web page as of March 16 of 2026. I'll represent that to you.
Could you move onto the second page?
A Yes.
Q And so do you see the description of the figure on the bottom of that page?
A Yes.
Q Okay. So could you describe to me what is on the second page?
A The second seems to largely be a reproduction of the web page from the first, although there are key differences, and it seems to be a snapshot taken from the Wayback Machine.
Q What are those key differences that you noted?
A Well, the first is that it seems to be a digital capture of the website at an earlier point in time. The buttons and other project information seem to be different.
Q Could you describe to me the difference between the buttons?
A Yes. Well, which page would we start with?
Q Sure. The differences between the

web page as of March 16 of 2026 and December 27 of 2023; what are the differences between the buttons?

A March 16, that was just yesterday.

I see on March 16 two buttons, a download cad, download docs, and the buttons only extend to clickable CTA UI elements. That may be the only difference of the buttons, but I note otherwise.

Q What does CAD stand for?

A Here I have personal knowledge of what CAD stands for. It would mean Computer Aided Design file.

Q Could you describe to me what that is?

A To the best of my ability and knowledge a computer aided design files, 3 dimensional representations, boundary representations, measurements, other metrics are captured or represented in some kind of model, some kind of design file. There are many different types.

Q So what would be -- and so could you describe to me the blue button underneath the red download CAD button?

A Yes. That's a download docs button.

Q What docs is that referencing?

A Documents. Docs is a reference to documents.

Q Would that be a build guide?
A In this case I am not sure that it would mean a build guide.
Q Do you know why there's two separate buttons for downloading the CAD, and downloading the documents on the March 16, 2026 web page, and the -- there's no separate buttons for the December 27, 2023 web page?
A Yes, I can see the reason here.
Q What is that reason?
A In the capture in Figure 2 the website seems to be interpreting the traffic or the user as coming from New Jersey or some other inaccessible state. And so the buttons don't present.
For example, you would see this page in California. This is a state that's suing the Plaintiff, because he hasn't developed this type of technology.
Q Okay. Then you see Metrics there. How is that data gathered and presented on the website as of December 7, 2023?
A I don't have firsthand knowledge of that.
Q Do you know who would have knowledge about that?

A Let's see, knowledge about -- could you tell me your question again?

MR. ZERMAY: Sure. Madam court reporter, could you please read it back?

(THEREUPON, the court reporter read back the preceding question.)

THE DEPONENT: I'm afraid I don't know what the "that" is referring to.

BY MR. ZERMAY:

Q The "that" which is referring to is the Metrics data, the views and downloads?

A If I had to ask someone about this it would be Garret Walliman.

Q And is Garret Walliman your employee?

A No.

Q Who is Garret Walliman?

A Garret Walliman is a technical -- let's see, he's been an employee of Defense Distributed. Maybe that's what you meant by your question.

Q We'll get to that.

A Well, he's not my employee.

Q Could you describe Mr. Walliman?

A Yeah, I could describe him.

Q What is your description of Mr. Walliman?

A Well, he'll probably see this, but I think

he's like a boyscout. He's a nice guy. Taller than me. Wears glasses. A white guy.
I don't know, would that suffice?
Q Sure. Do you have his address?
A I think I remember his address.
Q What is his address?
A 949 South Bowman Road, Apache Junction. It's in Arizona.
Q Do you know Mr. Walliman's phone number?
A I believe I have his phone number, yes.
Q What is his phone number?
A I don't recall.
Q Could you inspect records in your possession custody and/or control and get his phone number?
A Yeah, I could get that.
Q When do you think you could get that?
A At once.
Q Do you think we could get it when we take a lunch break?
A Oh, for sure.
Q Okay. Will I?
A Will I get it? I don't know. I'll have to respond to what my attorneys say I can and can't do.

Q Would it -- Mr. Walliman's number would be on your cell phone?
A I think it would be on my Slack or it would be on my laptop.
Q Do you have the Slack application on your cell phone?
A I don't recall.
Q Could you find out if you have a Slack application on your cell phone?
A Could I find out? I guess I could find out.
Q Could you find out if you had a Slack application on your cell phone during the lunch break?
A I expect that I could do that.
Q Will you find out if you have the Slack application on your cell phone during your lunch break?
A Man, you're predicting the future. I'll have to, you know, do as directed by my counsel.
MR. ZERMAY: Counsel, will you direct him?
MS. ZIBAS: Well, um, actually the proper way to do a request like this is to mark it in the record, and then we supplement it. But

I'll discuss it with Mr. Wilson and see what's available and how we'll address it.

MR. ZERMAY: Well, let's mark it in the record.

MS. ZIBAS: This isn't quite the process that I'm used to in federal court for 38 years, but we will accommodate you.

MR. ZERMAY: Okay. I appreciate that.

BY MR. ZERMAY:

Q Okay. So marching along here, how do you know that Mr. Walliman's an employee of DEFCAD?

MS. ZIBAS: Objection. He said Defense Distributed.

BY MR. ZERMAY:

Q Defense Distributed? Sorry, there's too many different companies.

A I know. It's a real pain.

How do I know that? Gosh -- well, he's made that representation to me. Now you're, you know, experiencing some philosophical doubt.

Q Okay. Let's just move on, then. We wouldn't want philosophical doubt.

Okay. Let's move on and talk about the BUBAR works. So if you could go to paragraph 114 to

115 in the First Amended Complaint. Do you have that in front of you?
A Yes.
Q Okay. Could you read paragraphs 114 to 116?
A Yes.
Q Okay. Have you done that?
A Almost. Okay.
Q Now, let's go to 148 to 150. Paragraphs 148 to 150 in the First Amended Complaint.
A Sorry, can you repeat the new paragraphs?
Q Sure. 148 to 150.
A Okay. I've read them.
Q Okay. So if I refer to the BUBAR works, would you understand what I mean? And I'll represent that there are 14 photographic and visual art works and copyrights No. VA0002381769. So if I refer to the BUBAR works would you understand that's what I'm referring to?
A I would understand the photographic works only.
Q Okay. And you don't understand the copyright No. VA0002381769?
A Good question. Maybe I understand it now. The paragraphs I'm reading mean a set of

photographic works. Does it mean anything more than that to you?

Q Yeah. And the copyright No. VA0002381769?

A Okay. I think I understand what you're saying. But you don't mean to say that the infringement includes the infringement of the number? And if that's what you mean, then I don't think we understand each other.

Q Okay.

MS. ZIBAS: Do you have a copy with the registration with the 14 photographic visual and deposit copies? Maybe you can show that to the witness? Maybe if you identify it -- that's how you identify it. You look at the copyright infringement and you bring the deposit copies to the witness, and he can verify it so we're on the same page.

BY MR. ZERMAY:

Q Okay. Well, we'll get there.

So could you please turn to page 8 of the Plaintiff's Exhibit 3?

A Okay. I note the pages aren't numbered. Is there a figure number you want me to land on?

Q Figure No. 9.

A Okay. I'm at Figure No. 9. The bottom describes March 16, 2026.

Q Okay. So could you describe to me the Figure 9?

A It seems to be a two dimensional reproduction of my website and copyrighted work.

Q Okay. So what is your understanding of what you can do on your website with the copyrighted work, that being the BUBAR work?

A My understanding is that I don't do anything on my website.

Q So what would happen if somebody were to click the download CAD button on the website that which constitutes Figure 9?

A Okay. The answer to that question would require me to suppose a number of things: About who's clicking the button, seeing the button, where they're located, and things like that.

Q Okay.

A Perhaps you could hypothesize on a persona, a location?

Q Sure. Somebody in Florida, what happens if I push the button here in Florida?

A If you push the button here in Florida? To my knowledge there are no Florida based

controls. It may depend upon if you're on a cell phone or a laptop.

So I don't know with certainty what would happen. It may be that you have a VPN. And again, I don't know what would happen.

Q So would I be able to download the BUBAR works by clicking that button?

A Are you in this question?

Q I'm me.

A You're you. Are you running a VPN?

Q Oh, no, I'm not running a VPN. And assuming I'm not barred from your website services?

A Well, you are, but --

Q Let me ask a little bit about that.

A Uh-huh.

Q Why am I barred from your website, by way of terms and services?

A Our policies are simply to ban gun control to law firms. It's nothing personal.

Q Okay. So turning to Figure 10, what's the difference between Figure 9 and Figure 10?

A I note similar differences as to the last set of figures we compared. For example, Figure 10 seems to be a snapshot taken at an earlier date from the Wayback machine.

And again, it shows a condition where the website seems to assume that you were from New Jersey or a state that does not have access to DEFCAD.

Q So was the BUBAR works on DEFCAD.com?

A Was it available?

Q For download?

A I don't have personal knowledge if the BUBAR was available on DEFCAD.

Q Who would have personal knowledge if the BUBAR was available on DEFCAD?

A I don't know for certainty. This is a work that I've never seen before this lawsuit.

Q Well, you purportedly reviewed the Complaint, right?

A Yes, I have knowledge of the Complaint.

Q Okay. So it's your testimony today that you've never seen this work before, the BUBAR work?

A Well, this work I've seen here now. But this work is not the work you're asking about. And these 14 photographs, I don't think I've ever seen them even now. I can't prove that they exist.

MS. ZIBAS: I'm going to have this marked

as Plaintiff's Exhibit 4.

(THEREUPON, the Court Reporter marked Plaintiff's Exhibit 4 for identification.)

THE DEPONENT: Sorry, are you waiting for me to answer a question?

MR. ZERMAY: Yes. Have you finished reviewing these pictures?

THE DEPONENT: Would you like me to review them all?

MR. ZERMAY: Yeah, take a once over look at them.

THE DEPONENT: All right. I think I've reviewed most of these photographs.

BY MR. ZERMAY:

Q Were these photographs available for download on DEFCAD.com?

A I do not know.

Q Were these photographs published on DEFCAD.com?

A This is the first time I've seen any of these photographs. I don't know if they were published on DEFCAD.com.

Q Who would know if they were published on DEFCAD.com?

A I don't know.

Q So have you had an opportunity to review the images that which constitute Plaintiff's Exhibit 4?
A Yes. I believe I've reviewed every image at least once.
Q Okay. So let's turn to page two. So do you see the registration number on the right, that is VA0002381769?
A I see it in duplicate. I mean, I see the number four at the top.
Q Okay. So the top image there do you see any difference between the image on the left and the image on the right?
A I perceive very few differences.
Q What are those differences?
A I would have to assume the differences may only be a result of the color printing that's been made of these photographs.
Q Do you see any meaningful difference between those images, apart from coloring issues from the printer?
MS. ZIBAS: Objection to form. "Meaningful."
THE DEPONENT: Look, as I understand copyright law any difference is a meaningful

difference.

BY MR. ZERMAY:

Q Okay. The same question for the image, the two images directly below that?

A No, there seemed to be only minor differences which may be artifacts of their printing. I can't tell.

Q Okay. The same question as to the third images below that?

A I have the same answer.

Q Okay. The same question for the images directly below that?

A A notable color shift on the image on the left, a higher red tone.

Q Okay. Moving onto the third page moving up to the top set of two photographs, what, if any, differences do you note from those two images?

A I see significant streaking on the image on the right which bisects the image on the right of Plaintiff's registered photograph. This again may be an artifact, I would have to assume.

Q The same question for the picture before that?

A The same answer. More significant

streaking, a higher red tone. A different scene.

Q The same question for the images below that?

A There are differences in the strange outline below the pink receiver, some kind of ghostly ring or artifact. I can't tell if that was part of the mat or part of the photograph or part of the printing.

Q The same question for the images below that one?

A Yes. On the AR barrel there's significant streaking, color differences.

Q Do you see any differences in the contents of the images, apart from color streaking from printing?

A The content of the images.

MS. ZIBAS: Objection to form.

THE DEPONENT: I wouldn't know how to answer that question.

BY MR. ZERMAY:

Q So do you know the difference between a content of something and its composition or resolution?

A I may not.

Q What is your understanding of the

differences, if any, between --
A Very little.
Q -- content and resolution of an image?
A Again, I speak in philosophical terms, so perhaps you can educate me.
Q Sure. You've noted streaking issues?
A This is my assumption. It may be a difference in the image. I don't know. I've never seen those images before.
Q Would you say that they are likely the same image?
MS. ZIBAS: Objection to form.
THE DEPONENT: I probably wouldn't.
BY MR. ZERMAY:
Q What is your basis for saying that the two photographs that which constitute these duplicate sets are not the same image?
A I didn't say that.
Q What are you saying?
A I responded to your question as to whether I say that they were likely the same image or not, so I would likely not say that.
Q What would you say?
A What would I say? I would say these images seem related. They seem to be derivations of

each other. I can't tell which direction. They seem to be substantially similar.

Q Okay. And would that remain true for all the images that would constitute Plaintiff's Exhibit 4?

A I wouldn't know. We could review them all, if you want.

Q Okay. Let's keep going. Would that be your answer for the top two images on page four?

A Let me look. These images don't seem to have a difference.

Q Okay. And is that the same for the images below that?

A It is not.

Q And the images below those two images?

A I note some differences in resolution of those two images.

Q But it's the same?

A I wouldn't presume.

Q Okay. So let's move onto the KF5 of the First Amended Complaint in paragraphs 117 to 121.

A Yes.

Q Okay. Could you please let me know when you've read those?

A You'd like me to read to paragraph 121?

Q Yes.
A Okay. I've read it.
Q Okay. So if I refer to the KF5 works do you understand that to be 16 photographic visual artworks and copyright registration No. VA20002381769?
A Yes. I believe it is only those 16 photographic works as described.
Q Okay. So if you could go to Figure 11 on Plaintiff's Exhibit 4, could you describe to me what you see on Figure 11?
A Figure 11 is a two dimensional reproduction of the copyright works of my website.
Q Okay. Was the KF5 works published on that website DEFCAD.com?
A I don't know. I've never seen these 16 photographic works. 16, I've never seen them.
Q Do you know who would know whether or not the KF5 is published on DEFCAD.com?
A I don't know.
Q Would you be able to ascertain and would know whether or not the KF5 was published in DEFCAD.com by looking at records in your possession, custody or control?
A No.

Q Do you know who would have knowledge whether or not the KF5 was published on DEFCAD.com?
A I'm not sure.
Q You've described DEFCAD.com as your website; right?
A Yes, I have.
Q What do you mean by that?
A I think I meant it in a loose sense, as like associated with me.
Q What do you mean by "associated" with you?
A I'm sure I may not even know what I mean. But I trying to be helpful.
So when you say is this your website? I might say yes, only meaning that I recognize it and that it is related to me.
Q Do you have control of DEFCAD.com?
A In what sense do you mean?
Q That you have the authority to publish things on DEFCAD.com?
A In the literal sense I don't have publication authority at DEFCAD.
Q So what do you mean, "In the literal sense"?
A Well, I mean as strict construction of

your question I don't have authority right now or in the past to publish files on DEFCAD.com.

Q Who has authority to publish files on DEFCAD.com?

A Publication means a few different things at this website.

Q What different meanings do you ascribe to the term "publication"?

A There are works -- and if we're using copyright as the framework, there are works that are uploaded to the website, there are works that are linked to from the website. Both of these conditions may be described as publication.

Q Can you make items or images or files available for download at DEFCAD.com?

A I cannot.

Q How are images, files or documents put up on DEFCAD.com made available for people to download?

A How are they made available? In general, the files are uploaded over a period of many years, they're uploaded. They're reviewed according to the policies that we've described earlier.

And -- let's see. In certain states they're made available for download like this that

we see in this figure here. By publication we mean that. It's a rough process of upload evaluation and publication.

Q Who are involved in that process?

A That's a lot of people. But it's also a lot of people over time.

Q Are you one of those people?

A I'm not.

Q Who are those people?

A Perhaps you can ask -- you could help me by, like, giving me a time frame.

Q Between the years 2021 and 2025?

A Gosh, between those years people involved in this process? Tom Odom -- Thomas Odom comes to mind. Let's see, Elizabeth Everett, Gage Moran let's see, Ethan Bauman, Garret Walliman would have been involved.

And then every uploader to some degree, depending upon the condition from 2021 to 2025. I mean the legal conditions, every uploader had some hand. And these uploaders are third parties. They're employed by Defense Distributor or DEFCAD. I don't know many of their names.

Q Who is the DMCA -- and by DMCA I mean Digital Millennium Copyright Act agent for DEFCAD?

A I believe if that registration is still current I believe I or Defense Distributed is the registered agent.
Q Could you describe your role as a DMCA agent?
A Certainly, yeah. DMCA requests our addressed to me, directed to me, and evaluated by me.
Q Could you go into more detail as to what that role entails?
A I can only go into detail as to my understanding of the role, and how I've been instructed to perform that role.
Q Who instructed you to perform that role?
A I've had many copyright counsel over the years at this website. But some of those copyright counsel, David Ingress (phonetic). I'm not sure how to say his name all this time. He's instructed me on how to perform as a DMCA agent probably for the longest amount of time.
Q So what steps were you told to accomplish as a DMCA agent?
A And I want to answer this question, but I worry if I'm -- if I've been told things by my

attorney is that's privileged?

MS. ZIBAS: If it's privileged, don't describe privileged discussions.

THE DEPONENT: Just -- I've never been deposed before, I just don't know. I mean, I want to answer truthfully.

But, you know, I can recall maybe not in the exact detail, but I can recall how I was instructed to perform as an agent.

BY MR. ZERMAY:

Q Please describe how you perform as an agent.

A You know, keep the registration current, keep a good address, be able to receive mail or email for the request, have a proper notice, counter-notice, take down policy. Maintain these. Make sure everybody at DEFCAD knows what this policy is. Things like that.

THE VIDEOGRAPHER: Sir, do you mind if I do just a quick media change?

MR. ZERMAY: Sure. Maybe we should use this as a stopping off point and come back after lunch. What do you guys think, because we're at noon now?

MS. ZIBAS: That's fine. Whatever you

want to do is fine with me.

MR. ZERMAY: Okay. Let's do that.

MR. LAROSIERE: You matter, too.

MS. ZIBAS: No, it's his deposition. I'm fine with whatever he wants.

THE VIDEOGRAPHER: We're going off the record. The time is 12:04.

(THEREUPON, there was a lunch recess, after which the following proceedings were had.)

THE VIDEOGRAPHER: We're back on the record. The time is 1:10. This is the beginning of Media Unit No. 3.

BY MR. ZERMAY:

Q Okay. So we're back. Mr. Wilson, the oath you took is still in effect that you took at the beginning of the deposition to tell the truth. You understand that?

A Yes.

Q Okay. So let's talk about or go back to what we talked about, which was the KF5. Do you understand what I mean by the KF5?

A We referenced some paragraphs about it.

Q Yes.

A I believe it was 117 to 121.

Q Yes. And the 16 photographic visual

artworks?

A The 16. Yes, I think I understand.

Q So did you have or did Plaintiff, Matthew Larosiere, give you a written license to publish the KF5 works?

A As I mentioned earlier, Plaintiff Larosiere licensed all of his work. Now, I don't believe that the KF5 is one of Plaintiff Larosiere's works.

Q Okay. So if -- maybe I didn't phrase the question correctly.

Do you have in your possession, custody or control a written license from Plaintiff Larosiere giving you permission to publish the KF5 works?

A Yes. I have such a license, a public license that explicitly licenses his work in my possession and control.

Q Could you describe the wording that he used to convey that license?

A Yes. Anyone can download my work as a text from one of the licenses. From another one of the licenses anyone can 3D print. Anyone can 3D print. I remember that bit of -- we're not trying to prevent that, are his words.

Q Does the license have your name on it?

A No, I just include myself in his use of words like "anyone" or "everyone."
Q Okay. On that license is there the name of the entity DEFCAD?
A The name of the entity DEFCAD? If you construct his entire statement to the press I think technically DEFCAD is included. Although, I don't think that answers the question the way that you mean.
Q Yeah. So the word DEFCAD doesn't appear anywhere on that license, does it?
A I wouldn't say it.
Q What would you say?
A I would technically says it does. It should be construed to include DEFCAD.
Q Are there the letters D-E-F-C-A-D on that license in the word?
A I'd have to check the document.
Q Could you answer in a yes or no to the question?
A No, I couldn't.
Q To the best of your knowledge is the word "DEFCAD" anywhere on that license?
A I couldn't answer a yes or no to that question.

Q Would you be able to inspect documents in your possession, custody or control to ascertain whether or not the word "DEFCAD" is on that license?
A I might be able to.
Q Is the word "Defense Distributed" anywhere on that license that you referenced?
A I don't recall.
Q So as you sit here today you don't know what the language that which was you, as in a license, that Plaintiff Larosiere used to convey permission to publish a KF5 infringement?
A I do. It's very broad, general, and public, the language.
Q So you know the language that was used and licensed; yes?
A Yes, I know some of the language.
Q Was the word DEFCAD -- quote "DEFCAD" end quote, anywhere in that license; yes or no?
A I can't answer to a certainty.
Q So you don't know the language in the license?
A I know the language. I can't say that I know every word, every punctuation mark.
Q Was the words quote, "Defense Distributed" anywhere in that license?

A I don't believe so.
Q Okay. Were the words quote, "Cody Wilson" end quote anywhere on that license?
A They very likely were.
Q In what context were the words quote, "Cody Wilson" end quote on the license that which you contend that Matthew Larosiere conveyed permission to publish the KF5 works?
A The license he gave for the 3D print industry the Plaintiff used my name in print, and it was reprinted.
Q Do you have possession, custody or control of that license?
A I should.
Q Will you be able to produce that to us in discovery?
A I have.
Q You have produced it to us in discovery?
A I have, yes.
Q Did you give it to your attorneys?
A Yes.
Q Let's move onto the SS5. Could you go to paragraphs 122 to 131 of the First Amended Complaint?
A Yes.

Q Let me know when you read those?
A Okay. You're asking me to read these?
Q Yes.
A Could you remind me of the paragraph to finish reading?
Q 131.
A Okay. I finished reading.
Q Okay. And can you also read paragraphs 154 to 158?
A Yes. All right.
Q Now, if you could turn to Figure 13 of I believe Plaintiff's Exhibit 4, 13 and 14?
A I'm at 13.
Q Can you describe to me what Figure 13 is?
A Figure 13 is a two dimensional reproduction from my website. The work would be copyrighted by DEFCAD.
Q Is that the -- I'm going to refer you to the 50 photographs referenced in paragraphs 122 to 131, and 154 to 158 as the SF5 works.
A One moment. The original paragraphs again?
Q 122 to 131 and 154 to 158, and the 3D model read me in the written documentation?
A All right. Sorry, is there a question?

Q Could you describe to me on Exhibit -- or Figure 13?
A Figure 13 is a two dimensional recreation of the DEFCAD website.
Q Okay. And what is Figure 14?
A Figure 14 seems to be a similar reproduction of the website, a page titled the SF5, which looks slightly different. The date is different and the buttons seem to be different.
Q Okay. Could a person download the SF5 works from the websites listed in Figure 13 and Figure 14.
A No. In Figure 13 and Figure 14 no one could download the works as you've described them.
Q Well, it says download CAD; right?
A Figure 13 has a button that says download CAD.
Q Okay. When you click download CAD that would permit somebody to download the SF5 works; right?
A As you define the SF5 works they include photographs, read me's literary works that are not included in download for that button.
Q Would the download CAD button allow somebody to download a 3D model of the SF5?

A In my personal knowledge, I don't know. I've never downloaded it. I could assume.
Q Do you have any reason to doubt that if you click download CAD that you would be able to download a 3D model of the SF5?
A I believe you could download a 3D model of SF5 by clicking that button.
Q Okay. The same question to the "Add to cart" function. If you click that button what would one be able to download?
A Nothing could be downloaded through that flow.
Q What does "add to cart" function permit somebody to do?
A It's more about what it doesn't permit you to do. It doesn't grant anyone a way to download any files.
Q What happens if you click "add to cart"?
A It depends on where you're from. In this figure I cannot tell enough to accurately answer your question.
Q What if you're in the State of Texas what would that "add to cart" button allow you to do?
A Figure 14 is not an accurate

representation of what you would see if you were in the State of Texas.

Q What would you see if you were in the State of Texas?

A You would see something similar to figure 13 if you're in the State of Texas.

Q Would you be able to download the SF5 works if you click a button on the web page if you were in the State of Texas?

A You'd have to heavily qualify an answer, depending on who you are, if you've got a VPN, and other aspects of your situation.

Q Assuming no VPN, and you're in Austin, Texas?

A Would I be able to download the SF5 CAD works or did you say the whole works?

Q Any works that constitute the SSF works?

A The SF5 works have been defined so broadly hat the truest way to answer your question is no, you would not be able to reproduce this infringement or download the works in Texas by clicking this button, as you stated.

Q So let me ask it this way: At any point were the files available to download from DEFCAD.com, the SF5 works?

A The works as defined here?
Q Yeah.
A I don't know in my personal knowledge.
Q How about any of 50 photographs would they constitute the SF5 works?
A I've never seen 55 photographs. I do not know.
Q What about the 3D model image that would constitute SF5 works?
A I do not know to a certainty. I have seen the model. I don't know if it was available for download at what time.
Q What about the "read me" that would constitute the SF5 works?
A Can we anchor this back to it? Is there a time frame that I'm being asked about or are you saying at any time?
Q Any time between the years 2021 and 2025?
A In my personal knowledge I don't know.
Q What about just your knowledge, period?
A That's what I mean.
Q Would you be able to look at records in your possession, custody or control to ascertain whether or not the SF5 works were available for download on DEFCAD.com?

A Your question is would I be able to look at records to determine if -- my answer I think is no, but maybe you can restate your question.

Q Okay. Would you be able to speak with anybody to ascertain whether or not the SF5 works were available for a download on DEFCAD.com?

A I'm not sure. I believe so.

Q Who would those people be?

A I would ask Garret Walliman. Garret Walliman is who I would ask.

Q Do you have any reason to doubt that the SF5 works were available for download on DEFCAD.com?

A If the SF5 were available? Only in the way that you're constructing the question. I'm not sure if all the works had ever been available. I don't know the works. I'm not familiar with them. I don't know that I can represent that they were ever there, in truth.

Q Was there a blog post about the SF5 works?

A Not to my knowledge.

MR. ZERMAY: This will be 5.

(THEREUPON, the court reporter marked Plaintiff's Exhibit 5 for identification.)

BY MR. ZERMAY:

Q Could you go to page 22?
A I'm almost there. Very good.
Q Could you describe to me what's on page 22 of Plaintiff' Exhibit 5, please?
A Page 22 seems to be a two dimensional re-creation of my website copyrighted work.
Q Could you read to me the text that's under the word "about"?
A Yes. SF5 STEP Master application for copyright registration.
Q The "about" in the middle of the page?
A I see. All right. Maybe you can restate your question for me?
Q Sure. Could you read the text that's underneath the "about" in the center of the exhibit of page 22?
A Okay. I'm now reading it. I have finished reading it.
Q Okay. So does it say, "Certified copy of the very first federal registration of a 3D printable gun model by none other than Matthew Larosiere, Esquire. Federal registration date 12/23/2023. The SF5 STEP Masters were made by an employee of Matthew Larosiere and registered with the United States Copyright Office.

3D models with the copyright registrations require permission from the author before you may reprint them. This historical document stands as a permanent record of and award to the cringe and stupidity of Fuddposting. Beware, the Fudd you bust may be your own."

A Yeah, it says that.

Q Who wrote that?

A This was a collaborative work.

Q Who collaborated to draft that?

A At this time it's hard to recall everyone that had a hand in it. I recall distinctly writing this second part about 3D models with registration.

Q Who else wrote that?

A I would have to guess.

Q Who would have knowledge of who else wrote that?

A Who would have the knowledge? The first person I would ask would be Elizabeth Everett?

Q Who in Elizabeth Everett?

A Yeah, Elizabeth Everett. She's Defense Distributed's librarian.

Q What do you mean by Defense Distributed's librarian?

A Gosh, I probably mean a lot of things. That's her title. That's her employment.
Q What role does she have -- or what are her duties as a librarian at DEFCAD?
A She's not DEFCAD's librarian, Defense Distributed's librarian.
Q Did you cause this to be posted on DEFCAD's website?
A Cause? I don't believe I caused it, no.
Q Who published this on DEFCAD's website?
A I don't recall when this was published or who approved it for publication.
Q If you click "download" would one be able to download the copy registration of the SF5 works?
A Are you saying as represented in this image?
Q Yes.
A As I see this image I would assume you could download this document, even with this FFL requirement notice.
Q So before we move onto the next one, do you have any written document from Matthew Larosiere giving you the right to publish the SF8 works?
MS. ZIBAS: Objection to form.

THE DEPONENT: As to this document I don't think I require Matthew Larosiere's permission.

BY MR. ZERMAY:

Q Do you have any signed license from John Elik giving you permission to redistribute the SF5 works?

A The SF5? I think the only licenses we would have would be unsigned licenses.

Q When you say "we," do you mean DEFCAD and Defense Distributed?

A In possession of any of the entities, that's what I mean.

Q Any of the entities?

A I think so.

Q So as to -- the same question as to DEFCAD. Do you have any -- does DEFCAD have any signed written licenses from Matthew Larosiere permitting reproduction or distribution of SF5 works?

A In my personal capacity I don't know. But again, I dispute Matthew Larosiere's ownership of the SF5, and any of its included works.

Q Are you or does DEFCAD or Defense Distributed -- I'm reading her --

A It's an occurring loop, whereas you discuss the record, the record closes, and now we're stuck in this hell hole together. What will end it? What will put us out of our misery?
Q Good question.
Do you have a signed document that specifically references you or one of the defense entities and references the SF5 works?
A Okay. Okay. A signed document references me or the entities?
Q Yeah.
A And is related to the publication of the SF5 works?
Q No.
A Sorry. Let's try it again.
Q That references the SF5 works?
A That references. My personal knowledge I don't know. I suspect that we have Mr. Elick's license somewhere, yeah.
Q Could you describe to me the license that Mr. Elik granted, either you or the entities, to publish the SF5 works?
A Let's see, to my knowledge these came as electronic messages, most often on Rocket.Chat. I recall having seen them, and then I recall as well

at one point they were deleted and Mr. Walliman could no longer fetch them from the Gatalog Rocket.Chat.

That's the most I can probably say about them. I recall them specifically. There may be others, I don't recall.

Q Did you provide them to your attorneys?

A Yes.

Q When did you provide them to your attorneys?

A If we had it, we've provided it.

Q So you can't say one way or the other whether or not you've provided them to your attorneys?

A Right. In my personal capacity sitting here right now I guess I can't prove it, can I?

Q Okay. Let's move onto the Plastikov works. Could you read paragraphs 159 to 177?

A 159?

Q Yes.

A To 177?

Q Yes.

A All right. I've read to 177.

Q Okay. So if I refer to the "Read me," the written documentation, 61 photographs and three

printed models. I refer to those as the Plastikov works, would you understand what I'm saying?

A Hold on. Read me --

Q If I refer to as the "Read me" documentation, 61 photographs and 3D model as to the Platikov's works would you know what I'm referring to?

A Yes.

Q So if we turn back to Plaintiff's Exhibit 4?

A Okay. One second.

Q And Figure 16.

A I'm ready when you are.

Q Could you describe to me the image that's depicted in Figure 16?

MS. ZIBAS: Objection to form.

THE DEPONENT: This is an image of images. In general it seems to be a reproduction of the DEFCAD website. It is copyrighted, et cetera.

BY MR. ZERMAY:

Q And what does that image -- can you describe for me that image?

A That image seems to also be a reproduction of the DEFCAD website, and one of its pages altered slightly in terms of its UI.

Q Okay. So do you have a signed license from Matthew Larosiere to publish the Plastikov's works?

A Do I have a signed license? I do not have such a license, and I don't believe that I would need one.

Q Do you have a signed license from John Elik to publish the Plastikov works?

A I have his unsigned public license to republish this work.

Q Do you have a signed license from Matthew Larosiere to reproduce the Plastikov works?

A I'll be saying this a lot in this deposition. I dispute Plaintiff's ownership of this work or any work connected to it by the name Plastikov. I would not seek, nor naturally consider that I receive a license from the Plaintiff to reproduce this work.

Q So is it fair to say that you do not have a license to reproduce the Plastikov's works?

A I believe the Plaintiff has nevertheless licensed the reproduction of the work many times publically, explicitly, and implicitly, as we have discussed earlier, and therefore, I do have such a license.

Q Is that license signed and in writing that you contend that you have from Plaintiff, Matthew Larosiere, to reproduce the Plastikov's works?

A Signed and -- by signed you mean bearing his signature? No.

Q Do you have a signed written license from John Elik to reproduce the Plastikov's works?

A Again, if by signed you mean signature, I suspect I don't.

Q Could we go to Figure 18?

A Yes.

Q Could you describe to me what Figure 18 is?

A Figure 18 I see a reproduction of two sections of the DEFCAD Newsletter. Both copyrighted works, I might add. I hope whoever captured this got permission.

Q What is the title of the first post?

A The first post. This first section of the top half of the image I see a title, "Pastikov V4: Now copyright free."

Q What does that mean?

A I could interpret it for you, if that's what you're asking?

Q Please.
A To read this I naturally read it to mean that there must be a a copyright associated with this Plastikov V4.
Q Who drafted that blog article titled, "Plastikov V4: Now copyright free"?
A I would have to guess, but as before, all of these posts are collaborative.
Q Who collaborates in making these posts?
A The stable is not always the same, the stable of characters. I participate most consistently and most often, especially in posts like these. So I had a hand in this one, I'm pretty sure. I have memory, I think, of this post.
Tom Odom would have had a hand in this one. I think that's the only two people I can be certain of for this one.
Q Who authorized this blog post to be published?
MS. ZIBAS: Objection to form.
THE DEPONENT: I disagree with the characterization. This is not a blog post.
BY MR. ZERMAY:
Q What is it?
A What I can see is a snapshot of what looks

like the DEFCAD Newsletter.

Q Who authorized publication of that newsletter?

A May 23rd, 2024? I don't know that there's a record of authorization in the way that you mean.

Q If there is not a record of authorization, who okayed this newsletter to be published?

A No one okayed it.

Q So the text -- a part of the newsletter states, "This file release, which I'm told is related to AKM, is a landmark moment in the history of Guncad. Now it's outside the scope of copyright. We proudly present it to you." Is that right?

A You left out the word "that" after "now," which I think changes the character of the meaning of that sentence.

Q Okay. What is meant by the phrase, "Now that it's outside the scope of copyright, we proudly present it to you"?

A Are you asking me what the author intended by writing this?

Q Yes.

A I can't know, because I don't know the author.

Q You testified earlier that you're part of the stable of people that collaborated in writing this newsletter.
A This is true. You're asking me a difficult question. You're asking what this combined authorship trust intended. And, you know, maybe I might have known at one point, but I can't say truthfully on the record that I know now.
Q Okay. Let's go on to the next part of the newsletter, "The primer on copyright 3D printed Guns Black Flag White Paper."
Are you familiar with the Black Flag White Paper?
A Oh, yeah, yeah.
Q Did you draft the Black Flag White Paper?
A More than --
Q Are you the author of Black Flag White paper?
A I claim authorship of the paper.
MR. ZERMAY: This will be Plaintiff's Exhibit 6.
(THEREUPON, the court reporter marked Plaintiff's Exhibit 6 for identification.)
BY MR. ZERMAY:
Q I'd like you to turn to page 7 of

Plaintiff's Exhibit 6.

A Oh, I see, you've renumbered the pages. Well, I'm at a page 7, anyway.

Q Could you describe to me the images on page 7?

A The images appear as figures. They appear as figures of 3 dimensional models, it seems to me.

Q Could you describe the models to me?

A Let's see, there are two. The first seems to be -- let's see, the first seems to be a set of 3 dimensional mechanical components on a plane, a couple of planes. Ahead of those it seems to be in space are modeled statements.

The words read, "No images, instructions, doc."

The next line reads, "Use, subscription download."

The next line reads, "Copyright 2024."

The second image seems to be a 3 dimensional trash can, waste bin. And then something similar to the modeled instructions or statement from the first first Figure is inserted or dumped into this trash can.

Q Okay. So does the text of page 7 around

those figures say, "We can apply what we've learned to a novel fact pattern. Say a creator releases a new design named Plastikov v4. He knows his build guide is copyrightable, but that his 3D models are not, so he models a copyright statement into the assembly himself.

According to Star Athletica, the only way to comply with the creator's copyright is to remove the potentially copyrightable elements of his design.

In this case the copyrightable part of the design is the copyright statement. By gently removing this, we return the model to legal significance."

A It does say that.

Q Does it also say, "Now we are the creator of two new works. One is purely creative sculptural work with its own new copyright.

And not the other, while not copyrightable, has heightened artistic value through determinate negation. We profit economically and morally, though not without some insider trading"?

A Yes, it says that.

Q Did you author those statements?

A I'm the author of these statements.

Q What did you mean by them?
A Shall we go line by line?
Q If that's more useful for you.
A It seems to me there are many, many, many here. And this gets to the heart of some of this case. So I'd be happy to go at length.
Q What did you mean by those statements?
A This section begins titled "Practicum." And so it means that we can apply to what we've discussed earlier in the paper. Applying this knowledge from earlier in the paper we propose a hypothetical. Now you'll note the "we" right? It doesn't say "I." It doesn't say "Cody Wilson."
This is what Blancho and Bart called the literary voice, "we." The reader, the author, both, who knows. It's this distinctness which it's about in the first line. Anyone who reads the paper can apply the lessons learned to novel fact pattern. I then present the fact pattern.
Would you like me to just continue?
Q Was the fact pattern that which is described in the Black Flag White Paper what you did with the Plastikov works?
A No, I think that's readily discernible. I think it's easy to determine that's not what I

did.

Q Did you remove the Plastikov notice from the -- sorry. Did you remove the copyright notice from the Plastikov works?

A No. I have never removed a notice from anyone's works. I've never uploaded any works to DEFCAD, nor published them.

Q How did you obtain a copy of these images with Plastikov works with the copyright image on it, and then that same copyright notice in a digital trash can?

A I dispute that these were anyone's works. What I'm saying at the end of this paragraph is that these are my works. Of course, they're not copyrighted, so you can reproduce them here.

Q I'm sorry if my question wasn't clear.

How did you get these images, one of which has the copyright notice on it, and one has the copyright notice in the digital trash can?

A You're assuming that I got the image. Are you asking how these figures were produced?

Q Do you know how the images were produced?

A These figures, I have some memory of how they were produced.

Q Tell me the memory of how they were produced?

A The memory of how they were produced? I believe both of these figures were produced by Ethan Bauman.

Q Who is Ethan Baumer?

A Ethan Bauman, B-A-U-M-A-N.

Who is Ethan Bauman? Ethan Bauman worked for DEFCAD for maybe two years. He's moved on to other opportunities.

Q What is his address?

A I don't recall.

Q Could you get his address from looking at records in your possession, custody or control?

A Can I get his address? You know, maybe.

Q Have you tried to look for his address during the course of discovery in this case?

A Ethan Bauman's address have I looked for it? I don't recall looking for it.

Q What about his phone number, do you have his phone number?

A Ethan Bauman's phone number? I may not. I don't recall, anyway.

Q Do you have records in your possession, custody or control which would have his phone

number?
A Records of his phone number? Oh, I don't think so, but I know who might.
Q Who might?
A I think Tom Odom would have those records.
Q Did you tell Ethan Baumer or Bauman --
A Bauman.
Q Bauman?
A Uh-huh.
Q -- to remove the copyright notice from the image which constitutes Figure 8, and put that copyright image into a digital trash can, which constitutes Figure 9, Black Flag White Paper?
MS. ZIBAS: Objection to form as to what is the copyright notice.
THE DEPONENT: That question makes a mistake, a number of mistakes.
BY MR. ZERMAY:
Q Did you ask him to make these images?
A I did not ask him to make these images.
Q How did you get these images from him?
A How did I get these images from Ethan Bauman? I recall asking Ethan Bauman to prepare a number of figures for this paper in advance of its publication.

I believe it's of the set of images that he made. The choices were his own. His presentation was his own. I don't recall any further instruction.
Q Did you give him the text?
A Did I give him the text? I'm sorry, by your question did you mean did I give him the text of the paper or of the figure?
Q Of the figure?
A No. I've never had possession or control of his text or these models.
Q Did you give him the text of the Black Flag White Paper prior to him producing these images?
A I don't believe so.
Q Why did you choose this particular image for the Black Flag White Paper?
A Choose that image? I believe we created that image for the paper.
Q Okay.
A Do you mean to ask me why I created that image?
Q Yeah. Why did you create this image, like, in the manner that you did?
A In the manner that I did? I don't know

what manner I created it in. I probably, myself, did not create the image.

But the signs in the image are related to Defense Distributed, and its history of signs. The most significant image genealogically is the arm with the sword. This is a Texan sign that has been adopted by my company.

Q So are you familiar with the concepts of pirates?

A I am.

Q What is your understanding of pirates?

A It's a broad topic. I understand pirates as a historical category. A term of some -- with some legal meaning. I understand it to have a commercial meaning. I understand it to also refer to digital piracy, like, in a topic in intellectual property manners.

Q Is a pirate in the concept of naval history or admiralty history?

A Yes.

Q What is your understanding of pirates in that context?

A Phew, that's a big one. You know, I've read about the golden age of piracy. I've read about piracy in the Caribbean, et cetera.

My understanding of that concept is linguistic. I think I understand its origin. And I also understand that I think historically its historicity. Maybe that's what you're asking.
Q Are you familiar with that they would fly certain flags on their vessels?
A I think I know your meaning.
Q Okay. Where a nation's state would fly, like, Great Britain, the Union Jack? Are you familiar with the Union Jack flag of -- the islands of Great Britain?
A I am familiar.
Q And perhaps the French flag of the Republic, First Republic?
A Good example, good example.
Q Would the sailors that which constituted outlaws in the seas have their own flags?
A In popular histories of pirates there are famous pirate flags, as I understand it. Most pirates would fly a false flag, however.
Q Okay. This title is titled -- or this paper is titled Black Flag White Paper, and many would describe the flag that's on this Black Flag White Paper as a pirate flag. Would that surprise you?

A I would not be surprised.

Q Okay. Is the term "pirate" in this context a double entendre between the pirates that would constitute the outlaws on the sea during the Grand Age of Sail or Great Age of Sail, a digital copyright of piracy?

MS. ZIBAS: Objection as to form.

THE DEPONENT: I'm looking for the term "piracy," at least as it was contained in your question.

BY MR. ZERMAY:

Q Could we go to Plaintiff's Exhibit 5, and if you would go to page 32?

A Yes.

Q What is on page 32, Plaintiff's Exhibit 5?

A It's nearly blotted out. It says, "Memorial Day Weekend," at the top, and it seems to be an excerpt from an Legio blog post.

Q Who drafted that Legio blog post?

A I drafted this. I recognize the language.

Q Okay. So in that Legio blog post you say, "The reason you don't sue is because you got the law wrong on copyright. That, and because you're a huge pussy.

Anyway, I wrote a paper to commemorate the

great pirates who lit our way. They pillaged so we could blunder. Enjoy your holiday weekend. If you would like to support these legal actions, please join Legio."

What did you mean by, "Anway, I wrote a paper to commemorate the great pirates who lit our way. They pillaged, so we could plunder"?

A There is some double entendre in that meaning. Of course, I'm referring to file sharing wars, and the pirates of that heir, not actually the pirates of the age of sail, as you mentioned.

There seems to be something missing here. Oh, there, it was a tweet. There was a tweet after, "Just a sample," and it says -- anyway, I was responding to that tweet.

Of course, I would never call the Plaintiff a pussy. I was calling the author of that tweet, which has been inexplicably removed, a pussy. But only because he was threatening violence and all this other stuff over work that he didn't own.

Q Are so as to Plaintiff's Figure 19 in Exhibit 4, could you describe to me what that image which constitutes in Figure 19?

A Yeah. Okay. I can. Have you got it?

MS. ZIBAS: Oh, Exhibit 4 -- oh, it's in

3.

MS. ZIBAS: Yeah.

BY MR. ZERMAY:

Q Sorry, it might be Exhibit 3.

A It seemed relevant.

MS. ZIBAS: Exhibit 4 is the 64 photographs. That's what Exhibit 4 is.

MR. ZERMAY: Okay.

BY MR. ZERMAY:

Q Exhibit 3. Sorry.

A Exhibit 3, Figure 19.

(Off-the-record discussion, after which the following proceedings were had.)

THE DEPONENT: Would you like me to describe this?

MR. ZERMAY: Yes, please.

THE DEPONENT: This seems to a 2 dimensional production of the website ghostguns.com. It seems to be a large reproduction of that website, and also as captured by what I assume to be the Wayback machine.

BY MR. ZERMAY:

Q Okay. Who owns ghostguns.com?

A Defense Distributed.

Q Does Defense Distributed have a license from Matthew Larosiere to sell the Plastikov -- sorry, to publish the Plastikov works?
A The Plastikov works are not at all connected to what I'm seeing in this Figure.
Q Does Ghostguns sell 3D printed -- or printing gun files using USB drives?
A I don't know that it currently does.
Q Did ghostguns.com -- or were USB drives ever sold with 3D printed -- or printing gun files on it?
A In my personal capacity, I don't know.
Q So we'll move on.
A No, I'm looking at this figure here. None of Plaintiff's works or claimed works are even related here. The only work I see is a rendering of the Plastikov, which, of course, we would own.
And the build kit isn't at issue in this lawsuit. If Plaintiff claiming to own something more than the Plastikov works? He's claiming more now that I'm sitting here?
Q Is it your contention that you own the image that would constitute the --
A Every image I'm looking at would be copyrightable. And if we authored these images,

then clearly we own the copyright. If that's an answer to your question.

Q So what is beneath the words, "Kit includes," about four bullet points down?

A AKM47 Fixed Stock Rear Trunnion.

Q I'm referring to the words quote, "USB containing IvantheTroll Plastikov v4 files from the Gatalog." Do you see that?

A I do see that.

Q If somebody bought this from ghostguns.com would they be given copies of IvanTheTroll's Plastikov v4 files?

A I could only assume.

Q Okay. So let's move onto the -- before we move onto the Hitchhiker, let's bounce back to -- oh, let's go onto the Hitchhiker infringement.

Okay. So could you look at that and read the Plaintiff's First Amended Complaint at paragraphs 201 to 215?

A 201 to 215?

Q Yes.

A I just finished 215.

Q Okay. So if I refer to it as the HitchHiker works, would you understand that to be the written documentation 3D model and 63

photographs that which are referenced in those photographs?

A I count 65. Could you restate your question?

Q Sure. So when I refer to the HitcHhiker works would you understand that to mean the written documentation 3D model and 63 photographs that which are referenced in the paragraphs?

A 65 works. Now I understand. Yes, I think we can proceed.

Q Okay. So let's go to Plaintiff's Exhibit 3, Figure 20.

A Figure 20. I'm there.

Q Could you describe to me what is Figure 20?

A Figure 20 seems to be a 2 dimensional reproduction of the DEFCAD work that is probably copyrighted.

Q And the same question for Exhibit Number 21 -- Figure number 21?

A The Figure 21 seems to be the same website, but a snapshot of the same taken at an earlier date, and there are UI differences of the bottoms I see at the top.

Q So did Matthew Larosiere ever give a

signed written license to publish the HitchHiker works?

A I have never published the HitchHiker works, and I have never received a license to do that from Matthew Larosiere, signed and written, as you've described.

Q Does DEFCAD have a signed written license to publish or to redistribute the Hitchhiker works?

A Specifically for the HitchHiker the Plaintiff has been loud, repeatedly public about licensing this work for anyone to download to reproduce in 3D print.

So I would say we do have such a license from the Plaintiff. Though, I don't think that it's signed with his signature, but I suspect we'll get it in the end.

Q Okay. Does Defense Distributed have a signed written license from Matthew Larosiere to publish or redistribute the HitchHiker works?

A My answer would be the same. The Plaintiff has notably visibly publically licensed his work. Especially this work, to all who would listen and to all who would know. Defense Distributed and DEFCAD noticed his license.

Q When you said earlier that you suspect you'll get a license in the end, what do you mean by that?
A I imagine as you've described, a written license with his signature to reproduce his work.
Q You believe that you're going to get a signed written license from the Plaintiff for that?
A I do.
Q Okay. So do you have a signed written license from John Elik to publish the HitchHiker works?
A Elik from the HitchHiker? I don't believe we have any communications from Mr. Elik about the HitchHiker.
Q Do you know if DEFCAD has any signed written license from John Elik to publish the HitchHiker works?
A Not in my personal capacity.
Q Do you know if Defense Distributed has any signed written license to publish the HitchHiker works?
A Not in my personal capacity.
Q So let's go to the "About" section on Figure 21.

A Plaintiff's Exhibit 3, Figure 21?
Q Yes.
A "About."
Q Could you describe to me the text that which constitutes the "about" section on Plaintiff's Figure 21?
MS. ZIBAS: Objection to form.
THE DEPONENT: I can describe the text. How would you like me to describe it?
BY MR. ZERMAY:
Q What is your description of the text? What is being conveyed by the language?
MS. ZIBAS: Objection as to form. You can answer, if you understand the question.
THE DEPONENT: What is being conveyed? Let's get a little more concrete.
MS. ZIBAS: Who drafted this? Start with who drafted this. Lay your foundation
BY MR. ZERMAY:
Q Okay. Who drafted the "About" section on Figure 21?
A The "About" section? The language looks familiar with me. Who drafted the language? I would have to guess.
Q How is this familiar to you?

A I suspect if I've seen, "The Gatalog Presents," that this was not authored by anyone at DEFCAD.

Q Who would have authored the "About" section?

A Who would have authored it? Again, I would have to guess, and I just -- I don't know who would have authored it.

Q Did you author the "About" section?

A Did I author this section? No, I don't recognize the writings. The writing is -- no, it's just -- it reads like someone who isn't a strong writer, who isn't a strong reader. I think it's a Gatalog production.

Q Was the language in the "About" section of Figure 21 edited by you in any way?

A No, no, I've made no eds.

Q Was it edited by anyone at DEFCAD?

A Was this language edited by anyone at DEFCAD?

Q Yeah.

A Your word may mean a lot of things. Clearly this text showed up at DEFCAD. Does that mean it was edited? I don't know if that answers your question.

Q Who edited the "About" section from Figure 21 to Figure 20?
A Okay. Hold on. Oh, these are different, I see that. I don't know to a certainty who edited it, either.
Q Well, I'm not asking to a certainty, but do you know who did so?
A Do I know? Not in my personal capacity.
Q You're qualifying by using the phrase, "In your personal capacity." Do you know in any capacity?
A I suspect this could be determined through DEFCAD's records who edited this.
Q Did you edit this?
A No.
Q Did Garret Walliman edit this?
A No, he doesn't edit these.
Q Who edits these?
A In my personal knowledge I recall only a handful of people who edit descriptions of entities.
Q Who are those handful of people?
A Elizabeth Everett is included in this list. Other people have the power to edit entity descriptions. Although, I don't know how they have that power. I can't prove when they had it today

sitting here.

Q Who other than Elizabeth Everett has the ability to change the "About" section on the DEFCAD website?

A I think Garret Walliman could. Garret Walliman has that power to do it.

Q Could you determine who edited this by looking at records in your possession, custody or control?

A No, not in my personal possession, no.

Q Okay.

A I think, though, that this change happened as a result of this lawsuit.

Q Did you direct this change as a result of the lawsuit?

A I don't recall making a direction for this change.

Q Could you have made a direction calling for this change?

A Could I have made the direction for this change? Is that the question?

Q Yeah.

MS. ZIBAS: Objection to form.

THE DEPONENT: Could I have made it? I mean there's a way to get the yes on that. I

don't recall directing this. And it's not common for me to direct changes to descriptions of entities.

BY MR. ZERMAY:

Q Do you know why this "About" section was changed?

A This section is the first time I've seen this new "About" text. I imagine it's related to the lawsuit. Here the lawsuit is cited, so it must be related.

Q Did you talk to anybody at DEFCAD about the lawsuit?

A Did I talk to anybody at DEFCAD about the lawsuit? I'm sure that I have.

Q Who did you talk to at DEFCAD about the lawsuit?

A Gosh, I've talked to probably everyone at DEFCAD about this lawsuit.

Q Who specifically did you talk to at DEFCAD about the lawsuit?

A I've spoken to Elizabeth about this lawsuit. I've spoken to Tom. Let's see, I've spoken to Gage.

And then the rest of your question is, you know, who's at DEFCAD? I don't know how to

accurately answer your question, past those three people.

Q How did you speak to these people about the lawsuit?

A If I was speaking to these people about the lawsuit or when that happened it would have been in a regular DEFCAD meeting. These are held on Wednesdays. Though, it is not my habit to attend every single one of these.

Q Would you have spoken to these individuals about the lawsuit over Slack?

A About the lawsuit? No, I've made it habit not to.

Q Why have you made it a habit not to discuss the lawsuit on Slack with?

A I don't think it's a good idea to open that channel and have them especially pose their questions about the lawsuit or policies related to the lawsuit on Slack. Slack is more their work and their day-to-day communications.

Q Have you used the email address CRW@DEFDIST.com to discuss the lawsuit with anybody?

A No, I haven't.

Q Have you used your work email to discuss the lawsuit with anyone?

A Well, by "anyone" you mean to include my lawyers? I mean, I'm sure I have.

Q Not including the lawyers?

A Oh, I see. It may be that I've used that email in discussions with journalists about the lawsuit.

Q What journalists have you communicated about the lawsuit with?

A Earlier in this deposition we mentioned the 3D Print industry. Definitely that website.

If on occasion I get questions from journalists at that email, like, the Palm Beach Post, for example, they were doing a whole thing about this lawsuit and the RICO thing.

That email? I don't know. I'd have to search more. There are more. I'm sure there are more.

Q Did you produce those communications to your attorneys in discovery?

A I've produced my entire email to my attorneys in discovery.

Q So you've produced your entire email to your attorneys in discovery?

A Yes, I have.

Q Would that include this CRW@DEFDIST.com?

A No, that's not a website or an email that I have.
Q You don't have the email address CRW@DEFDIST.com?
A I don't, no.
Q Are you familiar with that email address?
A I've never used that email address.
Q What is your work email address?
A My work email CRW@DEFDIST.org.
Q Have you produced that email to the rest of your attorneys in discovery?
A I have.
Q And you've used that email address to communicate with journalists about this case?
A To the best of my recollection I believe I have. It may not be true.
Q What is the email server that hosts that email address at, like, for example Gmail or Outlook?
A Oh. It's a Google work space.
Q So it would be with Google?
A But I don't know who services it. Do you know what I mean?
Q Do you have Gmail on your personal cell phone?

A Do I have Gmail on my cell phone? I have the app.
Q Okay. Do you have access to the CRW@DEFDIST.org on your Gmail application on your phone?
A Not at this time.
Q You're qualifying by "at this time." Can you explain that?
A Yeah, yeah. Once I had to give up my whole email for discovery. I prefer one channel for checking and using that email.
Q So it was on your personal cell phone at one time?
A I'm not saying that.
Q What are you saying?
A I'm answering your question.
Q Was the -- when did you open up the CRW@DEFDIST.org email address?
A When was it opened?
Q When did you first subscribe to that email address?
A Oh, man. Well, it wasn't always a Gmail address, if that's what you mean. So the address, itself, predates its use as a Gmail email.
Q What other type of email was it? By that

I mean, like, Outlook or --
A It's been too long. I've had it for 15 years. If you want me to think about it, sit here and think about it, I will.
Q Well, to the best of your recollection what provider did you use?
MS. ZIBAS: You're asking him about 15 years ago?
BY MR. ZERMAY:
Q Well, when did it change over?
A It's changed a few times. At one point it was a Thunderbird account.
Q When was it a Thunderbird account?
A 2012, 2013. We're getting into the territory where I'm going to say things that might not be --
Q Yeah, the best estimate, that's what I'll qualify it as.
A Those are my best estimates.
Q Did it change over from a Thunderbird to a different email server, apart from Gmail, or was it just the Gmail?
A I recall only that it was a Gmail account after 2018 now, I want to say. 2018, '19.
Q Okay. And when did you last have the

Gmail application on your personal cell phone?
A I couldn't recall.
Q And I don't want to misstate your testimony, but I believe you stated that you wanted -- when you had to produce this in discovery, that's when it came off your phone?
A No, that's when I wanted to rely on one channel and not make the risk -- not create the risk of creating more records, channels.
Q And what do you mean by that?
A You know, I'm not sure entirely what I mean by that. But it seemed to me, especially with the advice of counsel that I should only access work records in a certain way, a certain way, a certain time. And that extends to the email.
Q So would this have happened after the lawsuit was filed?
A I don't believe so. It would have happened before.
Q In anticipation of litigation?
A No, I didn't say that.
MS. ZIBAS: If these were all discussions with counsel, don't discuss them.
THE DEPONENT: Oh, you're right. And I

did mention that.

BY MR. ZERMAY:

Q So when you say, "limited to one channel," what channel did you mean?

A I think one mode of access -- it would not make sense to have Gmail available on multiple devices, multiple work computers. That would be a records problem. And mostly from the point of expenses. It's very expensive to give out double emails.

Q So what electronic devices is your work email on now?

A Which electronic device? In my personal capacity I don't know that I have a complete answer.

Q Well, I'm asking you just in your capacity in general, not in your personal capacity?

A No, I understand that that you're asking that, but I don't know that I can give the right answer.

Q Could you find out which electronic devices that you have access to your Gmail on by looking at records or devices in your possession, custody or control?

A It seems that would allow me to investigate in a different capacity, and I worry

that I wouldn't be able to give you a good answer in not understanding my obligation.

Q Well, to clarify it, it would be you controlling your physical self, your body?

A Well, of course. It has its own assumptions, doesn't it? I'm not sure how to associate your helpful instructions with a new answer.

Q So when you access your email you do so physically, right?

A I think so, yeah.

Q You reach out with your force of will, and you cause your body to type something into an electric device; right?

MS. ZIBAS: Objection to form.

THE DEPONENT: In general it requires physical activity, I think, to make use of my email.

BY MR. ZERMAY:

Q And you see the emails with your eyeballs; right?

A I see the emails with my eyeballs often, yes.

Q How do you see those e-mails, on which screens and electronic devices do you see your

emails and access them?
A I keep a work laptop for -- you mentioned DEFDIST.org, which is my work email.
Q Where is that work laptop stored?
A It is stored at work.
Q Where is work?
A Work is Defense Distributed.
Q What is the address of your work Defense Distributed?
A Defense Distributed is addressed at 2320 Donley Drive, Suite C, as in Charlie, Austin, Texas, 78758.
Q Is that the same address as your residence?
A No.
MS. GYEBI: Counsel, how long are you going to be? We're going on about an hour and a half now. Could we have a break?
MR. ZERMAY: Sure, we can take a break.
MS. GYEBI: Thank you.
THE VIDEOGRAPHER: We're going off the record. The time is 2:32.
(THEREUPON, there was a brief recess, after which the following proceedings were had.)
THE VIDEOGRAPHER: We are back on the

record. The time is 2:59. This is the beginning of Media Unit 4.

BY MR. ZERMAY:

Q Okay. So just for purposes of the record, Mr. Wilson, you're still under oath. Do you understand that?

A Yes.

Q So the oath carries its full force and effect.

So let's move onto the NS3 System. So could you look at the Complaint in paragraphs 230 to 249?

A Yes. I'll read them, if you would like.

Q Okay. Perfect.

A I read 230, is that it?

Q 230 to 249.

A Oh, sorry. Okay. I've read them.

Q Okay. So could you turn to Plaintiff's Exhibit 3, Figure 22?

A Yes.

Q Okay. And when I refer to the NS3 works I'm referring to the written documentation and "Read Me." And so when I refer to the NS3 works do you understand what I'm referring to?

A Is that two literary works?

Q Written documentation and the Read Me, yes.
A So it's two separation registrations. I believe I understand.
Q So could you describe to me Figure 22?
A Figure 22 seems to be a reproduction of a page from the DEFCAD's website, likely reproduced without authorization, since it's probably copyrighted.
Q And can you describe Figure 23 to me?
A Figure 23. Figure 23 seems to be substantially the same image of the website but as captured from the Wayback machine there's some variation near the download bottom.
Q What is the verification between the two images?
A I note a variation with the Menu Bar at the top. I note a verification of Descriptions. And below the Download Button immediately below, some annotation about location.
Q Do you see towards the bottom right-hand part of those two figures do you see the word "License"?
A The bottom. I'm sorry, which figure?
Q 22?

A 22. I don't see the word "license" in Figure 22.
Q The bottom right.
A Oh, sorry, yeah, "Some rights reserved."
Q Okay. Do you see a Figure in 23, roughly around the same area, do you see the license where it says, "No license"?
A Yes, I see that.
Q Why was the phrase, "Some rights reserved" added in the Figure 22 image, or whereas it says "No license" in the Figure 23 image?
A I do note the difference. I can't explain the change.
Q Do you know who would have had authorization to make that change on the DEFCAD website?
A Authorization? I don't think this change was authorized by the meaning of your question. But I could guess who might have made the change.
Q I don't want you to guess.
Who would have had the power to make that change?
MS. ZIBAS: Objection to form.
THE DEPONENT: I would like to answer this question. Could you rephrase as to "licensed

description," of what you mean?
BY MR. ZERMAY:
Q Sure.
Which employees of DEFCAD would have had the ability to change the description of, "No license" to "Some rights reserved"?
A To the best of my knowledge Tom Odom would have had such a power.
Q Was there anybody else who would have had such power?
A Let's see, not in my knowledge or memory or in my capacity here today.
Q Okay. It says under, "Metrics" -- I'm sorry. Under Figure 22 do you see the word "metrics" and under "metrics" there's "views and downloads"?
A Yes.
Q Do you know how those are calculated?
A I have only a sense of how they're calculated. No direct experience.
Q And what is your sense of how they're calculated?
A They reflect unique views, as I understand the term in, like, SCO. And they reflect how many times the entity has been downloaded.

Q Do you know where that data is stored?
A Do I know where the data is stored? I'm afraid -- I don't even know if it is stored. I don't know that I know.
Q Does DEFCAD have a server that the DEFCAD website is stored on?
A I don't think so.
Q Is the DEFCAD website licensed with a website hosting domain like Go Daddy or Host Gator?
A Okay. Can you restate that question?
Q Sure. If the DEFCAD website is not stored locally on a server, do you know if it's stored remotely on a third-party web hosting server, like, Go Daddy or Host Gator?
A Well, we see as DEFCAD I know there's maybe a handful of websites, and therefore maybe there's not one answer to your question. I think remote storage is somehow how DEFCAD works.
Q Can you name the handful of websites that you're referring to?
A Can I name the website? I know that there are services related to DEFCAD. I don't know if they have names. They are bundled as DEFCAD. Services or micro services, depending upon how they're treated. I'm not sure that they have

names.
Q Can you describe to me what you mean by services and micro services?
A We're at the limits of my understanding, in all fairness. So I don't know that I could accurately describe that to you.
Q Do you know the different domain names that which constitute the handful of websites you referenced?
A I know that DEFCAD.com is certainly one. I believe that there are development URL's, as well.
Q Through the inspection of records in your possession, custody or control could you get those development URL's?
A Not in my personal records, no.
Q What about in your records, in general?
A Well, I could look. This is not my habit to keep those records. This is a very secure website.
Q Can you describe what you mean by "very secure website"?
A Yeah, yeah, I could. The website was built out of a lot of security applications that even pre-date the use of DEFCAD, and then have been

evolved over the course of many legal situations, federal and state, as we discussed earlier in this deposition. So it's a combination of many projects, both things that we've developed and adopted from other open sources of security projects.

Q Okay. So it sounds like posting of these files is a sensitive topic?

A Certainly not the posting. We try to make that part easy. But maybe I'm assuming what you mean by the word "post".

Q So regarding access to the websites you -- is the website region locked?

A Is the website locked? Well, if you don't mind, I'd like to know your definition of "region locked"?

Q Sure. If I'm in California could I access the website and download 3D printing files?

A Look, for the record, no. Though California has certain exceptions to its law. So if you had an active file in California, it may be possible to access some of the files.

Q Who did you get to develop the website?

A Who did I get? The DEFCAD website has existed for more than 10 years. It has existed through multiple corporate forms, and therefore

multiple administrators and developers. I've gotten many people to develop the website.

Q Could you get to the names of the people who developed the website through records in your possession, custody and control?

A I'm unsure if I have development records of the website in my possession, custody or control.

Q Have you checked for records of that nature?

A Have I checked for development records of DEFCAD?

Well, discovery in this case has been extensive. And I'm not sure how to answer that question right now. I think I would need to consult some documents to know.

Q So apart from DEFCAD.com could you name any other websites URL, as you sit here today?

A I can name any website you want.

Q The website URL what which would constitute DEFCAD?

A Oh, well, I said I believe there are development URL's.

Q Could you name any of them?

A I would be guessing.

Q Where do -- do you get compensation for

these files that which can be downloaded?
A Is the question do I get compensation? That's what I heard.
Q Yeah.
A No, I don't.
Q Does DEFCAD get compensation for them?
MS. ZIBAS: Objection to form.
THE DEPONENT: I don't understand the question?
BY MR. ZERMAY:
Q Is there a subscription that which people could subscribe to in exchange for money or cryptocurrency to obtain 3D printing on files?
A I want to help you, man. I don't know how to answer that question.
Q What is DD Legio?
A DD Legio describes a website that offers, among other things, access, direct access to the repository of DEFCAD.com.
Q Do consumers have to pay money to Legio or any other organization to subscribe to what you just described?
A No.
Q So does Legio accept funds at all?

A Does Legio accept funds? Could you restate your question?

Q Does Legio accept funds for the subscription that you've described?

A Legio offers some paid subscriptions.

Q Can you describe to me what those paid subscriptions are?

A One of those subscriptions is an annual subscription, for example.

Q Where do the funds for the DD Legio paid subscriptions go?

A Funds for Legio? Legio is a d/b/a of another company that's not a party to this case.

Q What is it the d/b/a of?

A It is the d/b/a of DD Foundation, LLC.

Q Do you know if DD Foundation, LLC has bank accounts?

A Do I know if it has bank accounts? Yes, I know that.

Q Which bank has the DD Legio Foundation or DD Foundation, LLC's bank accounts?

MS. ZIBAS: Objection to form.

THE DEPONENT: Let's try it again.

BY MR. ZERMAY:

Q What bank does Legio DD, LLC have its bank

accounts at?

A I know that DD Foundation, LLC has a bank account with Truist.

Q How long has it had that bank account with Truist?

A Oh, gosh, I would be guessing, I think.

Q Do you have a best estimate?

A COVID.

Q And when you say "COVID" do you mean 2020?

A The DEFCAD -- this version of the website was relaunched in March of 2020. I believe it would have been around that time, if not before.

Q Why does the money go to DD Foundation, LLC, instead of DEFCAD?

MS. ZIBAS: Objection to form and foundation.

THE DEPONENT: Yeah. I was only going to offer that I'm not saying that it doesn't go to one or it doesn't go to the other.

BY MR. ZERMAY:

Q Could you describe to me the nature -- strike that.

Does DEFCAD get any of the funds that DD Foundation, LLC has used for the subscription for Legio?

MS. ZIBAS: Objection to form.
THE DEPONENT: Does DEFCAD get the funds? Hum? I suppose I don't understand what you mean.
BY MR. ZERMAY:
Q So DEFCAD has a data base; right?
A I'm not sure -- I'm not sure that that's a true characterization at this point.
Q How would you characterize it?
A How would I characterize what, the database?
Q Yeah.
A For example, I don't know that there's a monolithic database at DEFCAD. I don't know that.
Q So are you saying there's multiple databases?
A No, I'm saying it's not in my knowledge to confirm that there's a data base at DEFCAD. It sounds to me like the question assumes such database.
Q So the images that which constitute the works that are the subject of this lawsuit, we went through numerous screenshots of them on DEFCAD.com; right?
A Every screenshot I saw is not a work that

this Plaintiff owns. Every screenshot I saw is a work owned by someone that is not at issue in this case.

Q Setting aside the ultimate legal question of ownership, there are works that are being discussed that which are available for download on DEFCAD.com.?

A My testimony has not said that.

Q Okay.

MS. ZIBAS: You haven't even clarified what your works are in your Complaint, so I'm not sure where you're jumping to the download. But it's your deposition, so you can keep going.

BY MR. ZERMAY:

Q What about Defense Distributed, do any of the Legio funds go to Defense Distributed?

MS. ZIBAS: Objection to form and foundation.

THE DEPONENT: Legio funds? I can only assume what you mean.

BY MR. ZERMAY:

Q So the DD Foundation, LLC, receives money from the Legio paid subscriptions. That was your testimony; right?

A It does.
Q Okay. Does any of the funds that DD Foundation, LLC, go to Defense Distributed?
A Go to? Yes.
Q Okay. How do the funds -- what is the agreement between DD Foundation, LLC, and Defense Distributed regarding those funds?
MS. ZIBAS: Objection to form.
THE DEPONENT: Yeah. I mean, I can see that. Is there an agreement you have in mind?
BY MR. ZERMAY:
Q Is there a profit sharing agreement?
A A profit sharing agreement? In my personal capacity I'm unaware of an agreement by that name.
Q Are you aware of any agreements between Defense Distributed and DD Foundation, LLC?
A You mean written agreements?
Q Let's start with written agreements?
A I would have to guess, and I feel uncomfortable making such a guess.
Would such agreements include operating agreements?
Q Sure. Let's include those?
A Then I think it's likely.

Q Would you have access to those operating agreements in the records that are in your possession, custody or control?
A I can't know to a certainty. But I believe you mean agreements between the two entities?
Q Yeah.
A So I think it's likely, but I can't -- it's not my testimony today that I'm aware of such an agreement.
Q Okay. Are you a corporate officer of DD Foundation, LLC?
A Yes.
Q Okay. What is your position at DD Foundation, LLC?
A I believe it's member manager.
Q What do you understand that to mean?
A I understand I'm a single member manager of the LLC.
Q Do you have authority to take action on behalf of DD Foundation, LLC?
A I believe I do.
Q Okay. As officer of DD Foundation, LLC did you engage with Defense Distributed in any way whatsoever?

A Did I engage? No, I think all operating agreements under which we execute were made before my tenure as a manager.

Q Who controlled DD Foundation, LLC prior to you becoming the member manager?

MS. ZIBAS: Object to form.

THE DEPONENT: I'm afraid I don't know what you mean?

BY MR. ZERMAY:

Q Sure. You just mentioned before your time at DD Foundation, LLC, who controlled DD Foundation, LLC before you became an officer at DD Foundation, LLC?

MS. ZIBAS: Objection to form. "Control and officer."

THE DEPONENT: Maybe we start with one and get to the other?

BY MR. ZERMAY:

Q Sure. Let's start with the officer at DD Foundation, LLC?

A To the best of my knowledge the First officer was Jeff Winkleman. And then I believe Dennis Wilson, my father, was the officer in the interim of Jeff Winkleman and myself.

Q Who is Jeff Winkleman?

A Who is Jeff Winkleman? I know Jeff Winkleman as a manufacturing consultant, designer C&C programmer. I think that's an accurate description.
Q Okay. What is his address?
A I don't know.
Q Could you get his address through records in your possession, custody or control?
A I doubt it. Although, I may have an old address. I just suspect that he would no longer be at that address.
Q Would you have his telephone number?
A I don't think I have his phone number any longer. You have to understand this was some years ago.
Q The best estimate for how many years ago this was?
A Gosh, probably the last time best estimate? I think Jeff stopped being in 2018, 2019; probably 2019.
Q Okay. And you said your father. What was his name?
A Dennis Wilson.
Q Okay. He was the officer after that. What is his address?

A What is his address?
Q Yeah.
A You're going to think this is crazy, but I don't know his address.
Q Could you get his address from records in your possession, custody or control?
A Records? Maybe not records. I could ask him.
Q Okay. Do you know his telephone number?
A Yes.
Q What is his telephone number?
A His phone number is --
MS. ZIBAS: Just for the record, in Florida PII, phone numbers and addresses. So he does it has to be marked in the record. All addresses and phone numbers are PII in Florida law under the privacy laws.
So in order not to violate them you're going to have to mark the record so that it's not a record for any phone number or addresses. You can give it, but we just have to mark the record, according to PII.
THE DEPONENT: Perhaps I should submit it in writing.
MS. ZIBAS: Okay. Otherwise, you're going

to have to do motions to seal, and we need to make the motion for use of the transcript.

THE DEPONENT: But I'm happy to give it to you.

MR. ZERMAY: We'll order a request in writing.

BY MR. ZERMAY:

Q So do you have in your possession, custody or control a written license from Matthew Larosiere to publish the NS3 works?

A NS3 works? As with the other works in this case, I dispute the Plaintiff's ownership of them entirely.

I believe that the owner of the work nevertheless has licensed them. And I believe that Mr. Larosiere, even though he does not own them, has also licensed them publically implicitly and explicitly, and that I do have possession of these licenses.

Q How is it your contention that the Plaintiff Larosiere could license works that he doesn't own?

A It's my contention because it's his contention. It's plainly his contention. He represents it to a court that he can license works

that he doesn't own.

Q Do you have in your possession, custody or control a license that permits you to reproduce the NS3 works?

A Licensed --

MS. ZIBAS: Objection to form.

THE DEPONENT: Let's see. I think I've answered this question a few ways. Is there a way that you'd like me to answer it that's different?

BY MR. ZERMAY:

Q Yes. Do you have a signed written license from Matthew Larosiere expressly naming the NS3 works?

A I don't know see why I should seek such a license from the Plaintiff, but I suspect I don't have one.

Q You suspect you don't have one or you do not have them?

A Well, I'll say this as before, the Plaintiff has licensed his works. If he sincerely believes that this is his work, then he has licensed work, and he has done so in writing.

Q I guess just to clarify, because I'm --

A Sorry, sorry. And I possess this license.

My apologies.

Q Yeah. You possess a license, and your signed written license from Plaintiff Larosiere naming the NS3 works?

A You have to forgive me, I'm not a lawyer. To me I only intuitively think you mean a signed with his signature.

I experience his signature in other ways: As made in his voice, used with his screen name, broadcast publically on his identified social media. These are forms of signature.

Q Okay. So as to John Elik do you have a signed written license permitting you to reproduce the NS3 works?

A As to John Elik? I don't recall in my personal capacity such a license.

Q What about in your every day capacity?

A Good question. I would have to look. I suspect, though, that we don't have such a license.

Q Have you looked for such a license in your -- during the course of this lawsuit?

MS. ZIBAS: Objection as to form.

THE DEPONENT: Is the question have I searched for an NS3 license?

BY MR. ZERMAY:

Q A signed written license to reproduce the NS3 works from John Elik?
A Gosh, not with so many qualifications I don't think I have.
Q Let's go on to the TaxDriver.
Can you go to the First Amended Complaint of paragraphs 250 to 259?
A I'm there.
Q Could you read those?
A 250 to 259, yes.
Q Okay. Let me know when you're done reading.
A To 259?
Q Yes.
A I'm finished.
Q So when I refer to the TaxiDriver works would you understand that to mean the 3D model copied from the Hitchhiker?
A Would I agree?
Q Would you understand that to be what I'm referring to?
A I don't know. This one confuses me. An unauthorized copying of the 3D visual artwork, namely the models.
Does Plaintiff claim I own the models in

the TaxiDriver?
Q That's the contention.
A As I read 251 it is that of the infringement. It's a separate infringement containing an unauthorized copy.
Do I read that this works has -- I can't, sitting here agree, as I only know that there are differences, but I'm not intimate of what the differences are.
Q I'm just wondering if you understand what I mean when I referring to the TaxiDriver works?
A TaxiDriver works 3D models with the registration number. I don't understand the TaxiDriver models to be registered. And I suspect that this registration number may be that from the HitchHiker.
Q Yes.
A So if by TaxiDriver infringement you mean the HitchHiker infringement, then I guess I understand what you mean.
Q Okay. So could we go to Figure 24 of Plaintiff's Exhibit 3?
A Okay.
Q Could you describe to me what Figure 24 is?

A Figure 24 seems to be a screenshot of a reproduction page from the DEFCAD website reproduced without authorization.

Q When we're referring to these figures when you say, "Reproduced without authorization," what do you mean by that?

A I mean what you mean by it.

Q Well, are you stating that the printing of these websites constitutes unauthorized republication of the DEFCAD website?

A I'm assuming that the Plaintiff and you don't have a signed written agreement from DEFCAD. They can image and reproduce a screenshot of the website or the 3D image here, and I'm assuming therefore you don't have authorization in your own construction of what that means.

Q Okay. So did you have or do you have a signed written license from Plaintiff Matthew Larosiere to publish the TaxiDriver works?

MS. ZIBAS: Objection as to form. And also there's no clarification as to what is the works. Even from the Complaint it says the HitchHiker and it cross-references a USCO registration number.

The TaxiDriver and HitchHiker are

intertwined in this page, as well. So I'm just objecting that it's really kind of hard to -- I don't even understand what the TaxiDriver work is --

MR. ZERMAY: Okay.

MR. RAPKIN: -- because of how they're -- I don't see an image. I don't see a registration number. I see nothing that tells me what is the TaxiDriver here.

THE DEPONENT: I understood Plaintiff's Counsel to mean that the TaxiDriver infringement meant the HitchHiker infringement.

MR. ZERMAY: It's a verification of the HitchHiker infringement.

MS. ZIBAS: Then it's a separate copyright. It has to be. It's a totally separate copyright. There's no registration name.

MR. ZERMAY: I appreciate the speaking objections, but --

MS. ZIBAS: All right. Well, objection. He can't answer about -- we have no objection of works. If you want to clarify what the works is, that's great.

MR. ZERMAY: Sure.

MS. ZIBAS: Because right now it's impossible to tell.

MR. ZERMAY: Yeah. It's copyright registration No. VA0002418947.

MS. ZIBAS: And what is the title of that copyright registration, please?

MR. ZERMAY: Oh, am I being deposed now or is it --

MS. ZIBAS: No. I'm just asking you, because it's not clear. Either that, or he can't answer any questions about the TaxiDriver, because he can't define the work as the TaxiDriver.

MR. ZERMAY: Again, it's speaking objections.

MS. ZIBAS: I understand they're speaking objections.

MR. ZERMAY: And generally they're frowned upon by the courts.

MS. ZIBAS: Well, poor questioning is frowned upon, as well. So why don't we move forward and clarify for the witness, unless he can explain, you know, what is the work at issue.

I just want a clean record, because

right now it's very confusing. The Complaint is confusing, and the images are confusing, I'm just saying for TaxiDriver only I'm referring to.

THE DEPONENT: I don't understand the Plaintiff copying any of the images in the figure.

MS. ZIBAS: Well, he said works. I'm just trying to find out what the works is.

THE DEPONENT: Right. I understood the work to mean the HitchHiker.

MS. ZIBAS: Oh, all right. So the HitchHiker twice. So we're asking about the HitchHiker; is that correct, Mr. Zermay? You're asking about the work as the HitchHiker?

BY MR. ZERMAY:

Q So I'm at Figure 24, and in the "About" section it says quote, "The TaxiDriver is a single shot fully DIY open-bolt .22LR firearm that can be configured as a carbine. Legally a pistol or a rifle. It is based on earlier design, the HitchHiker. The TaxiDriver and its documentation and proof upon the HitchHiker in many ways," end quote.

Is that an accurate representation of what the "About" section says?
MS. ZIBAS: Objection as to form.
BY MR. ZERMAY:
Q In Figure 24?
MS. ZIBAS: Objection as to form.
THE DEPONENT: I can read what you have just spoken in the "About" section.
BY MR. ZERMAY:
Q Okay. So when I refer to as the TaxiDriver, do you understand that's what I'm referring to, and copyright registration No. VA0002418947?
A No. Your problem is you've described a single shot open-bolt .22 firearm. And no one here, I think, is claiming to have copyrighted a firearm, or are they?
Q It is the 3D model of that?
A Is it your contention, so that I can answer this question, that the 3D model and the firearm have identity?
Q We're talking about the 3D model.
A The 3D model is the firearm?
Q We are talking about the 3D model.
A What's described in this "About" section

is the firearm.
Q So I'd like to bring forth Plaintiff's Exhibit 7.
THE COURT REPORTER: Thank you.
(THEREUPON, the court reporter marked Plaintiff's Exhibit 7.)
BY MR. ZERMAY:
Q I'd like you to go to page seven of Exhibit 7.
A Uh-huh.
Q Would you look at page seven?
A Yes.
Q What do you see on page seven?
A I see a square with four items which are labeled at the top a View of 3D model, a View of registered model, and then a third column which describes registration numbers with the copyright numbers.
Q Do you see the text above, "A hidden poem is exactly reproduced"?
A Yes, I see this text.
Q What does that say?
A Would you like me to read the entire poem?
Q Yes.
A Hidden Poem: "How many are the

Whataburgers? Upon those streets of Texas? How many lie, these Wataburgers where our friend evades his taxes. What of the younger ladies which are dear friend fancies. Be they in those Wataburgers? Or perhaps escaped to Taiwan.".

Q Did you write that poem?

A Did I write that poem? Well, to call it a poem is generous. I don't believe I wrote the poem.

Q Do you know where the poem is on the 3D model on the TaxiDriver?

A Do I know where it is?

Q Yeah.

A Are you saying it's in the model?

Q Yes.

A I don't know where it is, no.

Q Do you know if you downloaded the TaxiDiver from DEFCAD's website one would download that poem?

A Are you saying that that is the case?

Q I'm asking you if you know that's the case?

A I don't know that to be true.

Q Okay. So I'd like to ask you a few questions about instances where you mentioned Matthew Larosiere on the DEFCAD website.

So why did you use Plaintiff's name at all on the DEFCAD website?
A Why did I use Plaintiff's name?
Q Yes.
A I'm not agreeing that I have used Plaintiff's name.
Q You've stated that Matthew Larosiere is publically associated with the Gatalog; right?
A I have stated that?
Q Yes.
A Do you mean on my website?
Q On your website?
A On my website? I don't know that I have stated that on my website. I may have stated that in public.
And for the record, of course, I believe that Matthew Larosiere is associated with Gatalog. At this point everyone knows that.
Q Can we go to Plaintiff's Exhibit 5 at page 18?
A I have to catch up with you here. All right. Plaintiff's Exhibit 5. Would you repeat the page? I'm on page 32.
MS. ZIBAS: Page 18, Contributor Certificate of Origin.

THE DEPONENT: Page 18.
MS. ZIBAS: He had said page 18.
MR. ZERMAY: Page 20. Sorry.
MS. ZIBAS: Look at 20.
THE DEPONENT: I see it.
BY MR. ZERMAY:
Q Can you read that?
A I assume you mean the description under the Gatalog?
Q Yes.
A "The Gatalog is the first corporate successor of Deterrence Dispensed, owned and directed by Matthew Larosiere and John Elik.
The Gatalog formed in 2021 to develop commercial kit designs for builds like the FGC-9 to promote its upmarket parts kits and defend its enterprise, the Gatalog experiments with copyright and closed source design principles."
Q Who wrote that?
A In my memory Garret Walliman wrote this entirely.
Q How do you know that Garret Walliman wrote this?
A Garret Walliman cares very much about the descriptions, these 3D2A organizations. It's like

his past-time or something.
Q Okay.
A I don't disagree with anything that I've read here, by the way.
Q So you believe what is stated in that description as true and accurate?
A Let me reread it. Yes. Every sentence is accurate and true, in my understanding.
Q What is the factual basis for you to believe that everything that's stated in that is true and accurate?
A Sentence one, the Gatalog has a corporate form. It is a successor of Deterrence Dispense. Its founders have claimed it to be on social media.
The corporate form is easily found with the Florida Secretary of State, owned and directed by Larosiere and Elik. Especially Elik has claimed this multiple times over many years. He has declared it to me on the phone.
What else is my factual basis? The Gatalog is being sued. Its directors, Larosiere and Elik, are being sued by the Attorney General of California. They're making the same representation.
The Gatalog formed in '21. That's true. You can see that with the Florida Secretary of

State. That's when they began to use the name at the same time.

They developed commercial kit designs. This is true. Anyone can see it. You can go to their website Odyssey where they direct you to where you can buy these commercial kit designs.

It's usually owned by -- made or sold by businesses of directors of Mr. Larosiere or Mr. Holladay, they own or control the upmarket or the Upmarket. Only in the sense that they're expensive.

I think Garret probably added that embellishment. Do I agree with it? Sure. What's my factual basis for it? The kits are expensive. People complain about how expensive they are.

The Gatalog experiments with copyright. This lawsuit, for example, is an experiment with copyright. You know the Plaintiff doesn't own the works, and can convince a copyright agent working at home that these are copyright in works. That doesn't mean that they are or that his lawsuit is not an experiment.

And of course, close source design principles. Agree with that, too. Close sources is kinds of like antipathetic to what we do here with

3D Guns.

Q Any other factual basis?

A Any other factual basis? Director Holliday has also made the same claims on social media.

Another factual basis? The agents of the Gatalog often make these same representations on social media. A lot of this has been disclosed in discovery I think to you.

Let me think. Are there other factual bases? Hum? I have records of Deterrence Dispense, and what the directors claimed at that time.

Q Where are those records located?

A Especially the Deterrence Dispense records I believe I have some of those. Where would they be? Definitely one of the -- I have a website called Gataligs (phonetic).

Q Gataligs.

A Gataligs, yeah.

Q Did you provide those records that you've just described to your attorneys?

A Yes, especially the Deterrence Dispense records, yes.

Q Did you start Gataligs?

A Did I start Gataligs? I'm not sure I

understand the question.
Q Did you register the domain name Gataligs?
A I must have. I believe I did.
Q Why did you register the domain name Gataligs?
A Well, the Gatalog has a tendency to leak information. It made sense at a certain point beyond a human level of organization to archive, collate all of the information that the Gatalog does leak, and to make an easy form of organization of information, retrieval of that information.
Q Why would you think to organize that information for retrieval of information?
A I had to. The Gatalog is a -- you could say a security risk on the internet.
Q To who?
A To themselves, first. To me, as well. I operate a legal website, as we've discussed.
The mistakes and leaks that they make impact the policies and decisions that our website makes, as well.
It's kind of important to know, like, if a ship next to you sinking or not. You know, why it's sinking? What the problem is.
Q Have you shared information that is on

Gataligs with third parties?
A With third parties? Well, if you mean my attorneys? Yes.
Q Not the attorneys?
A Third parties? No. By your question, no, I haven't shared that information with third parties.
Q You haven't shared it with the New York Times?
A Shared it with the New York Times? No, the New York Times does not know of, to my knowledge, Gataligs, though it is a public website; gataligs.org.
Q Have you registered gataligs.org as a corporation or a corporate structure at all.
A No. It's a nonprofit.
Q So it's a registered nonprofit?
A No, no. It's just not-for-profit.
Q So it's just an unincorporated --
A The website is not connected to a corporate form.
Q Okay. Understood.
So who decided that if DEFCAD paid, this would be attributable to the Gatalog?
A I'm not sure it was a decision. I don't

know that that's true.

Q Who decided if DEFCAD's web pages would be attributable to Matthew Larosiere or the FuddBusters' user name?

MS. ZIBAS: Objection to form.

THE DEPONENT: The web pages -- okay. Are we -- I don't know that any entity on DEFCAD is attributed to Matthew Larosiere. I don't have that knowledge. If you have a document, I'd be happy to examine it.

BY MR. ZERMAY:

Q Well, what about FuddBusters?

A I believe some of the works is attributed to FuddBusters. I may have even seen that in a screenshot provided to me here.

Q Do you know who would have attributed any content or information that is on DEFCAD website to FuddBusters?

A Who would have done this crime? Well, if we're -- there it is. You're right. The HitchHiker is associated with FuddBusters.

And your question is who might have done this?

Q Yep.

A Who would have done this? In the case of

the HitchHiker I don't have firsthand knowledge of who did this or who would have done this. I suspect it was someone working for DEFCAD. It didn't just happen randomly.

Q Would it have been Garret Walliman?

A The HitchHiker was published -- when I look at the project info here I'm going to make a -- I'm going to say Garret Walliman, but I'm tempted to explain why.

Q Why?

A It seems to me that since this was published in '24 that Garret would have had no connection to its editing or assigning any of its meta data. Garret has not done anything like that in years, in my memory.

Q Who would have had the power to do it?

A The power?

MS. ZIBAS: Objection to form.

THE DEPONENT: Do you mean who might have, who could have assigned FuddBusters as a creator of the HitchHiker?

MR. ZERMAY: Yes.

THE DEPONENT: Only a narrow group of people could have done this. The uploader could have done it. Let's see, Elizabeth

Everett could have done it if the uploader's name was not provided. I mean, if the upload, himself, did not provide the name of the creator.

It is possible that other people -- it is possible other people could have contributed. But I would suspect that either the uploader or Elizabeth would have known and assigned it first.

BY MR. ZERMAY:

Q And when you say "the uploader," what do you mean by "the uploader"?

A All the files that are brought to DEFCAD are uploaded by someone.

Q Are they ever uploaded by employees of DEFCAD?

A Uploaded by employees of DEFCAD? No.

Q So it's your testimony that DEFCAD employees do not upload anything to DEFCAD?

A No, I'm not saying that. I'm certainly not saying that.

Q Do you keep records of who uploads records of DEFCAD?

A I do not keep such records.

Q Do you know if DEFCAD keeps such records?

A Does DEFCAD keep the records of who uploads?

Q Yes.

A I believe there are records showing accounts and what they uploaded at DEFCAD.

MR. ZERMAY: Let's go to Plaintiff's Exhibit 8 now.

(THEREUPON, the court reporter marked Plaintiff's Exhibit 8.)

BY MR. ZERMAY:

Q Can you go to page 6 and of Exhibit 8?

A Yes, I'm there.

Q Could you read from 2.1 to 2.2? That's a Contributor Certificate of Origin.

A Okay. I've done so.

Q Could you also read 2.2 through 3.0?

A Okay. I've done so.

Q Okay. And sorry for this being out of order, but also 2.0, Terms of Contribution through --

A The same exhibit?

Q Yes. 2.0, 2.1, 2.2.

A I see. Okay. Got it.

Q Okay. Are these terms and conditions that which constitute Plaintiff's Exhibit 8, are those

published on the DEFCAD's website?
A Well, I believe that they are.
Q Do you have any reason to doubt that they are?
A No reason to doubt.
Q Okay. Are they at URL:DEFCAD.com/terms-of-service/?
A Yes, I suspect they are.
Q Okay. So does the Contributor's Certificate of Origin require the contributor to certify authorship, permission or receipt from another certifying person?
A Let's start again. Does the Certificate of Origin require what?
Q A contributor to certify authorship, permission or receipt from another certifying person?
A Does it require it? I see four conditions which don't have to be satisfied. So I'm not sure that it does require what you've described.
Q What does it require?
A These four conditions seem to be a certification that either you contributed in whole or in part, or that the contributions was based on other work to your knowledge, and is covered under a

license. Or C, that someone give you the work, that you haven't modified it, but that though you gave it, and it's under some open source license.

Q Okay.

A Or D, that you found the project as public. You understand that the record of your contribution is maintained, which doesn't to me to seem like a related certification.

But anyway, these all seem to be separate to me and not all satisfied or required to be satisfied.

Q Okay. Subsection D says, "The contribution record, including sign-off and personal information is maintained indefinitely," is that right?

A Including all personal information I submit with it. Of course, you don't have to submit any personal information with your contribution.

Q But such information, if it's submitted, is maintained indefinitely by DEFCAD; right?

A That's what this says.

Q Section 2.2 says that, "Uploaded materials grant DEFCAD irrevocable, a perpetual worldwide non-exclusive license," right?

A Hold on, hold on. "Irrevocable and

perpetual fully-paid."

Well, yeah, I mean, I read that here. And I'm glad you reminded me of this.

This is another example of the licenses that I suppose we've secured from John Elik by agreeing to upload at DEFCAD. He's given us this license. Very interesting.

Q When you say, "Given us this license," who is the "us"?

A Sorry, I'm meaning DEFCAD. The uploaded material to DEFCAD; therefore, DEFCAD has the license.

Q For each work does a contributor certification exist?

A It exists by virtue of the fact that they've accepted these terms of service at the time of upload. But I have no knowledge of, like, a file that's a certification, if that's what you mean.

Q Okay. So --

A It may exist. I just -- I don't know.

Q Were they produced to your attorneys in the course of discovery?

A These certifications?

Q Yes.

A The certifications? I don't know that

there are such certifications, as we're discussing. I just don't know.

Q Okay. So if these certifications, if they don't exist --

A Well, I read them to exist. I read them as the uploader to say, "By contributing I certify."

So, you know, if the certification exists it may not exist in a tangible form.

Q If they don't exist in a tangible form, is the phrase that they're "maintained indefinitely" incorrect?

A Let me see. Well, it's not -- I don't read D of refer to the certification. I read D to be a certification.

"I certify that I understand that this project and its contribution and its record of that contribution are maintained."

And, of course, a record of the contribution is maintained. But this is not the same thing as certification of the same.

Q Does a contribution record exist for the Amigo Grande works?

A Again, I would propose that someone uploaded the Amigo Grande, and therefore certified their contribution. I cannot speak to whether a

certification record, as we have discussed and hypothesized, exists or is maintained.

Q Okay. So you cannot say one way or the other if that certification record exists as to the Amigo Grande works?

MS. ZIBAS: Objection as to form.

THE DEPONENT: I can say that I'm sure a record of the contribution of the Amigo Grande exists.

BY MR. ZERMAY:

Q Okay. If it exists did you produce it to your attorneys?

A I'm sure I have.

Q As to the MPP99 work does a contribution record exist for that work?

A Let's see, the MPP99 is very early. It may predate these terms of service; therefore, I am not sure for a different reason whether the record exists.

Q Okay. As to the BUBAR works does a contribution record exist?

A If you don't mind, I'm going to find the screenshot of the same. You've asked me to make best estimates when I can. So I would like to make an estimate.

Q Okay.
A I would estimate that there is a contribution record of the BUBAR, based on the release date that I see here in the screenshot.
Q Did you produce that contribution record to your attorneys in discovery?
A I believe I did, yeah.
Q Okay. As to the SS5 works does a contribution record exist?
A I'm just using this to reference. I can't say for certain whether such a record exists, though I estimate that it would. I think it is more likely than not that it would.
If by contribution record you mean not the certification that we discussed, but the proof of who uploaded, as described in the terms of service.
Q Did you produce that record to your attorneys in discovery?
A I know that I have, yes.
Q So you can't say whether or not it exists, but you're saying you've produced it to your attorneys?
A Yes. I've produced records of the contributions. To me that seems slippery whether that satisfies the definition of the contribution

record that you've proposed or asked me to describe. The details here are difficult. But a record of the contribution of SF5 exists, and it has been provided to my attorneys.

Q So does a contribution record of the Plastikov works exist?

MS. ZIBAS: Objection to form.

THE DEPONENT: With all the provisos of the SF5 I believe a similar such contribution record exists.

BY MR. ZERMAY:

Q Was it produced to your attorneys in discovery?

A I believe it was.

Q Does a contribution record of the HitchHiker works exist?

A HitchHiker works? Well --

MS. ZIBAS: Objection to form.

THE DEPONENT: Yeah. So far you've described these things in one way, and now it feels like you're doing it in a different way.

Let's try it again.

BY MR. ZERMAY:

Q We've previously discussed the HitchHiker

works. Are you familiar with that discussion earlier?

A I think so.

Q Okay. I've previously described them as the written documentation 3D model and 63 photographs in reference to 201 to 215.

A And then your question is?

Q Does the -- does contribution work exist for the HitchHiker works?

MS. ZIBAS: Objection to form.

THE DEPONENT: I'm sorry, does contribution what?

BY MR. ZERMAY:

Q Does a contribution works exist for the HitchHiker works?

MS. ZIBAS: Objection to form.

THE DEPONENT: I'm sorry, does a contribution what?

BY MR. ZERMAY:

A Does a contribution record exist for the HitchHiker works?

A I believe a contribution exists for the uploads related to the HitchHiker.

Q Was that provided to your attorneys in discovery?

A Yes.
Q And as to the NS3 works, does a contribution record exist?
A I do not have knowledge of such a record existing, though I believe that one does exist.
Q Okay. Did you produce that record to your attorneys in discovery?
A I believe that we did. I'm less certain of this one.
Q Why are you less certain of this one?
A I think this is one that is related to the Amended Complaint. I could be wrong. Nevertheless, I've provided all contribution records related to the works at issue.
Q As to the TaxiDriver works does a contribution record exist?
MS. ZIBAS: Objection to form. Lack of definition.
THE DEPONENT: Again, as I understand discussion with the TaxiDriver it refers to the HitchHiker. And yes, we have provided the HitchHiker's contribution record.
BY MR. ZERMAY:
Q And you've provided those to your attorneys?

A Yes.
Q So for the Amigo Grande works do you know the identity of the entity or a natural person that uploaded the Amigo Grande works?
A No, I don't recall.
Q Do you know or -- would looking at records in your possession, custody or control, would you be able to ascertain who uploaded the Amigo Grande works to DEFCAD's website?
A In the case of Amigo Grande I'm not sure. I'd have to know what screen name uploaded it or something. Yeah, I may know that uploader, but I don't know who that uploader is.
Q Do you know if records exist that would identify the individual who uploaded the Amigo Grande to DEFCAD's website?
A I don't. It would depend on who the uploader was, and then how identified that uploader wanted to be.
In the case of Amigo Grande I don't have personal knowledge of who uploaded it.
Q Do you know if there's any records that which would reveal who uploaded it?
A By "who" you mean identifying, I don't. I suspect that it would be some screen name. And I

wouldn't necessarily know who that was.
Q Do you know who would know?
A Who would know? I'm not sure in the case of Amigo Grande who uploaded it. So I don't know who would know who uploaded it right now sitting here.
Q As to the MPP99 works do you know the identity of the individual who uploaded it to DEFCAD?
A MPP99? A work that early, I don't know.
Q Would there be records that would exist that unreveal the identity of the individual that uploaded MPP99 to DEFCAD?
A I suspect not. I suspect there wouldn't be identifying information. This would have been uploaded in '22. I don't think we have such records.
Q Okay. Do you know the individual who would have uploaded the BUBAR works to DEFCAD?
A One moment. I'm unfamiliar with the BUBAR. I do not know.
Q So do you need me to refresh your recollection as to the definition of BUBAR?
A No. I'm sorry, you don't need to -- I have no memory of who uploaded it.

Q Do you know if there's records that exist which would reveal the identity of the individual who uploaded the BUBAR works to DEFCAD?
A Do I know? Well, I'm getting hung up on identify, you know. I've heard you use the word natural person and things like that, so I can't say that I know that there are records that would help identify who in that sense uploaded it.
Q And by "who" I mean the name?
A Okay. Thank you.
Q So do you understand the question now or are you saying that the records don't exist?
A The records for the name? Let's do the question one more time.
Q Sure. Do records exist that which would reveal the entity of the individual who uploaded the BUBAR to DEFCAD's website, BUBAR works?
A Yeah, it's all good. I don't know to a certainty. I suspect -- I don't know the identity. I don't know how revealing the records would be, but there's a contribution record.
Q And those were provided to your attorneys?
A Yes, yes.
Q As to the KF5 works, do you know who uploaded the KF5 works to DEFCAD's website?

A The KF5 I guess I don't have firsthand knowledge of who uploaded the KF5.

Q Do you have any knowledge whatsoever of who uploaded the KF5?

A Any knowledge? I believe I recall being told that an account named Cyan uploaded the KF5.

Q What can you tell me about the account Cyan?

A Cyan; C-Y-A-N, about the account. I suppose I don't have much knowledge about the account yet. I guess I'm very limited in my knowledge or what I could tell you about the account.

Q Well, what could you tell me about the account, apart from the name?

A The account? I don't really understand how accounts exist at this website. I understand they refer to log-in with them. The entity is persistent. The credentials are provided. It's the same party in the case of a third-party uploader. It's not, like, a group of people or something. I believe it is one person.

And I know that our security controls apply to uploaders, as they would to downloaders in most respects. So I suspect that Cyan is probably

living in the United States.

Q Would you be able to obtain the true first and last name of the individual with the user name Cyan on DEFCAD's website?

A I don't think you could from DEFCAD's website, no.

Q How would you be able to get the true first and last name of the person that uploaded the KF5 infringement on DEFCAD?

A That's a tough one. I don't think I know personally how you would go about doing it.

MR. ZERMAY: How long have we been going for?

MS. ZIBAS: Almost an hour and a half.

THE VIDEOGRAPHER: Yeah, an hour and 20.

MR. ZERMAY: Okay. Let's take a break so you can change out everything.

THE VIDEOGRAPHER: We're going off the record. The time is 4:19.

(THEREUPON, there was a brief recess, after which the following proceedings were had.)

THE VIDEOGRAPHER: We're back on the record. The time is 4:47. This is the beginning of Media Unit No. 5.

BY MR. ZERMAY:

Q Okay. So, Mr. Wilson, you understand you're still under oath?

A Yes.

MR. ZERMAY: Okay. So what did we last discuss? What was the last works? Could you repeat my last question.

(THEREUPON, the court reporter read back the preceding question.)

BY MR. ZERMAY:

Q Okay. So let's keep marching through these. We're on the SF5 works. Okay. So do you know who uploaded the SF5 works to the DEFCAD website?

A The SF5? No, I don't.

Q Are there records in existence that identify the uploader of the SF5 works to the DEFCAD website?

A Yes, I believe so.

Q Were those produced to your attorneys in discovery?

A Yes.

Q The same question with the Plastikov works: Do you know who uploaded the Plastikov works to the DEFCAD website?

A No, I don't. I don't know who uploaded

them.
Q Do records exist that would identify the individual that uploaded Plastikov works to the DEFCAD website?
A I believe such records exist.
Q Were they produced to your attorneys?
A Yes.
Q The same question as to the HitchHiker works, do you know who the individual was who uploaded the HitchHiker works to DEFCAD.com?
A No.
Q Are there records that exist that would identify the individual who uploaded the HitchHiker works to DEFCAD.com?
A There are records about his upload. I don't know if they would in a satisfactory way identify the individual.
Q Were those documents provided to your attorneys in discovery?
A Yes, they were.
Q The same question as to the NS3 works. Do you know who uploaded the NS3 works to DEFCAD.com?
A Who uploaded the NFS3? No, I don't know.

Q Do you know if there's records in existence that would identify the individual who uploaded the NSF3 works to DEFCAD.com?
A I believe there would be a contribution record, as with the other uploads, I don't know if it would identify the upload.
Q Were those documents provided to your attorneys?
A They were provided, yes.
Q Okay. Same question as to the TaxiDriver: Do you know who the individual was who uploaded the TaxiDriver works to DEFCAD.com?
A As I understand how we have constructed the TaxiDriver works, I believe there's a record of the upload of this registered work.
Q Okay. Do you personally know who -- or do you know who uploaded it?
A I don't know.
Q Okay. Are there records that exist that would identify the TaxiDriver work to DEFCAD.com?
A I cannot say for sure. I cannot say that the records of the contribution would identify the uploader. Though, I believe there would be a record of the upload, and the account that uploaded it.
Q Okay. Were those records and documents

provided to your attorneys in discovery?
A That's a good question. On this one, I don't know.
Q Could you find out?
A Here's what I'll say: The records related to this registration have definitely been provided to the attorneys.
Q Okay. Does DEFCAD track views of the web pages with the Gatalog contributed pages?
MS. ZIBAS: Objection to form.
THE DEPONENT: I don't understand the question.
BY MR. ZERMAY:
Q Yeah. Do you know or are you able to ascertain how many times pages that mentioned the Gatalog are viewed?
A Am I able to? I would only be able to see views as publically presented of the distinct entities associated with the Gatalog.
Q What are the distinct entities?
A For example, the works at issue in this case.
Q Does Ghostguns track product sales or traffic attributed to the Gatalog?
A I don't know that there are Ghostgun pages

attributed to the Gatalog. And I don't believe that we track views or downloads of purchases of products related to that attribution.

Q Are there records of purchases at all?

A Could you help me understand what you mean?

Q Yes. When somebody gives compensation for a USB drive, are there records of the exchange of compensation for that USB drive that which is sold on Ghostguns.com?

MS. ZIBAS: Objection to form.

THE DEPONENT: USB drives are not sold at Ghostguns.com.

BY MR. ZERMAY:

Q What does ghostguns.com sell?

A Well, it sells things related to Ghostguns.

Q What is a Ghost gun?

A I've been trying to answer that for a while.

Typically when someone uses the word they mean unfurnished gun parts. Kits, which include such unfinished gun parts. But they often mean finished guns that don't have registration that aren't registered or do not bear serial numbers.

Q Did Ghostguns.com used to sell USB drives?
A In my memory I believe it did.
Q Does Ghostguns.com have records of those USB drive sales?
MS. ZIBAS: Objection to form.
THE DEPONENT: I can't say positively that it has the records of those sales.
BY MR. ZERMAY:
Q Does Defense Distributed have the records of the USB drives that were sold on Ghostguns.com?
MS. ZIBAS: Objection to form.
THE DEPONENT: Have the records? In my personal capacity I don't -- I'm not able to give a truthful answer yes or no to that question.
BY MR. ZERMAY:
Q What about in any capacity whatsoever?
A In any capacity? I don't know sitting here today. I have not seen such records. I don't know.
Q Would you be able to ascertain whether or not such records exist by inspection of records in your possession, custody or control?
A Would I be able to ascertain if they exist or not?

Q Yes.
A I suspect. I don't have such records in my possession.
Q Do you have records in your custody or control?
A Same answer.
Q You created and operate a website called FedCAD.com?
A No.
Q What is FedCAD.com?
A I don't know.
Q I could spell it for you if that would help clarify what FedCAD.com is.
A It sounds like a website.
Q Yeah. The URL is F-E-D-C-A-D, dot C-O-M.
A Thank you.
Q Does that refresh your recollection as to what FedCAD.com does?
A I'm aware of a website called FedCAD.com.
Q Could you describe the website FedCAD.com to me?
MS. ZIBAS: Objection to form.
THE DEPONENT: Hum? I am familiar only very vaguely with the website. It's not a website that I own or build or control or

direct. I don't know that my descriptions would be very good.

BY MR. ZERMAY:

Q What is your descriptions of the website?

MS. ZIBAS: Objection to form.

THE DEPONENT: Hum? It's a simple website. I've seen screenshots of it in this case. It seems to be a very simple website.

BY MR. ZERMAY:

Q Can you further describe it?

A Could I further describe it?

Q Yes. What is your further description of that website?

A That further description? Let's see. It seems to be about compiling records. It's got, like, a government -- it looks like a government logo. I remember that.

Q Does the website track the works of DEFCAD copies in which copyright notices to them?

A Does it do that? Not to my knowledge.

Q Would it surprise you if the website FedCAD.com does that?

A Okay. Are you saying -- I'm sorry, please restate your question.

Q Sure. Would it surprise you if the website FedCAD.com tracks the works that DEFCAD copies in which have copyright notices attached to them?

MS. ZIBAS: Objection to form.

THE DEPONENT: Would it surprise me? I don't believe that's what's happening at that website. No one has told me that.

BY MR. ZERMAY:

Q What do you believe is happening at that website?

A All I know about that website is that it seems to be some snarky attempt to trace or record copyrighted works.

Q Do you know who operates FedCAD.com?

A Yes. I've been told.

Q Who operates FedCAD.com, to the best of your knowledge?

A His name is Garret Walliman.

MR. ZERMAY: Okay. Let's mark this Plaintiff's Exhibit 9.

(THEREUPON, the court reporter marked Exhibit 9 for identification.)

BY MR. ZERMAY:

Q Would you read the title of the document

Exhibit 9?
A That would be Cody Wilson's Objections and Responses to John Elick's request to Interrogatories to Cody Wilson?
Q Yes. Could you go to Number 12?
A I'm there.
Q Okay. Could you read Interrogatory Number 12?
A Would that be the question and the response?
Q Yeah.
A All right. I've read it.
Q Would you go to the second to the last page? Are you familiar with the verification?
A The second to the last?
Q Yeah, the second to last page.
A One second. I'm on the final page.
Q Yeah, the final page.
A Yes.
Q Okay. Did you sign the verification that says, "I, Cody Wilson, Defendant in the above-titled case do solemnly declare and affirm under the penalty of perjury that the foregoing responses to Interrogatories are true and correct to the best of my knowledge, information, belief"?

A I signed that, and that's my signature.
Q Okay. And that was executed on August 25, of 2025; right?
A It seems so.
Q Okay. So I'm going back to Interrogatory Response Number 12. In that what you responded: "Defense Distributed registered the domain name FedCAD.com to combat trade libel against DEFCAD and domain squatting. Garret Walliman uses the site as a personal project to track 3D2A copyrighted claims."
Could you rectify your previous testimony and your response, since the Interrogatory regarding FedCAD.com?
MS. ZIBAS: Objection to form; "rectify".
THE DEPONENT: In what regard is it not perfectly rectified?
BY MR. ZERMAY:
Q Well, you say in this Interrogatory Request that Defense Distributed runs through the domain FedCAD.com?
A Okay.
Q Okay. And you previously testified that its operated by Garret Walliman.
A I think this is what I'm saying in the

Interrogatory and my testimony. I don't see the difference.

Q Is FedCAD.com controlled by Defense Distributed?

A No.

Q It registered the domain name, though; right?

A Yes.

Q And it registered the domain name to combat trade libel against DEFCAD; right?

A Yeah, kinda. Getting domains is common. You know, people like to squat domains. For example, many people have DEFCAD related domains in foreign countries. You try to get what you can. FedCAD seemed to be an obvious one.

Q Why is it an obvious one?

A There's an ongoing trade libel campaign, for example, that uses the term FedCAD. I'm not sure if this domain was purchased before or after that campaign, but it becomes obvious to me that it was a good idea to possess it because of campaigns like that one.

Q What do you mean "trade libel campaign"?

A FedCAD is campaigned by this Plaintiff to fight DEFCAD by other means outside of copyright

law, outside of the law in general. Anyway, he wants people to assume that somehow we're in league with the federal government, for example.

FedCAD is a trade libel, in short. It means that DEFCAD doesn't just abide by the laws, but it somehow influences them and conspires with federal authority. It seems to be particularly malicious to me. And it wouldn't be a good idea to let them operate a website called FedCAD.com.

Q What do you see as wrong with working with the federal government?

A As wrong with working the federal government?

Q Yes.

A No, I only see that it's a trade libel to accuse my website of doing so.

Q Well, how is trade libel to be working with federal authorities?

A To be working with federal authorities?

Q Yes.

A People like to believe -- and this is just their beliefs, that if you're working with federal authorities that may mean that you're an informant. That may mean that you inform on your customers, things like that. And customers in this space, our

3D2A space, don't want to patronize business that do that.

Now, those are their value judgments. I can understand them. And to some degree to understand is to forgive. But that's me casting a judgment about them, it's just stating what they are.

Q Well, I guess when you use the term "informant," what do you mean by "informant"?

A Oh, gosh. It seems to me to have a pretty typified meaning at this point. There are confidential informants, human in form. People who assist law enforcement. Specifically in this context, the accusation that they pass information to an authority upon request or not, but, like, factors or agents of human intelligence, things like that.

Q What is wrong with passing information to the federal government?

A Again, my answer will be like before. I'm not saying there's anything wrong with it, but I'm saying the customers in this market do not want to patronize a business which they believe is taking their information and giving it to federal authority. They do not want to do that.

And so the accusation that my business is doing that is a trade libel. It's anticompetitive. It's meant to disadvantage my business. And it's meant to harm the reputation in the market with my customers.

Q So would you not give information to federal authorities upon request?

A Legal requests for information that I may possess in the form of a federal subpoena, for example, I'm obliged by law to answer if I have records in my control. And, of course, I would abide by such request.

Q Would you do so outside the context of a subpoena?

A Would I do so outside such a request?

Q Yep.

A I have never done so.

Q Well, would you?

A Would I do so?

Q Yeah.

A It's hard for me to answer no and think that I've left something unexamined. But my orientation is to say no, I would never do such a thing.

Q Why not?

A It's a disposition, I think. I'm a civil libertarian. I believe that maintaining -- this is a fiction, of course. There's not truly a separation of powers in this country.

But let's say to maintain the good fiction I would at least request that that authority use proper process and paper-up such request and make them give them that information.

Q And so it's your contention that an insinuation that you would cooperate with federal authorities is libel?

MS. ZIBAS: Objection to form. Relevance.

THE DEPONENT: Yeah, I understand where this is going.

Let's see. The insinuation? I'm only meaning that the FedCAT campaign is a form of trade libel. That's how it works in the market.

BY MR. ZERMAY:

Q Okay. So can we go to Plaintiff's Exhibit 5?

A Yes.

Q Okay. Let's go to page 2.

A I'm there.

Q Could you describe to me what page 2 is?

A Page 2 seems to be a 2 dimensional reproduction of a website, a page from that website, a home page, even. And I don't know, man, I'll I hope he checked with the author to see if this was okay to reproduce.
Q Okay. Is it a true and accurate representation of the FedCAD website?
A I don't know.
Q So would you turn to pages 4 through 6?
A All right.
Q Would you review those for me?
A 4 through 6?
Q Yes.
A All right.
Q Can you describe for me what pages 4 through 6 are?
A Pages 4 to 6 seem to be like a search return, or even a presentation of a search space with results, and they have different status messages.
Q Okay. So do you see on page 4 there's a reference to the NS3 stock system?
A Yes, I see it.
Q Okay. Is that referring to the NS3 works?
A I could only -- I would have to guess if

it was. It seems likely that it is.

Q Do you see the HitchHiker both beneath that?

A Yes.

Q Is that a reference to HitchHiker works?

A I don't think so. As I understand the HitchHiker works and the NS3 works even, those works are a broader category of things that are being referenced here.

And I disagree with other things that I'm seeing here, "rights holder." I don't believe anyone on this page holds any rights to any of these works. I disagree with a lot that I'm seeing here, actually.

Q Let's go back to Plaintiff's Exhibit 9 and the Interrogatory Number 12.

A Was that the one you just gave me?

Q Yeah.

A 12, I see. We were just looking at that.

Q Okay. So Garret Walliman is using this website; right?

A I presume.

Q And you described it as his personal project to track 3D2A copyright claims?

A Yes.

Q Garret Walliman is employed by Defense Distributed; right?
A He is an unpaid employee of Defense Distributed.
Q Is he an employee of DEFCAD?
A No.
Q Is he an employee of the DD Foundation, LLC?
A No.
Q Can we go back to the Black Flag White Paper? I forget which exhibit number this is.
A I've got 6P.
Q So this would be the page 9.
A Yes, I'm there.
Q Okay. So underneath the Epilogue, and the italicized, "One is much more of an artist than one knows."
And we have a phrase, quote, "In deference to the community's need for profile work, and because the law may one day change, I announce FedCAD.com. Let it be a place for respecting and contacting all 3D gun rightsholders. Let it serve as a reminder that in this movement the only possible theft is property."
A Yes.

Q You authored that statement; right?
A I wrote it. Authorship is a heavy word.
Q What did you mean by, "I announced FedCAD.com"?
A The "I" in this section is not the "I" who authored the work. You might understand that the voice that you read in the work is not the voice of the author.
Q Is there a character in this Black Flag White Paper?
A Do you read there to be one?
Q I don't know. But is the "I" in the Black Flag White Paper is referring to you?
A I disagree with that characterization. It is a radical vulgar simplification of what is clearly a literary attempt to explain the law of copyright.
Q Well, I don't want to be vulgar. It's not something I like to do.
A I appreciate it.
Q So how would you describe it?
A The "I"?
Q That statement of the announcement of FedCAD.com with you being the writer and author of this?

A How would I describe my -- well, I first dislocate the announcement from myself. This is in that indistinct indifferent voice that literature pretends to. Okay? And we'll let time be the judge of whether it's literature or not.

FedCAD.com gets announced here. There's no question about that. But, of course, I didn't create FedCAD.com. I didn't announce it. Though, you see the works there, that doesn't mean that the "I" is speaking to you in a text to the reader is the "I" who wrote the words. This is literature 101.

Q So it appears that the website FedCAD.com tracks the works of -- that DEFCAD is copying, which has copyright notices attached to them. Is that a true and accurate statement?

A I don't believe so.

Q It appears that DEFCAD.com, which in the Black Flag White Paper -- FedCAD.com, sorry. It appears that the website FedCAD.com, which was announced by way of the statement quote, "I announce FedCAD.com," clearly details the actual notices that you and your companies have for each of the works at issue. Do you agree or disagree with that statement?

MS. ZIBAS: Objection to form.
THE DEPONENT: I can't agree to that statement. That's a very difficult thing to agree to. Maybe we can break it up?
BY MR. ZERMAY:
Q Why is it difficult to agree to or express an opinion one way or the other?
A I have nothing to do with this website. It seems to be a clumsy attempt to trace -- I've never heard of an M84 Sound Impact Grenade. I don't know if these are on DEFCAD. And you're trying to get me to answer if they're on DEFCAD? I don't know. I have nothing to do with DEFCAD.com.
Q But you announced it in the Black Flag White Paper?
A No. I've told you very clearly that I did not announce it.
Q So what did you mean when you said, "It is a place for respecting and contacting all 3D2A gun holders?
A It is a vulgar assumption that you would think that I have a specific meaning, and somehow you can read these words and know that I am trying to give you a meaning.
What to you think it means?

Q I'm not the witness or being deposed.

When you're referring to, "The Spanish Court in the Fifth Circuit being stronger than any base made in the Bahamas or Outer Banks," are you referring to the United States Circuit Court of the Fifth Circuit Court of Appeals?

A Was I referring to it? Again, I disagree with this neat simple construction. I'm happy to talk about interpreting this work, if you would like?

Q How do you interpret it?

A As a reader I interpret the Fifth Circuit to mean the Fifth Circuit Court of Appeals.

Q Isn't that a simplified version of what I conveyed to you?

A How can I know if it's simplified or not? I don't know what you have conveyed to me at all.

Q Maybe I should have asked this question in the beginning, and I apologize. It's one of those questions that I typically do.

Are you able to read the English language?

A Sometimes.

Q Sometimes. Is it your native language?

A I suppose.

Q Could you understand the conveyance of

thought in English?
MS. ZIBAS: Objection to form.
THE DEPONENT: You know, my bias is for, like, post structuralism. Usually a record of someone's on paper is the surest detour away from what they were thinking, and not at all a signification.
BY MR. ZERMAY:
Q Well, as curious as I am about post structuralism, it's beyond the scope of this deposition. I'm more interested in what is written and what you meant in writing this.
A I'm happy that you're interested.
Q What did you mean by writing that?
A By this paper, by this section, by the Fifth Circuit?
Q Yeah. By that, "Ed Teach died nearly forty, the Commodore of Charles Town Bar. Well, my Spanish fort in the Fifth Circuit is stronger than any base he made in the Bahamas or the Out Banks.
Sail under this flag young pirates, and fear no copyright."
What did you mean by that?
MS. ZIBAS: Objection as to form.
THE DEPONENT: I disagree with a definite

intentional meaning that I, Cody Wilson, sitting here have. It serves as an Epigram. It is meant to associate different images clearly related to Spain, old Spain, the Fifth Circuit, Charlie Town Bar, the Bahamas, the Outer Banks.

BY MR. ZERMAY:

Q What about the phrase, "Sail under this flag, young pirates, and fear no copyright"?

A Well, what about it?

Q What did you mean by it?

A Again, I hate to provide this proviso. It is not I, Cody Wilson, who had a meaning or wrote a meaning into this work. Though, this slogan was authored by me.

The voice of the person, let's say the speaker in this text, has a meaning, I'm sure, but that's known between him and God at this point. I'm more interested what the reader would derive from. And I hope the reader has certain derivations.

Q Who is the voice in this paper?

A It's the voice of the speaker.

Q Okay. Is the speaker in the room with us now?

A Obviously not.

Q To shift a little bit, your attorney in response to Judge Moe's Order disclosed the existence of insurance coverage for this. Could you describe the nature of the insurance policy in which your attorney was referencing?

MS. ZIBAS: Objection as to form. The full policy was provided a while ago under Rule 26. You can answer.

THE DEPONENT: Could I describe it? To the best of my ability I can try to describe it.

MR. ZERMAY: Yep.

THE DEPONENT: Okay. If you would maybe prompt me about what description you'd like?

BY MR. ZERMAY:

Q How -- oh, sorry. What entity is covered by that insurance policy?

A That policy covers Defense Distributed and DEFCAD, as I understand.

Q Okay.

A Now, I believe it also may cover the third entity. But now I'm speaking outside of my exact knowledge.

Q Okay. Has the insurance carrier accepted the facts of Plaintiff's claim as a covered

event?

A A covered event? I'm not sure that that is true.

MS. ZIBAS: Objection as to form.

THE DEPONENT: I don't know the insurance language.

BY MR. ZERMAY:

Q Are you familiar with the phrase "Defending on a reservation of rights"?

A No.

Q Are your attorneys defending on a reservation of rights?

A I couldn't say.

Q So you have no knowledge whatsoever if the insurance carrier that was disclosed has --

A I know they agreed to pay.

Q Okay. So you're not paying out-of-pocket for your attorneys' bills?

A I did not say that.

Q Do you know if there's a consent to settle provision in the insurance policy?

A I don't know.

Q Does the insurance company require your permission to settle Plaintiff's claims?

A Huh? I don't know.

Q Could you find that out?
A It would require my permission to settle. Surely, I could.
Q Okay. So I'd like to ask you some questions about messages or communications that were posed to which mention John Elik.
A Uh-huh.
Q Why do you mention John Elik in public?
MS. ZIBAS: Objection as to form.
THE DEPONENT: This is news to me. Is there a document you want me to read?
BY MR. ZERMAY:
Q Could we go back to Plaintiff's Exhibit 5, page 21?
A One moment.
Q I'm sorry, go to Exhibit 5, page 25.
A 5, 25. Got it.
Q Let me know when you have reviewed it.
A I'm sure I've reviewed it. I'm familiar with the text.
Q Who authored the text?
A I authored this entirely.
Q Why did you author this text?
A Well, I think it's a true -- I guess it's a true note, and it occasioned Pride month. And I

don't know what year this was, '24, '25. And I thought it reflected the difference in our cultural appreciation of Pride month that year.

You know, not many people talked about Pride month that year, and I didn't want to overlook the strong gay influence of arts and letters in the 3D gun culture, and I thought it was an important note historically.

Q So I'll read some parts to this. So you wrote, "No doubt developer names like 'Faggythekid' and 'Suckboy' or projects like AWCY's PEN15."

A Correct.

Q It reads penis. "Are annoying statements of masculine emotional limitation as much as they are powerful, if ultimately meaningless psychosexual expressions."

You wrote that?

A I wrote it.

Q You have a photograph of Matthew Larosiere and John Elik there with a rainbow flag; right?

A I have the photograph there? Sure. I mean, the photograph is presented in this post, yeah.

Q Why is there a rainbow flag superimposed

over Matthew Larosiere here and John Elik?
A It's to celebrate their contribution to gay culture and letters.
Q Is it your belief that Matthew Larosiere and John Elik are gay?
A Well, how about this -- you know, I think their involvement is probably far from sexual. But they qualify by any definition of queer.
Q What do you mean by "queer"?
A I mean, in the sense of queer theory or -- you know, Duke literature on queer theory. Representing yourself as sub-alter and marginal, of fluid sexuality, and a kind of a dynamic bisexuality. This often, you know, intersects with a biracial condition or -- you know, we could go on and on. I mean queer in that sense with the quotation mark.
Q What is the factual basis for you to make those claims?
A A large part of my factual basis is actually contained in this section that you have provided to me.
Q Could you read the language that you're referring to?
A Yes. For example, the title of

Mr. Larosiere's and Mr. Elik's public podcast is Twig, which is known to be a piece of Polari slang, gay, queer slang.

I read radicalism not just in that title, but also in the way that they convey, like, a kind of startling -- and by the way, this is praise, okay. Startling intimacy.

It is almost like -- when you listen -- and I am a listener of the podcast. There's a confessional quality. There's a quality that you see in lost gay novels of the 20th century where two men are so involved with each other, and their soles become kind of knit. And they forget how they're appearing to listeners and outsiders. They become self-conscious of the fact that they're ignoring their wives or their loved ones. You know, it's that very intimate masculine kind of correspondence exchange of masculine love. And it's strange to me that they don't want to be celebrated in this way.

Q So is there a contention that Matthew Larosiere and John Elik are in a homosexual relationship?

A Homosexual only in the artistic sense. I have no factual basis to know if they're gay lovers in the way that's commonly meant.

But there's no doubt that they are queer icons and represent a queer faction for 3D2A. There's not doubt in my mind. And that's been a good thing.

Q What do you mean by "queer icons"?

A Queer icons? They represent tolerance, inclusivity, and even a redefinition of the Second Amendment as about marginalized groups and people.

Matthew Larosiere, himself, is specifically an important -- an important representative of the idea that the Second Amendment represents and defends unlimited immigration, fluid sexual racial identity. And these are important to locate in a queer discourse. And I'm happy that they do so publically, as you see Mr. Elik shows his face in this image.

Q You mentioned, "Fluid racial identity." What do you mean by, "Fluid racial identity," could you describe that?

A I could try to describe it. It's that, you know, we live in a post-racial society. And identify, especially profile work, like, we've mentioned otherwise in this deposition.

Profile work becomes about this continuing revolution of who am I? You know, who am I from?

Where am I going? Where am I from?

Race is one of the important conditions and preconditions for online identity, subjective identity. And its fluidity is marked even in people who otherwise would be identified as having homogeneous racial identity.

I think that's an answer to your question.

Q Okay. So in this you wrote, "In its recent seasons TWIG has grown beyond the libidinal musings of the lonely Fuddbuster. With the addition -- "

A Could we back up for the record? Counsel meant to read --

Q I'm sorry?

A Counsel meant to read, "TWIG has grown beyond the libidinal musings." Lubidinal -- "lubidinal musings of the lonely Fuddbuster."

Q Okay. "With the addition of John Elik as Great Remberer " -- it probably should have been "The Great Rememberer," but we're there.

A Everyone is great.

Q "TWIG has evolved into a creative, spontaneous, and podcast length justification of mutual male infatuation. The suffering ecstasies

and gulping monologues of Larosiere, whose blood boils too much for him to bear, are transformed through Elik's midnight intimacies and paratextual confessions into a profound exchange of two men's love, thoughts, and mind histories. This is some of the best gay fiction of the decade in any medium, and we are privileged to witness."

A Exclamation point.

Q Exclamation point.

What is the factual base for you to say that it is some of the best gay fiction of the decade?

MS. ZIBAS: Objection to form.

THE DEPONENT: Oh, I'll answer otherwise. It's autofictional. I mean in that sense of literary critique.

The form of the podcast is two male admirers engaged in the kind of continuing rediscovery of the virtues of the other, and their admiration for each other. And as history often describes it, you know, history is biography, you know.

So these are two men, almost creating the other, right. Kind of sculpting each other in realtime. In praise, admiration, and

occasional criticism.

But it's important to point out that this is still largely fictional imprints. Like, this is sort of aspirational. It's about, you know, encouragement of -- you know, about who the person could be. And that's part of its affection.

BY MR. ZERMAY:

Q Would it also be a friendship?

A What I'm describing is inclusive of that great friendship. And, in fact, a celebration of how strong this friendship is.

I think even later in the text I'm saying this is about one of the strongest friendships. I mean, I'm commemorating what is a great friendship. Concealed within what? I mean, yes, I'm using romantic terms. Concealed within an employment.

Look, the gun thing, the whole subject matter of the podcast is almost pretextual. These are two men who enjoy each other. They could be talking about guns, but they could easily just be talking about cars. They could just be easily talking anything, because they enjoy each other's company.

Sure, it's a friendship. It is a great friendship and a good example of how strong a friendship is, especially in the south with southern values where the treatment of, like, gay and queer identity is often only ever subtextual. You know, it never really comes to the surface. And this is my contribution and commemoration of that friendship.

Q Do you wish you had a friendship like Mr. Larosiere and John Elik?

A This is a beautiful friendship. And I would aspire, like, anyone else that listens to this podcast to such.

It's not without its dangers, right. But any good friendship I think should have that tool. Risks, you know. Oh, no. Are we going to lie to a federal judge? You know, it's kind of like Bonnie and Clyde.

Q Okay. So let's turn to paragraph 28, page number 28.

A This would be Exhibit 5?

Q Yeah.

A I'm there.

Q Okay. What is on page 28?

A This is a reproduction of a copyrighted

work from 2024 called My First Copyright.
Q Okay. Could you describe the images to me?
A It looks like one of those children's activity sheets that you can, like, color. And there's, like, games. There's, like, a maze. It seems to be made for children.
Q Who made this?
A I'm familiar with this work. A man named Pablo Diaz made it.
Q Did you ask Pablo Diaz to make it?
A Did I ask him to make it?
Q Yes.
A I don't recall asking him to make it, no.
Q Do you know how it came into existence?
MS. ZIBAS: Objection to form.
THE DEPONENT: Let's try it a different way.
BY MR. ZERMAY:
Q Do you know how this image came into existence?
MS. ZIBAS: Objection to form.
THE DEPONENT: This image? Listen, I see an image on this page; right?
MR. ZERMAY: Yeah.

THE DEPONENT: Do I know how this image came into existence? No.

BY MR. ZERMAY:

Q So could you describe your communication was Pablo Diaz related to the images on page 28 of Plaintiff's Exhibit 5?

MS. ZIBAS: Objection to form. It assumes facts.

BY MR. ZERMAY:

Q Did you have a conversation with Pablo Diaz about the images on page 28 of Plaintiff's Exhibit 5?

A About the images? I don't believe I had conversations with him about the images.

Q Did you communicate with him in written text regarding --

A Written texts?

Q -- these images?

A I don't recall if there is any writing about this work. This is what, '24?

I believe I spoke to him about it. I don't believe -- well, I just don't recall if I sent him any messages or had any written correspondence about it.

Q What do you recall your communications

with Pablo Diaz about these images?
A These images? I remember a very simple conversation. I was building a license, a gun CAD license, yeah. And I said it would be fun to have, like, an activity sheet to communicate, you know, kind of rudimentary and elementary what the thinking was in that license.
And our Pablo, at our designer of Defense Distributed, was largely left on his own to kind of create the -- I think I pointed to something like this on Amazon.com. And it seems to me that he basically just reproduced that.
Q Who is the toddler in the images?
A I have no idea.
Q Do you know if Pablo Diaz took a picture of a toddler?
A Do I know? I don't know. I think not.
Q Is there a reason why that the toddler is black?
A I can't assume that this is a black toddler. I don't assume that this is a black toddler.
Q Can you see the image of the toddler on page 28 of Plaintiff's Exhibit 5?
A I see, like, a baby's head, yeah. I would

guess this is a toddler. Yes, that's true. And to stereotype, sure. I think most people would see this toddler and think this is a black toddler.

Q Is there a reason why the toddler is black?

MS. ZIBAS: Objection to form.

THE DEPONENT: Yeah, I think I recall pointing to a similar worksheet on Amazon. This may be -- he might have just grabbed from that. There was no instructions of hey, put a black toddler on a worksheet.

BY MR. ZERMAY:

Q And do you see a cartoon image of a person with a beard with large eyebrows; do you see that?

A I know what you're referring to, yeah.

Q Is that intended to be a likeness of Matthew Larosiere?

A I couldn't say.

Q Does it resemble Matthew Larosiere to you?

A Only in a very crude way.

Q And what is the bundle of sticks with a -- it looks like an ax in it?

A It does look like that. I think that's associated with US Congress, or I think I remember

seeing that it in, like, the senate chambers or something.

Q Is it a fasces? Is that how you pronounce it?

A Your guess is as good as mine.

Q Who designed the crossword puzzle?

A I don't recall. I don't think it was designed by anyone. I think, if I remember, this might have been just been spit out from one of those, like -- I think you can do something like this online.

Q Do you know who spit it out online?

A Yeah. I'm pretty sure Pablo Diaz did this.

Q So you mentioned the guncad license previously?

A Yeah. This work is associated with that.

Q Okay. Could you go to page 23 of Plaintiff's Exhibit 5?

A I'm there.

Q Okay. Is that the guncad license which you referenced?

A Yeah, this is the one.

Q Who wrote the "About" section in this image?

A Let's see, you know, it reads like I wrote it, but I'm sure that I didn't put it in this description or put it on the web page.
Q It says, "In collaboration with PLA boy and the Gatalog, a radical fresh take on roomerized licenses. None of the bullshit legalese. Just simple English and the quiet satisfaction that you've definitely a hundred stopped someone from jacking your intellectual property. Remember free men do sometimes have to ask. Comes with activities."
Did you author those statements?
A I don't recall if I authored this or not.
Q Did you post this on DEFCAD.com?
A No, certainly not.
Q Who posted this on DEFCAD.com?
A Sitting here, I don't know. I could only guess.
Q Was this universal DEFCAD license created in tandem with the activity sheet that's on page 28?
A It's not a DEFCAD license.
Q A guncad license? Sorry.
A I'm not sure if it was created in tandem. I think it was created very close in time. I think

this license predates the activity sheet by some period.

Q So you're a pretty well-read guy; right?

A I don't know.

Q You like literature?

A Not particularly.

Q Okay. Are you familiar with authors like Sir Arthur Conan Doyle, Robert Louis Stevenson?

A Stevenson, yes. I don't think I've read much of Doyle.

Q Have you read the book Treasure Island?

A Yes, many times.

Q Do you recall what happens in the beginning of the book of Treasure Island?

A Sure.

Q What happens in the beginning of the book of Treasure Island?

A Jim Hawkins has a rough go and is thrown into a world of doubt and intrigue, and given to the custody of -- you know, he loses his family.

Is that the answer to your question?

Q Close. Can you tell me about the black spots in chapter three of Treasure Island?

A Chapter three? I think you need to present it to me in chapter three.

Q Okay.
A I would venture to tell you some about it.
Q Please.
A The black spot? In chapter three I think that's its introduction. It's its first presentation in the text.
Q Uh-huh.
A Who's the name of that sailor? It's the sailor staying at the end. I forget his name. But he gets it, and he seems awfully scared when he gets it. A blind old sailor gives it to him.
Q Okay. Could we go to Exhibit 5, page 8?
A I'm there.
Q So if you send somebody a black spot, does that mean that they're marked for death?
A No, not in my reading of the black spot.
Q What does it mean to you in the reading of the black spot?
MS. ZIBAS: Objection to form.
THE DEPONENT: I would like to answer. Well, you know, when they asked Long John Silver what a black spot is, he says it's a summons. That's what I would say the black spot means.
BY MR. ZERMAY:

Q Okay. What was your last interaction with John Elik?
A Gosh, I don't know if I recall.
Q If I could refresh your recollection could you go to -- let's see, page number 7, Plaintiff's Exhibit 5.
A I'm there.
Q Okay. Could you read those?
A It says, "Wilson email threat to Elik," under the title called "Threats." Would you like me to read?
Q Yes, please.
A "Friday, September 6."
Well, I suppose I could just read it quietly or would you like for me to read it for the record?
Q Well, if you could read it for the record, that would be great.
A Yeah, I can't always be great.
Is there a section you want me to read for the record?
Q Just from the bottom up.
A Okay. We're going to be reading. I'll do it just for you.
"On Monday August 5, 2019 at 8:15 p.m.

Ivanthetrol@protonmail.com wrote: If it's at all possible I prefer avoiding that. At least just because I'm unfamiliar with what that info will be used for, and who exactly will have it. But if it comes down to being absolutely necessary and something, I could punch fake info into, then I'll do it, provided I can be assured about the privacy/security."

Sent from ProtoMail Mobile.

And would you like me to continue?

Q Yes, please.

A "On August 5, 2019, 8:22 p.m." Mere minutes later Cody Wilson, crw@defdist.org wrote, "These are the standard forms for how you get merchant ID's through organizations that process credit cards.

Maybe I've misjudged the personal risk involved of payout and USD of any kind through DEFCAD would require at least payoneer or US bank account information. If you want to buy bitcoin only you can maintain your privacy in total. You don't need to fill out the same forms.

I'm looking for someone who will help us pilot the merchant bank side of stuff, though. Do you know someone active who you'd recommend?"

And then my initials are there.
Shall I continue?
Q Yes, please.
A On Monday August 5, 2019, 8:25, Ivanthetroll@protonmail.com wrote, "I'm just concerned who ends up having my info. If it wouldn't end up being Googeable that would be good. If it wouldn't prevent me from holding a security clearance, even better."
Sent from ProtoMail mobile.
Finally, Friday, September 6, 2024, 9:25 p.m. Cody Wilson, crw@defdist.org wrote: "I wouldn't worry about it."
Signed with my initials.
Q Why did you reply to that email chain years after Mr. Elik sent you the August 5th, 2025 email with, "I wouldn't worry about it"?
A Mr. Elik had been concerned in our exchanges about whether his personal information would be public or Googleable, if you will.
He had also been concerned that he could no longer hold a security clearance with the United States Government. And I said you probably shouldn't worry about it. Anyway.
Q Why did you say that?

A This was occasioned upon his decision to prosecute a lawsuit against me. This makes your information Googleable. It also encourages prosecution from Government. And probably he can no longer hold a security clearance.

Q So you were being ironic?

A I would say there's an element of humor here.

Q Okay.

A I think it's kind of unfair to label that a threat. Telling the guy to relax, I don't think that's very threatening.

Q What about the -- did you send him a black spot?

A Did I send him a black spot?

MS. ZIBAS: Objection to form.

THE DEPONENT: Did I send him a black spot? It's hard for me to answer.

BY MR. ZERMAY:

Q Reflect your recollection by turning to page 8 of Plaintiff's Exhibit 5.

A Yeah, I'm on page 8.

Q Page 8, yes.

A Page 8, I see the black spot. Everything in this image I have a memory of.

I remember mailing this book with this bookmark. I can't say for sure it was on this chapter. It feels like it was, because of the reference to style. And again, all in good humor. I thought the book would do him a better service than his legal representation.

Q Okay. Let's go to page number 27. Let me know when you've read it?

A 27, the same exhibit. I've read it.

Q I'm sorry, I meant 29.

A Okay. One moment. Nice. Okay. Hold on. I'm there. Do you want me to read it?

Q Yes.

A Uh-huh, uh-huh, uh-huh. All right. I've read it.

Q Did you -- so would you classify this as a newsletter or a blog post?

A As I see this it seems to be a snapshot from our newsletter.

Q Did you draft the newsletter?

A I did not draft this newsletter, but I wrote -- well, I think I rewrote most of this section.

Q Okay. So what did you mean in this newsletter? Why did you cause this newsletter to be

published?

MS. ZIBAS: Objection to form.

THE DEPONENT: Again, we mentioned the newsletters earlier. The newsletters are not caused to be published, though, they're usually scheduled.

BY MR. ZERMAY:

Q Okay. Did you schedule this newsletter to be published?

A I didn't schedule it, no.

Q But you edited the text which constituted the newsletter; right?

A I edited the text I see on this page. I recall editing this text.

Q So you partook in writing this; right?

A I think that's fair. Yeah, I think I did.

Q Why did you write this?

A Why did I write this? To share news about important lawsuits in our market, in our space.

Q You write in here that, "Day two will be about why they deleted " -- that's italicized, "the evidence they didn't fabricate."

What is your factual basis for your contention that evidence was deleted?

A Oh, gosh.

MS. ZIBAS: Objection. Asked and answered. Form.

THE DEPONENT: We have gone through this. That's true.

MS. ZIBAS: Uh-huh. Earlier today, hour one.

THE DEPONENT: My answers are largely the same.

BY MR. ZERMAY:

Q Okay. Let's move onto page number 30.

THE VIDEOGRAPHER: You wanted me to give you a 20-minute warning.

MR. ZERMAY: Okay. Thank you.

BY MR. ZERMAY:

Q Could you read this?

A Yes. The entire thing?

Q Yeah.

A Okay. I've read it.

Q Okay. Did you edit this newsletter?

A Let's see, I don't have memory of editing this. Although I believe the final section of text was my exclusive contribution.

Q Okay. Did you write the phrase quote, "A Florida Federal Court has just become the nation's instrument for discovering the details, identities,

and the even greater mysteries of America's 3D2A underground," end quote?

A I'm sorry, I'm going back to this. Yes, yes, I did write that part.

Q Okay. What did you mean by the phrase, "The Florida federal court became the nation's instrument for discovering the details of America's 3D2A underground"?

A The RICO act allows civil parties to prosecute, not just the case, but to conduct their own investigation.

So the RICO Act allows you to actually be the investigator and the prosecutor of your own case. So the Court is the vehicle through I guess the instrument which is more appropriately, like, the RICO Act. But, you know, I'm just kind of writing off-the-cuff here.

Q So prior to this litigation being filed did you file a bar complaint against Matthew Larosiere prior to this litigation?

A Yes.

Q Why did you file a Bar complaint against Matthew Larosiere?

A Only to alert the Florida Bar of his unprofessional conduct.

Q Did you send that -- for references, this is Plaintiff's Exhibit 5, page 11.
You sent it from the email address CRW@DEFCAD.com, right?
A No, I mailed it.
Q You list your email address at CRW@DEFCAD.com, though?
A I see that I've done that here.
Q You've testified earlier that you have the email address CRW@DEFCAD.org, but not CRW@DEFCAD.com?
MS. ZIBAS: Objection to form. It's DEFDST.org.
THE DEPONENT: That wasn't my testimony.
BY MR. ZERMAY:
Q Do you have access to the website CRW@DEFCAD.com?
A There's no website by that name.
Q You list that as your email address, though; right?
A You mean do I have access to the email?
Q Yes.
A Yes, I do, because I have access to that email.
Q Is that a work email of yours?

A Yes.

Q Why did you list your work email on the Bar complaint that you filed against Matthew Larosiere?

A I think that's a good question. It must be that I thought the Plaintiff's behavior was related to my work.

Q You could have listed the organization beneath your name? You see that on the form; right?

A Oh, I do see a space for "organization."

Q Why didn't you list an organization, like DEFCAD, Defense Distributed, DD --

A Oh, you have to understand I don't know how Bar complaints work. But in the course of running this Bar complaint, I got in with a good Bar complaint firm in Florida. And for the next one I will list the organization.

Q Without telling me what you said to your attorneys, who did you retain?

A Smith Tozian.

Q Could you spell that?

A S-M-I-T-H, T-O-Z-I-A-N.

Q Do you know their address?

A No. But it's in communications that we have already provided in discovery.

Q Are they a Florida law firm?
A They are.
Q What part of Florida are they in?
A South Florida.
Q Miami?
A I don't recall.
Q Are you familiar with a settlement communication that we've provided to your attorneys during the course of this litigation?
A I'm familiar with one such communication.
Q Do you know that we've provided a copy to -- a physical copy directly to the Attorneys Leia Leitner and Amaris Gyebi?
A No, I'm unaware of it.
Q How did you receive a copy of that settlement communication?
A I recall receiving it by email.
Q Do you know that the settlement communication got published on DEFCAD.com?
A Do I know it?
Q Yeah.
A I have knowledge of the publication.
Q Do you know how that got published on DEFCAD.com?
A Not exactly.

Q Did you publish it on DEFCAD.com?
A Certainly not.
Q Who did you give the settlement communication to?
A Who did I give it to?
Q Yeah.
A You know, I thought about who would have it, and I suppose -- well, I would have to suppose, so I guess I can't guess.
Q So you don't know who you gave the settlement communication to?
A Sitting here right here I can't say for sure.
Q Could you figure out who you gave the settlement communication to?
A I believe I could. There may be a record of that. It was a digital file.
Q Were you surprised to see the settlement communication ended up on DEFCAD.com?
A Yeah, I was. I was surprised to see the communication about it.
Q Did you take any disciplinary action against any employee that may have published this settlement communication on DEFCAD.com?
A Disciplinary action? I have made sure

that everyone involved at DEFCAD and Defense Distributor has not mishandled documents, and looks for whether a document is marked confidential, whether a document is addressed to me, addressed to Defense Distributed.

Was that disciplinary in nature? I don't know. Probably not.

Q How did those communications with the DEFCAD employees occur?

A We have regular meetings on Wednesdays. I communicate about, you know, some updates in the lawsuit or some, you know, moments that the lawsuit kind of occasioned, right. I communicated about them there.

Q Do you have meeting minutes?

A Minutes of those meetings?

Q Yes.

A No, no. We don't keep minutes of those meetings. This is a weekly, like, standup kind of meeting kind of like a huddle.

Q Do you have calendar invites for those calendar invites?

A No, no, there's no calendar invites.

Q How do these meetings occur?

A They are in person often. If someone

can't join, they may be remoted in by phone. The host of the meeting is always in person.

Q Who attends those meetings?

A The meetings are attended by Tom Odom, Elizabeth Everett. Again, the meetings have changed over the years. I think you mean right now who's attending the meetings this year?

Q Yeah, from 2021 to 2025 who attended the meetings?

A It's changed a lot. In fact, I can't swear that we've had weekly meetings in 2021. But I was trying to characterize the recent meetings and how I communicated about recent things, like, this lawsuit. That happens in these weekly meetings which are hosted in person.

Q You say if the people cannot appear in person they get remoted in. What is -- do you Zoom to remote people in?

A We Zoom. You know, Tom will remote Pablo in, for example. I think Tom may use -- he has an iPhone. I think he just phones them in. It's not Zoom. We don't have, like, a DEFCAD Zoom account, if that's what you mean.

Q Do you have a conference call number?

A No, DEFCAD does not. Have we done Zoom?

I think Defense Distributed has a Zoom account and does Zoom meetings on occasion.

Q So would you be able to obtain those records regarding the Zoom meetings?

A Would I personally be able to obtain them?

MS. ZIBAS: Objection to form. Go ahead and answer.

THE DEPONENT: Well, surely some of those records would be by -- you know, an email or by Slack. And so yeah, I guess.

BY MR. ZERMAY:

Q Who is Guard Denver?

A I've asked myself the same question. To the best of my knowledge Guard Denver is a pseudonym for John Elik.

Q And when I say Guard Denver, I'm sort of backtracking in the context of the Bar complaint.

Do you think Guard Denver is John Elik?

A I now have reason to believe it is John Elik.

Q What is your reason to believe that Guard Denver is John Elik?

A John Elik was posting on Reddit as Guard Denver and messaging people related to this lawsuit

as Guard Denver.

Q So in the Bar complaint Guard Denver's emails were forwarded to you, and you censored the intermediate forwarding email?

A Yes.

Q Why did you censor the intermediate forwarding email?

A He was a lawyer.

Q With that law firm that you referred to earlier?

A No, a different lawyer.

Q Who was the lawyer?

A David Simms.

Q Who is David Simms?

A An attorney in Florida who I've worked with in Florida for some years.

Q Do you know his address?

A Not off the top of my head, no.

Q Do you know his Bar number?

A No, I don't.

Q Do you know his telephone number?

A I don't know it. I can find it.

Q Okay. So you redacted David Simms' email?

A I believe that was the redaction in that

document.

Q So I'd like to go to --

MS. GYEBI: Madam court reporter, what time do you have, for the record?

THE COURT REPORTER: 6:15.

MS. GYEBI: Oh, six hours and 15 minutes?

THE COURT REPORTER: I don't know what --

THE VIDEOGRAPHER: We're on the record for six hours and 55 minutes.

MR. ZERMAY: Okay. We have five minutes.

BY MR. ZERMAY:

Q So I'd like to go to the Plaintiff's Exhibit 5, page 47.

A Oh, it's at the end. Sure.

Q Do you see a message from A. Zinoviev? Is that it?

A Yes.

Q Okay. What does that say there?

A A. Zinoviev, November 25th, 2024, at 3:50 p.m. It seems to be a message from Slack, it's so titled. The message is: "Where we talk about their registrations, we accuse them of fraud."

Q Okay. Is that your user name?

A Yes.

Q Did you send that message?

A Hum? I can only assume that I sent this message. It doesn't look like it was a message to me. It looks like it was a message that I sent.

Q Okay. What did you mean by, "Where we talk about the registrations, we accuse them of fraud"?

A I guess it's hard to tell isolated like this. It's difficult for me to suppose.

Q Did you send this message before you saw any of Matthew Larosiere's -- a copy of registrations?

A Well, this message is from November, late November of '24, so I would have been served with his lawsuit by then. So therefore, I would have seen his registration before I sent it.

Q Would you have said this before you saw the transfer in employment agreements between John Elik and Matthew Larosiere?

A Okay. Hold on. The question is: Would I have said this?

Q Yes.

A I don't know if I would have said it, but I would have believed it. I've believed it forever, before this lawsuit was even filed.

The agreements are phony. There is no

employment agreement. It has no legal reality. No commercial reality. It's a fraud. It's fake. Fake lawsuit, fake lawyers, fake agreements, fake file, fake copy.

Q So you believe that there was fraud from the very beginning?

A Yes. And I made such representations.

Q And that's -- and when you refer to fake lawsuits and fake lawyers, I guess -- let's take it piece by piece.

What to you mean by fake lawsuits?

A Lawsuits brought without evidence, without real plaintiffs, without real claims, without real damages. Fake all the way through.

Q Okay. What do you mean by fake lawyers?

A Even the property at issue is fake, and insubstantial and without commercial reality. It is so fake there are fake levels of how fake it is. Even the news about it is fake. It is a cake of fraud.

Q Are the works that you're calling fake, are they still on DEFCAD.com?

A The works? The works are defined so broadly in this lawsuit. As I understand it almost

all of the works are no longer available for access on DEFCAD.

Q The Amigo Grande is no longer, their works is no longer available on DEFCAD.com?

A The works of Amigo Grande, as described as believe literary works, photographic works, and other visual works, including the models.

I think only models are available for download on DEFCAD.com.

Q Is the HitchHiker works still available on DEFCAD.com?

A The HitchHiker works, as I've been educated today, includes 63 photographic works, which may include the models. Hell if I know. And two literary works. I believe only the models are included.

For the record I'll say before the five minutes are up: The value contributed by DEFCAD, created by DEFCAD, it's in access to the files. It is not in the images or the files, themselves. We don't ask people to pay money to download the images or the models. The value goes toward providing access, information, organization of that information.

Q So why didn't you just stop publishing

them when you were sued?
A Because you don't have copyrighted models. And it's upon important question of law to settle so that people in this community stop trying to use it as a caudle and create fake lawsuits for fake property.
This bridge has to be crossed. It might as well be crossed with this Plaintiff and this attorney for a vendable buzz or something. It's an important question of law.
Q When you say, "With this attorney," are you referring to me?
A I am.
MS. GYEBI: Counsel, we have run out of time. We've hit seven hours.
BY MR. ZERMAY:
Q Well, am I a fake lawyer?
A I don't know you, man.
MS. GYEBI: I think we can go off record.
MS. ZIBAS: I think we can go off record.
MR. LAROSIERE: I don't know you, dude. I did see you at that hearing on ChatGPt. You've got me wondering.
MS. ZIBAS: Yes.
THE VIDEOGRAPHER: We're going off the

record. The time is 6:22 p.m.

(THEREUPON, this video deposition concluded at 6:22. The reading and signing of the transcript was not waived.)

REPORTER'S CERTIFICATE

STATE OF FLORIDA )
COUNTY OF SARASOTA )

I, KARIN J. STRAUSS, Court Reporter, certify that I was authorized to and did stenographically report the foregoing Deposition of CODY WILSON and was requested, and that the foregoing transcript, pages 1-301 are a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 22nd day of March, 2026.

Karin J Strauss

KARIN J. STRAUSS, Court Reporter

C E R T I F I C A T E

STATE OF FLORIDA )
COUNTY OF SARASOTA )

I, the undersigned authority, certify that CODY WILSON was before me, and was duly sworn in on March 17, 2026.

WITNESS my hand and official seal this 22nd day of March, 2026.

KARIN J. STRAUSS, Court Reporter
Notary Public - State of Florida
My commission # HH 702791
Expires: 8/31/2029

ERRATA SHEET - CODY WILSON

Please read the original transcript of your deposition and make note of any errors in transcription on this page. DO NOT MARK ON THE TRANSCRIPT ITSELF. Please sign and date this sheet and sign the transcript below.

PAGE/LINE CHANGE

____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________

I have read the original transcript, and except for the changes noted above, I subscribe to the transcript as an accurate record of the statements made by me.

______________________________ ____________

Signature Date

March 22, 2026

CODY WILSON c/o
Jura Christine Zibas, Esquire
Wilson Elser
2063 Main Street
Suite 100
Sarasota, Florida 34237

Re: Larosiere v Wilson

Dear Mr. Wilson,

Please take notice that on March 17, 2026, you gave your deposition in the above cause. At that time you did not waive your signature. The transcript is now available for your review.

Please complete your review of the transcript and execute the Errata Sheet, which can be found at the back of the transcript before this letter. To make this process easier, you will have to print this Errata Sheet and fill it in and sign and date it. Once completed, please email back the Errata Sheet to Ms. Zibas and Mr. Zermay for attachment.

Thank you for your cooperation,

Karin J. Strauss, Sarasota Court Reporter